**E-FILED**
Monday, 04 April, 2011  09:51:16 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1

120110jk[1]

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF ILLINOIS
 3
 4   NORMAN OETH, JR.,
 5        Plaintiff,
 6        vs.                      09 CV 1407
 7   KNOX COUNTY, et al.,
 8        Defendants.
 9
10        THE DEPOSITION of NORMAN OETH, called as a
11   witness by the Defendants in the above entitled
12   cause, taken before me, Deanna S. Gabbert, CSR,
13   License #084-002929, a Notary Public in and for
14   the County of Peoria and State of Illinois, at
15   2101 Windish Drive, in the City of Galesburg,
16   County of Knox and State of Illinois, on the
17   1st day of December, A.D., 2010.
18
19
20
21
22
23
```

2

```
 1
 2   APPEARANCES:
 3
 4   LAW OFFICES OF LAWRENCE V. JACKOWIAK
     20 North Clark Street - Suite 1700
     Chicago, IL 60602
```

120110jk[1]

```
 5   312.795.9595
     By: Louis J. Meyer, Esq.
 6         For Norman Oeth

 7   O'HALLORAN KOSOFF GEITNER & COOK
     Edens Corporate Center
 8   Fourth Floor
     650 Dundee Road
 9   Northbrook, IL 60062
     847.291.0200
10   bfunk@okgc.com
     By:  Brian M. Funk, Esq.
11         For Knox County, Dave Clague, Brad
            Abernathy and Jason Morton
12
     JAMES M. KELLY, ESQ.
13   Attorney at Law
     4801 North Prospect Road
14   Peoria Heights, IL 61616
           For the City of Galesburg and
15         Michael Ingles

16   ALSO PRESENT:
     Dave Caslin
17   Jason Morton
     Brad Abernathy
18

19

20

21

22

23
```

3

```
 1                   ********

 2

 3                  I N D E X

 4   Examination by:
           Mr. Kelly             4
 5         Mr. Funk             84
           Mr. Kelly           111
 6         Mr. Funk            128
           Mr. Meyer           134
 7

 8          (No exhibits marked.)

 9

10

11
```

Page 2

120110jk[1]

```
12
13
14
15
16
17
18
19
20
21
22
23
```
                                                                4

```
 1
 2              NORMAN OETH, JR.,
        being first duly sworn, deposes and says as
 3      follows, in answer to:
 4      EXAMINATION BY MR. KELLY:
 5  Q.  Sir, please state your name for the record.
 6  A.  Norman Oeth, Junior.
 7  Q.  The court reporter is going to be taking down
 8      everything we are saying.  So it has -- it's
 9      important that you wait until I'm done talking
10      and I do the same and that you give verbal
11      answers, okay?
12  A.  Yes.
13  Q.  Yes?
14  A.  Yes.
15  Q.  And is there any reason today that you cannot
16      give complete and accurate answers?
17  A.  No.
```

120110jk[1]

18  Q.  Are you under the influence of any alcohol

19      today?

20  A.  No.

21  Q.  Are you under the influence of any drugs --

22  A.  No.

23  Q.  -- prescription or otherwise today that would

                                                    5

1       prevent you from giving complete and accurate

2       answers?

3  A.   No.

4  Q.   At any time during this deposition that you

5       need to take a break, just let me know, and we

6       will let you take a break.

7            We will just have you finish your answer,

8       and then feel free to do that.  So if there is

9       any time you need to do that, let me know so

10      that you don't feel like you are under duress

11      or can't give a full or complete answer, okay?

12  A.  Yes.

13  Q.  If at any time during the deposition, I ask you

14      a question that you don't understand, I want

15      you to -- I don't want you to answer it.

16           I want you to tell me you don't understand

17      so that I can clarify it so that I know you

18      have given me a complete answer -- an accurate

19      answer to the question I want, okay?

20  A.  Yes.

21  Q.  Yes?

22  A.  Yes.

23  Q.  If at any time during this deposition you need

                                                    6

120110jk[1]

```
 1      to clarify a previous answer, stop me, tell me,
 2      and we will get it on the record, okay?
 3  A.  Yes.
 4  Q.  If there is anything that you want to help you
 5      in giving an answer -- a document, a picture, a
 6      photograph, anything like that that would allow
 7      you to give the most complete and accurate
 8      answer, let us know that, okay?
 9  A.  Yes.
10  Q.  What did you do to prepare for today's
11      deposition?
12          I don't want you to tell me any discussion
13      you had with your attorney; but what, if
14      anything, did you review or documents you
15      looked at in preparation for this deposition?
16  A.  I reviewed the tapes from the jail and the
17      documents that we looked over.
18  Q.  Okay.  That's what I want you to do.
19          I want you to outline for me the documents
20      that you looked over prior to this deposition.
21  A.  The documents were the statements that my
22      attorney and me took from an earlier point.  I
23      don't remember the date.
```

                                                    7

```
 1          MR. MEYER:  Interrogatory answers.
 2          MR. KELLY:  Okay.
 3  BY MR. KELLY:
 4  Q.  Your interrogatory answers?
 5  A.  Yes.
```

120110jk[1]

6  Q.  When did you look at those?

7  A.  Just right before coming in here.

8  Q.  This morning?

9  A.  Yes.

10  Q.  What other documents did you look at?

11  A.  Just the video.

12  Q.  All right.  What -- when did you look at the

13      video?

14  A.  Just right before coming -- before everybody

15      came in.

16  Q.  Had you ever seen that video before?

17  A.  No.

18  Q.  Is that the video of you at the Galesburg

19      Community Center, or is that at the Knox County

20      jail?

21  A.  Both video.

22  Q.  And do you agree that you are the person in

23      addition to the officers that are shown in both

                                                    8

1       of those videos?

2  A.  Yes.

3          MR. KELLY:  Can we have the stipulation we

4       are talking about the two videos disclosed in

5       discovery?

6          MR. MEYER:  Yes.  Same videos.

7  BY MR. KELLY:

8  Q.  Now, on the night of March 5th, 2009, you were

9       arrested by the Galesburg Police Department,

10      correct?

11  A.  Yes.

12  Q.  And do you remember the night of the traffic

                    Page 6

120110jk[1]

13     stop?

14  A.  Yes.

15  Q.  And were you upset that you were stopped by the

16      Galesburg Police Department?

17  A.  Not that I was stopped; but I was angry that --

18      I felt that they had -- during the stop, they

19      had searched my vehicle in an improper way.

20  Q.  Tell me, in your opinion, why you felt they

21      searched your vehicle in an improper way.

22  A.  The traffic stop was just a simple rear license

23      plate, and the officer jumped in my vehicle and

                                                          9

1      searched my vehicle and grabbed something that

2      he said could be used as a weapon, but it was a

3      tool we use for work.

4   Q.  Well, the officer -- do you know the name of

5      the officer you say jumped into your vehicle?

6   A.  I don't recall the name.

7   Q.  Were you told why you were arrested?

8   A.  No.  During the traffic stop, me and Mr. Ingles

9      were kind of playing a guessing game with my

10      name.  He didn't want me to tell him.  He knew

11      a name they call me by, Junior, but he was

12      trying to guess my real name, and I was going

13      to reach in and grab my I.D. and show it to

14      him, and he told me, wait, and he wanted to

15      play a guessing game until he got it.  Because

16      me and Mike had known each other for a long

17      time, but he couldn't remember my real name,

18      but he remembered the name that I go by.

120110jk[1]

19  Q.  So Officer Ingles is standing at the driver's
20      side door?
21  A.  Yes, and the driver's side door is open, and
22      I'm standing in the threshold of the door
23      talking to Ingles.

                                                    10

1   Q.  And the other -- you reached inside of the car
2       to get your --
3   A.  No, I told him I would reach in and grab my
4       wallet so he could have the I.D. so he would
5       have the correct name, and he tells me, no,
6       wait a minute, and he plays like a guessing
7       game with my name.
8   Q.  You were okay with playing this game with
9       Ingles?
10  A.  Sure.  I went with it, yeah.
11  Q.  There was another officer with Ingles?
12  A.  Yes.
13  Q.  Do you recall -- know his name?
14  A.  I don't recall his name.
15  Q.  Did he go to the passenger side window when
16      Ingles was talking to you during this guessing
17      game?
18  A.  Yes.
19  Q.  And when you reached into the --
20  A.  I never --
21  Q.  -- vehicle -- let me finish my question.
22      That's what I explained to you.  She can't take
23      us both down talking.  It's impossible for her.

                                                    11

120110jk[1]

1    She has a hard job.  She has to sit through

2    this long deposition to try to get everything

3    down, okay?

4  A.  (The witness nodded his head.)

5  Q.  When you reached back into your vehicle to get

6    your identification, did the other officer then

7    open the door?

8      MR. MEYER:  Objection.  Misstates his

9    prior testimony.  You can answer.

10      THE WITNESS:  I never reached into the

11    vehicle.  Mike Ingles told me not to reach into

12    the vehicle and grab my I.D.

13  BY MR. KELLY:

14  Q.  At some point, did the other officer open the

15    other side door?

16  A.  Yes, and jumped in the vehicle.

17  Q.  And did he -- did you see him grab anything out

18    of the vehicle?

19  A.  He starts rummaging through the vehicle.

20  Q.  Well, you have already told us that you had in

21    plain view a thumper that you thumped semi

22    tractor tires with, correct?

23  A.  Yeah, and --

                                              12

1  Q.  Just yes.

2  A.  Yes.

3  Q.  That is in plain view on the seat of your

4    vehicle, correct?

5  A.  It's not in plain view.

6  Q.  Where is it?

                  Page 9

120110jk[1]

7  A.  It's tucked in between the seats, under the

8      seat with like a GPS monitor, a few other

9      things, like a miniature coffee pot that you

10     use to boil water in the semi.  They are all

11     shoved like in between the console and the seat

12     together.

13 Q.  What kind of a vehicle was this?

14 A.  This is like an SUV.

15 Q.  And are you talking the console between the

16     passenger and driver side seats?

17 A.  Yeah, it's like the lid of the console was

18     ripped off.  They were all in -- in that

19     section in between the seat.

20 Q.  Were they actually in the console?

21 A.  Yeah, and beside the console.  Kind of

22     overflowing out of the thing.

23 Q.  And the thumper, are you saying that you could

                                                    13

1      not see that if you looked into your vehicle?

2  A.  You couldn't see that.

3  Q.  Why could you not see it if there was --

4  A.  I had a --

5  Q.  Sir, sir, sir, we are not going to keep doing

6      this.  You have got to let me finish, all

7      right.

8          Why, in your opinion, could you not see

9      the thumper if you had no top on this console?

10 A.  I had a Carhart jacket sitting between me with

11     my wallet in it.

12 Q.  Are you saying the Carhart jacket was covering

13     up the thumper?

                  Page 10

120110jk[1]

14  A.  It was covering the little center console.

15  Q.  When you were stopped, you were -- had an open

16      can of alcohol -- or open container of alcohol

17      in your car, correct?

18  A.  Yes, there was.

19  Q.  And where was that located?

20  A.  I think behind the -- behind the driver --

21      passenger seat, I believe, or under the

22      driver -- passenger seat, I believe.

23  Q.  Say that again.

                                                    14


 1  A.  I can't -- I was in the squad car.  From what I

 2      read in the report, it was either under the

 3      seat or behind the seat.  I can't remember.

 4  Q.  Let's back up a step.

 5          Do you recall the events of the night of

 6      March 5th, '09?

 7  A.  Yes.

 8  Q.  Do you have any independent recollection of

 9      those events?

10  A.  Yes.

11  Q.  Why would you need to refer to some report

12      about this question then?

13  A.  Because I don't think I left the bottle in

14      there.  I think I was with a friend prior to

15      the traffic stop, and we were working on the

16      vehicle doing some minor welding on the

17      vehicle, and I think maybe he left it in there

18      during this time period that we worked on the

19      vehicle right before.

Page 11

120110jk[1]

20  Q.  So you do not know as you sit here today where

21      the bottle of open liquor was in your vehicle?

22  A.  I never seen the bottle of open liquor in the

23      vehicle.  I was in a squad car during the time

                              15

1      that they say they found it.

2  Q.  Listen to my question.

3         As you sit here today, you do not have any

4      personal knowledge as to where the bottle of

5      open liquor was in your car on March 5th, 2009?

6  A.  No, no, no.

7  Q.  Now, at -- after Officer Ingles told you not to

8      reach into the car, what happened next?

9  A.  After he got my name or the officer jumped in

10      and grabbed the tool that is used for checking

11      semi tires -- air pressure in semi tires and

12      thought it was a weapon and we have a dispute,

13      at that time, Mike Ingles asked me to sit in

14      the car, and I sit in the car uncuffed during

15      the rest of the traffic stop.

16  Q.  When you say we have a dispute, tell me what

17      you mean by that.

18  A.  I asked him why he got in the vehicle without

19      me giving him my permission.

20  Q.  At that point, you were angry with the

21      officers, correct?

22  A.  Not angry but disappointed that they -- you

23      could say angry, yeah.

                              16

1  Q.  You wanted to -- you wanted to -- you know, you

120110jk[1]

2    wanted to fight this other officer, didn't you?

3  A.  There was never nothing mentioned at that time.

4    There was never nothing at that point.

5  Q.  You did not threaten this officer -- the -- not

6    Ingles, but the other officer at the scene for

7    taking your tire thumper?

8  A.  Not that I recall.

9  Q.  Do you not have a -- do you think that's

10    something that could have happened?

11    MR. MEYER:  Objection, speculation.  He

12    answered he couldn't recall.  You can answer.

13    BY MR. KELLY:

14  Q.  I don't want you to -- when we are in front of

15    a jury, I don't want you to come in later and

16    tell me a bunch of facts about this.

17    MR. MEYER:  Then, you impeach him with the

18    transcript.  Says, he can't recall.

19    MR. KELLY:  Let me finish my question.  I

20    don't want you to come in later in front of a

21    jury and say something different.  So I want to

22    make sure I'm clear on this.

23    MR. MEYER:  That's not even a question.

17

1    Ask him a question, and he'll answer the

2    question.

3    BY MR. KELLY:

4  Q.  Do you remember threatening the officer at the

5    scene about the tire thumper?

6  A.  No.

7  Q.  So if the officer says that you did threaten

Page 13

120110jk[1]

```
 8    him, you would have no basis to say he is
 9    wrong?
10         MR. MEYER:  Objection, speculation,
11    incomplete hypothetical.  You can answer if you
12    can answer.
13         THE WITNESS:  I don't have an answer.
14    BY MR. KELLY:
15 Q. You have to give an answer.
16         Do you have any reason -- do you have any
17    reason to disagree with that statement that the
18    officer said that you threatened him at the
19    scene for taking his tire thumper?
20 A. There was no threats at the scene at the
21    traffic stop.  There was no mention or anything
22    of a fight or threatening or anything at the
23    scene of the traffic stop.  I was in the car
```

                                                    18

```
 1    during the time.
 2 Q. Did you call him a pussy?
 3 A. No.
 4 Q. Did you tell him you were going to kick his
 5    ass?
 6         MR. MEYER:  At what point?
 7    BY MR. KELLY:
 8 Q. When you're at the car.
 9 A. Not at that point.
10 Q. At the truck before -- at the scene, before you
11    were put in the car, did you call him a pussy?
12 A. No.  There was nothing -- no fighting or
13    conversation between me and him like that at
14    all at the scene.  Now, there was a dispute
```
                         Page 14

120110jk[1]

15      later on at the public safety building.

16  Q.  And that's the one that we have on camera?

17  A.  Yeah.

18  Q.  But you are saying none of that happened?

19  A.  At the scene.

20  Q.  Back at the scene?

21  A.  No.  I was in the car.

22  Q.  Now, on the ride from the scene, you went then

23      to the Galesburg Community Center?

19

1   A.  Yes.

2   Q.  And on the ride to the Galesburg Community

3       Center, did you tell Officer Ingles that you

4       were not going to cooperate with him?

5   A.  No.

6   Q.  Did you tell Officer Ingles that you were not

7       going to do shit for him?

8   A.  No.

9   Q.  Did you threaten to kick his ass on the ride to

10      the Community Center?

11  A.  Not at all.

12  Q.  Now, when you got to the Galesburg Community

13      Center, you were able to watch the video of

14      your conduct once you were in the booking area,

15      correct?

16  A.  Correct.

17  Q.  And would you agree that that's an accurate

18      representation of your conduct during -- at the

19      booking area?

20  A.  I don't understand.

120110jk[1]

21  Q.  Well, in other words, you don't think that they

22      distorted the film or they altered the audio or

23      anything like that?

20

1   A.  No.  No.

2   Q.  You would agree that's an accurate portrayal of

3       what happened in that booking area that is

4       contained on that video?

5   A.  Correct.

6   Q.  You would agree with me when you were in the

7       booking area there, you threatened to kick the

8       officer's ass, correct?

9   A.  I would say we were doing more joking and

10      playing at that point -- me and Ingles.  Me and

11      Ingles have known each other for a long period

12      of time.  None of it was serious.  We were

13      joking.

14  Q.  When the officers ordered you to be handcuffed,

15      you recall that from the video?

16  A.  Yes.

17  Q.  And you would agree with me that you didn't

18      follow their order to be handcuffed?

19  A.  I did follow the order to be handcuffed.

20  Q.  Do you recall backing away when they were

21      trying to handcuff you?

22  A.  No.

23  Q.  Do you recall that you were moving your hands

21

1       and tensing up so they couldn't put handcuffs

2       on you?

Page 16

120110jk[1]

3   A.   No.

4   Q.   Do you recall that it took a second officer to

5        handcuff you to take you out of the Galesburg

6        Community Center?

7   A.   I remember the second officer coming up because

8        I couldn't get my hands behind my back, at one

9        point, and he come up and kind of disputed me

10       that I needed two pair of cuffs because of my

11       size issue, and they were disputing where they

12       were going to put the handcuffs.

13  Q.   Explain to me why you could not get your hands

14       behind your back when they wanted to handcuff

15       you.

16  A.   Usually, when I'm handcuffed by Knox County,

17       they use two pair of cuffs because my wrists

18       can't meet together to get one set of cuffs on

19       behind my back, and we were discussing whether

20       to cuff me in the front or to use two pairs of

21       cuffs to put them across my back.

22  Q.   When you were leaving the Galesburg Community

23       Center, you were discussing with the officers

                                                        22


1        whether to cuff you in the front or the back?

2   A.   Yes.

3   Q.   Are you unable to put your hands together

4        behind your back?

5   A.   No.

6   Q.   That was a poorly worded question.

7            Are you unable to put your hands together

8        behind your back?

                    Page 17

120110jk[1]

9   A.   Not my wrists close enough together.  I can

10       touch my fingertips together behind my back.

11  Q.   Is there a physical reason why you can't?

12  A.   At that time, it was just my size.

13  Q.   And from the Galesburg Community Center, you

14       were then taken to the Knox County jail?

15  A.   Correct.

16  Q.   At the Knox County jail, you were ordered to

17       get out of the police car, correct?

18  A.   Yes.

19  Q.   And you would not follow the order, correct?

20  A.   No.  Due to my size, when I went in the police

21       car, I was kind of laying across the seat, and

22       he put me in on the passenger side, leaving the

23       Community Center in the basement, and then at

                                                      23


1        the jail, he wanted me to come back out the

2        door.  I told him it was easier for me to crawl

3        right back out the other side because I

4        couldn't go backwards, which the squad car is

5        narrow; and once I crawled in, I couldn't sit

6        in the seat, as the normal seat.  I had to lay

7        across the street.

8   Q.   When the officers told you to get out of the

9        car, you didn't get out of the car?

10  A.   No.  I asked Mike to open the other door and

11       let me out of the car.

12  Q.   When the officer told you they were going to

13       taze you, did you then get out of the car?

14  A.   Mike helped me and pulled me out of the car at

15       that point.  I asked him not to taze me.

                        Page 18

120110jk[1]

16  Q.  From the same way that they asked you
17      previously to get out of the car, you got out
18      of the car?
19  A.  With Mike's help.
20  Q.  Did you threaten to kick the officer's ass at
21      that point?
22  A.  No.
23  Q.  Now, what happened after you got out of this --

24

1       out of the squad car at the Knox County jail?
2  A.  I went into a holding cell from the garage
3      area.
4  Q.  Who took you from the holding cell or from the
5      garage area to the holding cell?
6  A.  Mike Ingles.
7  Q.  At some point, did Mike Ingles hand you off to
8      other officers?
9  A.  Yes.
10  Q.  Did you know those other officers?
11  A.  Yes.
12  Q.  What were their names?
13  A.  Mr. Jason Morrison (sic) and Abernathy.
14  Q.  Had you ever met them before?
15  A.  Yes.
16  Q.  How had you met them before?
17  A.  Mr. Jason Morrison has a child with my cousin.
18  Q.  How do you know the other officer?
19  A.  We had an incident several years before where I
20      spit on the officer and received a sentence.
21  Q.  With regard to Morton -- is it Morton?  No, who

120110jk[1]

22    did you say the first time?

23  A.  Morton.

25


 1  Q.  With regard to Morton, you said he has a child

 2      with your cousin?

 3  A.  Yes.

 4  Q.  How often had you seen Morton prior to

 5      March 5th '09?

 6  A.  I had seen him plenty of times before he was an

 7      officer, growing up, and not very often as an

 8      adult.

 9  Q.  Let's say the year before this incident

10      happened, did you interact with him in any way

11      the year before this incident happened?

12  A.  Yes, at two different jails -- the old jail and

13      the new jail.

14  Q.  Did you ever do anything socially with him in

15      the ten years prior to this incident?

16  A.  No.

17  Q.  Your interaction with him was primarily through

18      your criminal history?

19  A.  And the family thing before he was an officer.

20  Q.  That's what I wanted to know.

21          When was the last time you did anything

22      with him connected to the child with the

23      cousin?

26


 1  A.  We would have been six -- anywhere from 10 to

 2      16, during that age group, maybe.

 3  Q.  How old are you now today?

120110jk[1]

```
 4  A.  Thirty-three.
 5  Q.  Ten years prior to this incident in '09, had
 6      you had any connection with him in a social or
 7      family setting?
 8  A.  No.
 9  Q.  So in the ten years prior to this incident,
10      your only connection with Officer Morton would
11      have been through your criminal background?
12  A.  Correct.
13  Q.  Had you had any other dealings with
14      Abernathy prior to this incident other than the
15      spitting-on-the-officer incident?
16  A.  I don't remember if there was any dealings
17      before; but as far as I recall, no.
18  Q.  Now, what happened when you were transferred
19      over to these two officers?
20  A.  I was put in a holding cell; and at that point,
21      I'm wearing Mike Ingles' cuffs, and Morton is
22      going to take the cuffs off as an exchange and
23      do the booking process.  He comes in and takes
```

27

```
 1      one cuff off one arm, has me put my hand to the
 2      back of my head; and at this point, he spreads
 3      my legs -- has me spread my legs and searches
 4      in my pockets as like a sweep for any
 5      contraband.
 6  Q.  Did you tell the officer that you had drugs in
 7      your crotch area?
 8  A.  No.
 9  Q.  Did any time in the holding cell, did you tell
```

Page 21

120110jk[1]

10    officers that you had drugs in your crotch

11       area?

12  A.  No.

13  Q.  Go ahead with the rest of your answer.

14  A.  He does a quick pat down.  At one point, he

15       kicks my legs wider than I had spread.

16           Does a lot of tugging and pulling on the

17       cuff that's on my hand to a point where I'm

18       kind of like dancing on my tippy toes.  From

19       there, they come in and slam me down, and we

20       have the incident where my arm is broke.

21  Q.  So up until the time where he spreads your legs

22       out wider, had there been any threatening

23       remarks from you to the officers?

                                                       28

 1  A.  No.

 2  Q.  After spreading your legs apart and you were

 3       kind of on your tippy toes, did you make any

 4       threatening remarks to the officers?

 5  A.  I don't recall one.  I know me and Morton had a

 6       discussion back and forth at this point that he

 7       was yanking on my arm.  At that point, we did

 8       have like an argument, but I don't recall what

 9       was said.

10  Q.  So after your legs were spread apart on your

11       tippy toes, an argument developed between you

12       and Morton?

13  A.  Yes.

14  Q.  And you can't recall the specific words that

15       you said to the officer, correct?

16  A.  No.  I don't remember the specific words.

                    Page 22

120110jk[1]

17  Q.  After the argument begins, did you move your

18      arms in any way to resist Officer Morton?

19  A.  No.

20  Q.  Once this argument has developed, did you move

21      your legs in any way to try to resist the

22      officers?

23  A.  No.  At that point, the tension on my arm was

29

1       good enough that it had me like dancing on my

2       tiptoes in one place.

3   Q.  When you are talking about the tension on your

4       arm, describe for me what is causing tension on

5       your arm.

6   A.  If your arm is in a back position, the pulling

7       up of the arm.

8   Q.  So you have your right or your left arm behind

9       you?

10  A.  I have my right arm behind me.

11  Q.  Your right arm is behind you; and for the

12      record, you have it behind you and then you

13      have your arm -- forearm across your back?

14  A.  Correct.

15  Q.  And Officer Morton has ahold of your right arm?

16  A.  Yes.

17  Q.  And during the argument with Officer Morton,

18      did he give you any orders or instructions?

19  A.  Just to have the other hand on my head -- the

20      free hand.

21  Q.  Did you keep your left hand on your head during

22      this argument?

120110jk[1]

23  A.  Yes.  I recall -- I think I did.  To a certain

30

1      extent, until they started to slam me on the

2      ground.

3  Q.  At any time before any other officer got

4      involved, did you take your left hand off the

5      back of your head?

6  A.  There was a point where he tells me -- he slams

7      my head against the wall.  He says to put my

8      head against --

9  Q.  Wait.  Right now though, you are still standing

10      up, correct?

11  A.  Yeah.  Kind of like dancing around from the

12      tension on my arm.

13  Q.  So you would acknowledge that you were dancing

14      around at this point?

15  A.  Yes.  Because of the tension.

16  Q.  And when you say dancing around, you mean you

17      were moving your feet back and forth?

18  A.  Trying to stand on my tippy toes to release the

19      pressure from him pulling up on my arm.

20  Q.  And at some point, then, did another officer

21      get involved?

22  A.  Yeah.

23  Q.  Why did the other officer get involved?

31

1      MR. MEYER:  Objection, speculation.

2      BY MR. KELLY:

3  Q.  In your opinion.

4  A.  I recall Abernathy coming in.  He didn't really

Page 24

120110jk[1]

5    get involved, but he is asking me what I'm

6    being arrested for at that time.  He just

7    stands in the doorway.

8  Q.  What did you tell him?

9  A.  I told him I was being arrested for DUI.

10  Q.  What then did the -- did Officer Morton tell

11    you to do?

12  A.  The commands that Officer Morton gave me, I

13    did.  At this point, it happened so fast that

14    we were on the ground.

15  Q.  Did Officer Morton tell you to go over and

16    place your hands against the wall of the

17    holding cell?

18  A.  Yes.  After one hand --

19  Q.  Did he tell you to put your hands against the

20    holding cell?

21  A.  Yes.

22  Q.  Did you comply?

23  A.  Yes.

                                                    32

1  Q.  Did you push against the wall against Officer

2    Morton with your body?

3  A.  No.

4  Q.  So now you are standing with your back to the

5    door of the holding cell, is that correct?

6  A.  No.  I'm facing horizontal to the door of the

7    holding cell.

8  Q.  And you have your -- you have your -- both

9    hands on the wall?

10  A.  No.

                    Page 25

120110jk[1]

11　Q.　Tell me how you had your hands.

12　A.　I have one hand in a cuff behind my back.  He

13　　　releases one hand.  One hand went to the wall.

14　　　From there, there was a command for this hand

15　　　to go to the back of my head.

16　Q.　So at any time before that point, did you place

17　　　your hand on the wall?

18　A.　From being released from the cuff, yes.

19　Q.　The right hand when you were doing the tiptoe

20　　　dancing around, did your right hand still have

21　　　the cuff on?

22　A.　Yes.

23　Q.　That was Ingles' cuffs?

                                                          33

 1　A.　Yes.

 2　Q.　So, he took that cuff off then?

 3　A.　That cuff never got taken off my hand during

 4　　　the whole struggle.

 5　Q.　When he tells you -- gives you the order to go

 6　　　and stand against the wall -- did he give you

 7　　　that order?

 8　A.　Yes.  In the very beginning when he came in the

 9　　　cell.

10　Q.　Now, at some point then, did he tell you to go

11　　　put your hand on the wall?

12　A.　No.  I'm cuffed at the very beginning.

13　Q.　No.  We are past the dancing on your tiptoes

14　　　now.

15　A.　No.  There is no command.

16　　　　Once I dance on the tiptoes, it's an

17　　　automatic slam onto like a bench shelf that is

                    Page 26

120110jk[1]

18     in there or homemade concrete bed.

19   Q.  And you are laying on your stomach?

20   A.  I'm laying on my stomach.

21   Q.  Are the officers -- is Officer Morton in the

22     room?

23   A.  Yes.

               34

1   Q.  Who else is in the room?

2   A.  Abernathy and Ingles.

3   Q.  Now, there's three officers in the room, and

4     you are laying face down on a concrete bench?

5   A.  Yes.

6   Q.  And did an officer give you a command that they

7     were going to handcuff you?

8   A.  He tells me he wants to put me back in

9     handcuffs, and he tells me to give him my other

10     arm, but he is on my back, with his knee on my

11     back, and I tell him with him on my back, I

12     can't give him my other arm. It's bent

13     underneath me.

14   Q.  Which officer gave you the command that they

15     wanted to handcuff you?

16   A.  Morton.

17   Q.  Morton tells you they want to handcuff you, and

18     which arm is under your body?

19   A.  The free hand without the cuff -- my left hand.

20   Q.  Where is your right hand?

21   A.  My right hand is still being held by the cuff

22     that's on my arm by one of the officers. I

23     think there was an exchange of this hand.

120110jk[1]

35

```
 1        At this point, my face is turned into the
 2     wall.  So I have no more visual.  I can only
 3     hear what they are saying and feel what they
 4     are doing to me.
 5  Q. During this point in time, are you laying still
 6     on the concrete bench, or are you resisting?
 7  A. No.  I'm laying still.  I can't move.  I'm
 8     telling them I can't breathe.  They tell me --
 9     I can talk, I can breathe.
10  Q. And when -- did they order you again --
11     instruct you again that they were going to try
12     to handcuff you?
13  A. They keep saying over and over, give me your
14     arm, and I'm telling them, I can't give them my
15     arm.  It's pinned underneath me.
16        At one point, another officer comes in
17     with leg shackles and applies the leg shackles,
18     and my leg stays up, vertical in the air during
19     that time.
20  Q. And is there an officer on your back?
21  A. Yes.
22  Q. And do you know which officer is on your back?
23  A. I do not know who -- at that time, who is on my
```

36

```
 1     back.  Like I said, I lose my vision.  I can
 2     only see the wall.  My head is turned in toward
 3     the wall.
 4  Q. So you can't identify which officers were doing
 5     what to you once you are on the concrete bench?
```

120110jk[1]

```
 6  A.  Correct.  I can -- I know there is an exchange
 7      of the cuff.  I know Ingles at one point tries
 8      to get my right hand out from underneath me.  I
 9      know at one point, my arm breaks, and I tell
10      them my arm is broke.  I tell them --
11  Q.  You told me that you had your left hand
12      underneath your body, correct?
13  A.  Correct.
14  Q.  Now, you just told me that at this -- at some
15      point, now, Officer Ingles is trying to get
16      your right hand?
17  A.  I'm sorry.  I confused the right with the left
18      at that point.
19  Q.  Was your right hand ever underneath your body?
20  A.  No, never.
21  Q.  Did you ever clinch your right hand and put it
22      underneath your stomach or body/chest area?
23  A.  No.  It happened during the fall.  During the
```

                                                    37

```
 1      fall.  My right hand was never under my body
 2      area at all.
 3  Q.  At any time, did you clench your right fist and
 4      put it under your body and your chest area?
 5  A.  No.
 6  Q.  Were you being cooperative with the officers at
 7      this point?
 8  A.  Yes.
 9  Q.  Did you make any threats to the officer?
10  A.  No.
11  Q.  Did you call any of them pussies at this point?
```

Page 29

120110jk[1]

12  A.  No.

13  Q.  Did you threaten to kick any of their asses at

14      this point?

15  A.  No.

16  Q.  Did you make any threats to the officers while

17      you were in the holding cell?

18  A.  None.

19  Q.  In your opinion, did you cooperate with the

20      officers' orders while you were in the holding

21      cell?

22  A.  Yes.

23  Q.  Yes?

                                                    38

1   A.  Yes.

2   Q.  On the specific question of your right arm

3       breaking, how did that happen?

4   A.  From them -- my right arm was like this with

5       the cuff on it, and they were pulling it

6       further toward the back of my head -- up my

7       back.

8   Q.  For the record, you have your right arm behind

9       you and your forearm is against your back?

10  A.  Yes.

11  Q.  And you are saying, somebody lifted your arm up

12      closer to your head, and that's when it broke,

13      in your opinion?

14  A.  Yes.

15  Q.  Did you hear anything?

16  A.  Yes.  I heard a loud pop.

17  Q.  After the pop, did the officers -- what did the

18      officers do?

                    Page 30

120110jk[1]

19  A.   Abernathy sat there and debuted (sic) whether

20       it was dislocated or broken.  I told him it was

21       broken.  He told me, no, it was dislocated.

22  Q.   How do you know it was Abernathy?

23  A.   Because at this point they had all got up and

                                                      39


 1       ran off my back and fled the cell.

 2  Q.   When the pop was heard, the officers got up?

 3  A.   And took off right out of the cell.

 4  Q.   And did they say anything?

 5  A.   Just our discussion -- me and Abernathy's

 6       discussion whether it was broke or dislocated.

 7  Q.   At this point, are you laying down, or are you

 8       sitting up?  What are you doing?

 9  A.   I'm asking them for a Tylenol.  Because from

10       the pain, I see like spots.  I feel like maybe

11       my conscious -- I kind of feel like I'm going

12       in and out of conscious from the pain and the

13       lack of me not being able to breathe from being

14       pinned down.  Because at the point where they

15       are on top of me, I'm telling them they are

16       twisting my arm too far, it's going to break,

17       before it breaks.

18  Q.   Did you ever lose consciousness?

19  A.   Yes.  I think there is a time period where

20       maybe I lost consciousness.

21  Q.   How were you positioned when you lost

22       consciousness?

23  A.   I was still on my belly with everybody on my

                                                      40

120110jk[1]

```
 1        back.  The arm was already broke, but they were
 2        still pulling.  This was after the pop.  At
 3        that point, they still pull -- after the pop,
 4        there is maybe 10 or 20 seconds going on with
 5        everything still going on.
 6   Q.   Then, after the officers 10 to 20 seconds, are
 7        you saying then the officers got off of you?
 8   A.   Yes.
 9   Q.   Now that they are off you, during that 10 to 20
10        second period, you still are conscious,
11        correct?
12   A.   I kind of come back and Abernathy is standing
13        over me, and I'm telling him my arm is broken,
14        and he is telling me, no, it's dislocated.
15   Q.   I'm trying to pinpoint when you lost
16        consciousness.
17   A.   I don't know when I -- it was right after the
18        arm broken, I was still -- they were still on
19        top of me.
20   Q.   So then when you came back from consciousness,
21        were you still on your stomach?
22   A.   Yes.
23   Q.   At some point, did you sit up, or were you
```

41

```
 1        talking to the officers laying on your stomach
 2        the entire time?
 3   A.   At one point, I got up and straightened my arm
 4        out.  Because, at the break point, it kind of
 5        looked like maybe an elbow bend, and I got up
 6        and straightened the arm back out to take some
```

Page 32

120110jk[1]

7      of the pain away.  I pulled it back straight,

8      kind of looked like another joint here at this

9      point.

10  Q.  When you were sitting up, was there an officer

11      now in the room with you?

12  A.  Abernathy was in the room.

13  Q.  What did you and Abernathy discuss?

14  A.  I asked for a Tylenol --

15  Q.  What did Abernathy say?

16  A.  -- or an aspirin.

17          I think -- one of them left the room.  I

18      don't remember which one left.  From --

19      Abernathy was in the room with me, but I don't

20      know which one went to go get the Tylenol and

21      come back and said they couldn't give it to me,

22      and there was an ambulance called at that

23      point.

                                                    42

1   Q.  Clear up for me, you have the officers still in

2       the room?

3   A.  When they left the room, they just stand in the

4       doorway.

5   Q.  Sir, we have to stop talking at the same time.

6           Before you told me that the officers when

7       they heard the pop, they all ran out of the

8       room, and now, it sounds to me like the

9       officers are still in the room.

10  A.  They run out of the doorway of the room into

11      the outside front of the door.  They are no

12      longer in that holding cell.

                    Page 33

120110jk[1]

13  Q.  So it's just you and Abernathy in the holding

14      cell?

15  A.  I think Abernathy kind of goes in and out at

16      that time and the door is open.

17  Q.  Did you hear the officers saying they were

18      going to get you medical attention?

19  A.  I see an effort to go get a Tylenol, and they

20      come back and tell me that they can't give

21      me -- they are not authorized to give me a

22      Tylenol.

23  Q.  Did somebody tell you that they had called for

                                                    43

1       an ambulance?

2   A.  Yeah.  At one point, someone says they called

3       an ambulance.

4   Q.  And then you -- the ambulance showed up, and

5       you were taken to the hospital?

6   A.  Correct.

7   Q.  Did any other meaningful conversations occur --

8       strike that.

9           Did any conversations occur with the

10      officers after the discussion about them

11      telling you, you can't have a Tylenol or

12      aspirin until the time you were taken away in

13      the ambulance?

14  A.  I think there was a discussion about getting

15      the leg shackles off and the handcuffs off.

16  Q.  Did you take them off before you went to the

17      hospital?

18  A.  When the ambulance showed up, they took them

19      off.

                        Page 34

120110jk[1]

```
20  Q.  Who took them off?
21  A.  I think it was this gentleman here.  I don't
22      recall his name.  I'm not positive.  I'm not
23      positive who took them off.
```

44

```
 1  Q.  In the ambulance, did any police officers ride
 2      with you?
 3  A.  No.
 4  Q.  Were you in handcuffs on the way to the
 5      hospital?
 6  A.  No.
 7  Q.  Did any officers meet you at the hospital?
 8  A.  No.  Yes.  Ingles, yes.
 9  Q.  Did Ingles take you into the hospital?
10  A.  No.  The ambulance took me, and Ingles showed
11      up after I was already in a room in the
12      hospital.
13  Q.  And then what happened after that point?
14  A.  My family came up.  I went through x-rays and
15      did the whole thing the hospital had me do, and
16      Mike Ingles left.
17          At that point, I was admitted into the
18      hospital for one or two days.  I don't
19      remember.
20  Q.  When you were discharged from the hospital, did
21      you go to jail, or did you go home?
22  A.  I went to jail.
23  Q.  Who took you to jail?
```

45

120110jk[1]

1  A.  I don't recall the officer that picked me up --
2      his name.
3  Q.  How long did you stay in jail?
4  A.  I didn't stay in jail.  They come and told me
5      and immediately they were going to release me
6      that I just had to go to the jail while they
7      called the State's Attorney, and I would be
8      released instantly.
9  Q.  And what did they tell you, if anything, about
10     the conversation with the State's Attorney?
11 A.  I watched the conversation with the State's
12     Attorney and the officer that picked me up, and
13     he just told the State's Attorney my arm was
14     broken, for sure.  Gave him details from the
15     hospital, and the State's Attorney --
16     basically, come and told me that the State's
17     Attorney told me I was going to be released;
18     and within 30 minutes, I was released from the
19     jail with no bond or --
20 Q.  Do you know who the State's Attorney was?
21 A.  No.  I do not know.
22 Q.  Did you hear the -- could you actually hear the
23     discussion between the officer and the State's

46

1      Attorney?
2  A.  Not word for word, no.
3  Q.  And when you were being released then from the
4      jail without any bond, what was your
5      understanding of your charges at that point?
6  A.  I had two DUI tickets.  One was a felony.  One
7      was a misdemeanor.  I had a lights and traffic

Page 36

120110jk[1]

```
 8      tickets, and I was given just basically the
 9      traffic tickets.  The same ones -- I actually
10      wasn't given any papers.  Mike Ingles give me
11      them tickets at the hospital.
12   Q. What I was getting at, I didn't probably ask it
13      very artfully.
14           Did you think your charges were still
15      pending, or what was your understanding when --
16   A. Yes, the traffic violations were still pending.
17   Q. What did you think happened to the other
18      charges?
19   A. I didn't -- I wasn't aware there was any other
20      charges.
21   Q. At no time, up until this point, had anybody
22      advised you that there were any other charges
23      other than the two DUIs and the traffic
```

47

```
 1      charges?
 2   A. The officer that came up to the hospital said
 3      that he thought the State's Attorney had filed
 4      a resisting charge that day and wasn't
 5      positive, but I never got any paperwork leaving
 6      the jail on it.  I never found out about that
 7      charge until I called after being released to
 8      the courthouse to find out the charges.
 9   Q. Did you ever have to go to court for anything
10      other than the traffic tickets?
11   A. Yes, resisting and I think that was the only
12      other charge added that I'm aware of.
13   Q. And did you have representation for that?
```

Page 37

120110jk[1]

14   A.   Carl Johnson was the attorney.

15   Q.   And what was the resolution of the resisting

16        charge?

17   A.   It was dropped.

18   Q.   And do you know the nature of why it was

19        dropped?

20   A.   No.

21   Q.   Were you part of any discussions with your

22        attorney and the State's Attorney's office as

23        to why it was dropped?

                                                        48

1    A.   No.  At one point, I know I was offered a

2         folder with some kind of a deal, and I asked my

3         public defender -- I told him I didn't even

4         want to read it.  Take it back.  I never looked

5         at the offer or whatever it was.

6              At this point, Louis Meyers (sic) -- he

7         contacted Louis Meyers, and Louis Meyers tells

8         me that I should go talk to him.

9              MR. MEYER:  Don't talk about conversations

10        we had.

11        BY MR. KELLY:

12   Q.   Who told you to contact Louis Meyer?  Your

13        public defender, you mean?

14   A.   I was told to go contact my public defender

15        because he wanted to talk to me.

16   Q.   What I'm getting at, you are not saying the

17        State's Attorney's office said to contact Louis

18        Meyer?

19   A.   No.  I'm saying the -- my public defender had

20        an envelope from the State's Attorney's office,

                          Page 38

120110jk[1]

21      some kind of offer.

22   Q.  An offer, and you rejected that?

23   A.  I rejected that.

49

1   Q.  Why did you reject that?

2   A.  Because I felt I wasn't guilty.

3   Q.  I don't want you to give me any privileged

4       stuff, but I just wanted to know who sent you

5       to Louis Meyer.

6           Who told you to go to Louis Meyer?

7   A.  I went to Louis Meyers and had Louis Meyers

8       represent me for the lawsuit.

9   Q.  Okay.  Then, was that the full extent of any

10      further court or anything that you had with

11      this other than this lawsuit?

12   A.  I don't understand.  I don't know.

13   Q.  Did you have any other reason you had to go to

14      court for anything at all regarding that

15      incident that night on March 5th, 2009, other

16      than this lawsuit?

17   A.  No, not that I recall, I don't think.

18   Q.  Now, on the night of the accident -- or on the

19      night of the incident, were you drinking?

20   A.  Yes.

21   Q.  And when did you -- let's try to use a time

22      line.

23          Tell me what time, in your opinion, you

50

1       were pulled over that night.

Page 39

120110jk[1]

2  A.  I'm assuming 12 -- anywhere from 12:00 to 1:00.

3  Q.  And that's at night?

4  A.  Yeah.

5  Q.  And when had you -- prior to this incident,

6      when had you started drinking?

7  A.  I think I drank -- I think we bought the beer

8      about 5:00.

9  Q.  And what kind of beer was it?

10  A.  Miller Lite, I believe.

11  Q.  And between 5:00 and when you were pulled over

12      at the 12:00 to 1:00 time frame, how many

13      Miller Lites did you drink?

14  A.  I can't say I actually sat down and drank one

15      completely out of the bottle.  Because we were

16      welding, and I was using the beers to actually

17      cool the welds.  After we would weld, I was

18      dumping them on the hot weld to cool them off.

19      I know there's a 20-pack purchase, and there

20      was four bottles missing out of there, and it

21      was between two of us.

22  Q.  How many beers would you estimate that you

23      drank between 5:00 and when you were pulled

                                                        51

1      over?

2  A.  I would say, I drank one completely and used a

3      partial one to drink and to pour out to cool

4      off the weld.

5  Q.  Who were you welding with?

6  A.  Christian Price.

7  Q.  So where were you welding?

8  A.  At his house in his garage.
                      Page 40

120110jk[1]

 9  Q.  Where does he live?

10  A.  On Chambers Street.  I don't know the correct

11      address.

12  Q.  Had you ever been there before this night?

13  A.  Yes.  He is like someone I have known my whole

14      life.  I went to foster care as a child and was

15      raised by his father.

16  Q.  So you are really close with Christian Price?

17  A.  Yes.

18  Q.  Other than the estimated one beer between 5:00

19      and 12:00 and 1:00 time frame, did you have any

20      other alcohol?

21  A.  No.  No.

22  Q.  Did you have any drugs between the 5:00 and

23      12:00 to 1:00 time frame?

                                                    52


 1  A.  No.

 2  Q.  How about between 12 noon and 5:00?  Did you

 3      drink any alcohol?

 4  A.  No.

 5  Q.  Did you have any drugs?

 6  A.  No.

 7  Q.  Tell me your prior criminal history prior to

 8      this night.

 9  A.  I have a drug conviction, a battery conviction,

10      and I have a drug conviction that sometimes

11      says that I was -- I have seen them say that

12      it's another drug conviction I pled out to but

13      the charges were dropped, but sometimes they

14      come back and say it was -- I don't even know

Page 41

120110jk[1]

15    how to word it.  Like a -- where you are
16    released and just watched by the courts.
17  Q.  So you know you have at least three
18    convictions -- two drug related and one is a
19    battery?
20  A.  Yeah.
21  Q.  Did the -- was the battery the one involving
22    spitting on the officer?
23  A.  Yeah.

53

1  Q.  Other than those three convictions -- let me --
2    give me the dates.  Let's say the first drug
3    conviction, when did that occur?
4  A.  The first drug conviction would be -- I was
5    probably the age of 18.  So that would be '98,
6    '99, maybe further back than that.  I don't
7    know the exact date.
8  Q.  Was that a felony conviction?
9  A.  I -- it wasn't a conviction.  I was charged
10    with it, and there was four people charged with
11    it, and one ended up taking the -- admitting it
12    was his, and the rest of us were supposed to
13    be -- the charge was supposed to be dismissed.
14        Now, sometimes it shows up on my -- later
15    on, when I did have a conviction, I have seen
16    them try to use it as a conviction, but it's
17    not a conviction.
18  Q.  When did the battery occur?
19  A.  The battery would have been 2004.
20  Q.  And tell me what happened in that incident.
21  A.  I was in a Knox County jail for breaking an
        Page 42

120110jk[1]

```
22      Order of Protection.  At that point, I was
23      filing motions to go to court for the Order of
                                                      54


 1      Protection to get my kid taken off, and I had
 2      followed it to a T in the jail, and I asked to
 3      have it stamped and notarized so I can send it
 4      to the City Clerk to get a court date, and an
 5      officer crumbled it up and told me it wasn't a
 6      legal document and threw it in the toilet in
 7      front of me.
 8  Q.  Who did that?
 9  A.  I don't recall the name.  I know it was a
10      female officer.
11  Q.  And then what happened?
12  A.  At this point, I get on the microphone, and I'm
13      irate, and they tell me they are going to take
14      me to segregation, and they come with black
15      gloves -- Abernathy and another officer.  I
16      don't recall the other officer's name.
17          At this point, they do tell me to cuff up,
18      and I tell them to leave me alone and shut the
19      door and try to explain to them the situation.
20      The officer tackled me, and we have a ruff'n
21      up.  We get the cuffs on; and during the walk
22      from my cell to there, I spit on Abernathy.
23  Q.  And was that incident -- when you say the
                                                      55


 1      officer tackled you, was that similar to the
 2      incident that happened the night of March '09?
```

Page 43

120110jk[1]

3  A.  NO.  NO.

4  Q.  Did you feel like the officer was justified in

5     tackling you back in the 2004 incident?

6  A.  I don't understand.

7  Q.  Do you think he should have tackled you?  Were

8     you resisting back in 2004?

9  A.  I wouldn't say resisting, but I was told to

10    walk to seg., and I stood there.

11  Q.  So you understood he gave you an order, and you

12    didn't do it?

13  A.  At that time, yeah.

14  Q.  Now, the third thing you told me about was a

15    drug conviction.

16        When did that occur?

17  A.  2000, 2001.

18  Q.  And what was the nature of that conviction?

19  A.  You mean the outcome?

20  Q.  No.  Just were you charged with distribution or

21    just paraphernalia?

22  A.  Just possession.

23  Q.  Possession of what?

                                        56

1  A.  Methamphetamine.

2  Q.  And where did that occur?

3  A.  In Galesburg.  I don't remember the address.

4  Q.  Did all of these occur in Galesburg?

5  A.  Yes.

6  Q.  And did all of them involve the Galesburg or

7     Knox County Police departments?

8  A.  Yes.

9  Q.  2000, 2001 drug conviction, did you serve jail

                    Page 44

120110jk[1]

10      time?

11  A.  Doc time.

12  Q.  How much time did you serve?

13  A.  Twenty-two months of a six-year sentence.

14  Q.  That was a felony?

15  A.  Yes.

16  Q.  Other than these three incidents, tell me your

17      past experience with the police.

18          Any other time you had contact with the

19      police?

20  A.  The only other time I have been picked up for

21      missing a fine payment or maybe a traffic court

22      date or something.

23  Q.  Can you remember any specific time where you

                                                        57

1       interacted either with the Galesburg or the

2       Knox County officers other than these three

3       incidents?

4   A.  There has been plenty of times.  Like I said, I

5       missed lots of court dates, and they pick me

6       up, and I just bond out.  There have been

7       several times.

8   Q.  Have you had any other jail time other than

9       that 22-month sentence in the Department of

10      Corrections?

11  A.  Yes.  For the case with Abernathy, I was

12      sentenced to two years.

13  Q.  Where did you serve that?

14  A.  I served it between three or four prisons.

15  Q.  What prisons?

                        Page 45

120110jk[1]

16  A.  I think I started out in Shawnee, Illinois,

17      Pickneyville, Illinois River.  I think that

18      might be it.

19  Q.  Where did you do your 22 months for the drug

20      conviction?

21  A.  In Menard and Statesville.

22  Q.  The entire time?

23  A.  Yeah.

                                                    58

1   Q.  Any other jail time?

2   A.  I think I was doing 30 days for the Order of

3       Protection thing when we had the incident with

4       Abernathy, I think it was.

5   Q.  That was just at Knox County?

6   A.  Yeah.

7   Q.  Any other jail time?

8   A.  Not that I recall.

9   Q.  Had you ever had any prior contact with Officer

10      Ingles in his professional police capacity

11      prior to that night?

12  A.  Yes.

13  Q.  And what was that?

14  A.  Just for the like missing court or seeing him

15      in there when I went in.

16  Q.  Had he ever arrested you before?

17  A.  Yeah.

18  Q.  And -- tell me about that.

19  A.  I don't know.  Probably for like a fine

20      payment -- missing a fine payment review or

21      something.

22  Q.  Anything else that you can recall?

                    Page 46

120110jk[1]

23   A.   No.

59

1    Q.   Any other criminal incidents that you have had
2         that you can recall?
3    A.   No.
4    Q.   Who is your family doctor prior to this
5         incident?
6    A.   Flacco.
7    Q.   Spell his name for us.
8    A.   I'm not for sure the spelling.
9              MR. MEYER:   Might be in the documents.
10        BY MR. KELLY:
11   Q.   Just give us -- I didn't even understand you.
12   A.   Flacco.
13   Q.   Can you give me your best guess.
14   A.   I don't even have a clue to tell you the truth.
15   Q.   And how long had Flacco been your family
16        doctor?
17   A.   My whole life.
18   Q.   Where is he located -- or she?
19   A.   At OSF.
20   Q.   Is it a man or a woman?
21   A.   It's a man and a woman.   It's a family -- it's
22        a daughter and a father and a son.
23   Q.   So did you see -- what's the name of the

60

1         practice?
2    A.   I don't -- it's an OSF practice, I guess.
3    Q.   OSF where?

Page 47

120110jk[1]

4    A.   In Galesburg.

5    Q.   Do you know where it's located?

6    A.   I don't recall the street that the hospital is

7         on.

8    Q.   It's the actual hospital?

9    A.   Yeah.

10   Q.   And you know that you have seen a Flacco who

11        has been your primary care doctor your entire

12        life?

13   A.   Yes.

14   Q.   Has it been the same, you know, family members,

15        I guess -- I'm trying to figure out, is it one

16        person primarily that treated you?

17   A.   No, it's a family ran deal.  It's the daughter

18        and the father and the daughter's husband, I

19        believe, and some other doctors that are there.

20   Q.   Any past medical problems that you had?

21   A.   Yeah, I have been born with a lung condition.

22   Q.   What's the lung condition?

23   A.   Where I was asthmatic, and my lungs weren't

                                                      61

1         fully developed when I was born.  So the first

2         six or seven months of my life, I was in like

3         an incubator for my lungs to develop.

4    Q.   Were you taking any medications because of that

5         condition prior to this incident?

6    A.   I was supposed to be taking an inhaler, but I

7         hadn't got the inhaler and stuff because I

8         didn't have insurance to pay for it.

9    Q.   Where did you fill your prescriptions?

10   A.   Walgreen's, usually.

                  Page 48

120110jk[1]

11  Q.  In Galesburg?

12  A.  Yeah.

13  Q.  Anyplace else?

14  A.  I think there's been a few pharmacies -- you

15      would have to get the doctor reports to ever

16      see back where I ever picked everything up at.

17  Q.  When prior to the March '09 incident had you

18      last used an inhaler?

19  A.  Maybe two years before I had some bad problems

20      and I used them; and before that, mainly as a

21      child -- constantly as a child.

22  Q.  Nothing in the year prior to this March

23      incident?

62

1  A.  No, I was not using them.

2  Q.  You were not having problems?

3  A.  I still have lung problems.  I just couldn't

4      afford the medication.

5  Q.  Were you taking any other medications other

6      than the inhaler?

7  A.  No.

8  Q.  Any other past medical problems?

9  A.  No.

10  Q.  Had you ever had a seizure before?

11  A.  No.  Oh, well, there was a time when I was in

12      prison that they thought I had a seizure, but

13      they weren't positive.

14  Q.  When was that?

15  A.  It would have been -- I think it was the one

16      where I did it at Menard.

Page 49

120110jk[1]

17  Q.  What happened?

18  A.  I had an abscess in a tooth, and I don't know

19      if it was -- I don't know -- you would have to

20      get the records to find out what the doctor

21      said, but it was due to a tooth problem.  I had

22      a bad infection from an abscessed tooth.

23  Q.  When I think of a seizure, I think of somebody

                                                    63


1       falling on the ground and thrashing around.

2           Have you ever had anything like that

3       before?

4   A.  Not thrashing at the ground but lost like

5       consciousness, you know -- awareness of what is

6       going on.

7   Q.  Is that what happened at Menard?  You lost

8       consciousness?

9   A.  Yeah, from the infection.

10  Q.  Other than that incident in Menard, had you

11      ever had anything -- or had you ever had a

12      seizure or anything or anything that anybody

13      thought might be a seizure?

14  A.  No.

15  Q.  And the Menard time frame would have been 2000,

16      2001?

17  A.  Correct.

18  Q.  Subsequent to this March incident, have you had

19      anything that you thought was a seizure or a

20      medical person diagnosed as a seizure?

21  A.  At the time in the jail when I thought that I

22      lost consciousness, I said the word "seizure,"

23      but I might have used the wrong word, you know.

                    Page 50

120110jk[1]

64

1  Q. Did you use the word "seizure" when the
2     officers were communicating with you in the
3     holding cell?
4  A. I believe so.
5  Q. Do you remember what you said?
6  A. Not really because it was like right after I
7     woke up.  I was still kind of seeing the spots
8     from losing conscious.  I was kind of aware but
9     not aware.
10 Q. Do you think you used the word "seizure" after
11    that or before that?
12 A. It would have been after the arm was broken
13    that I maybe would have thought that losing
14    unconsciousness was a seizure.
15 Q. In other words, you weren't during the struggle
16    with the officers telling them that you were
17    having a seizure?  The term "seizure" came up
18    after you --
19 A. I don't recall whether it was before or after,
20    to tell you the truthful.
21 Q. To be honest, you are not sure what exactly you
22    said to the officers at various times in the
23    holding cell, correct?

65

1  A. I remember what I said to the point to where I
2     lost consciousness -- or right before I lost
3     consciousness.  I was saying things right
4     before I blacked out like during a point where

Page 51

120110jk[1]

5      I wasn't able to breathe, and I was saying

6      things during that point, right before I really

7      lost all consciousness.

8          As I came back, I kind of knew what was

9      going on but didn't know what was going on.  I

10     couldn't tell someone where I wanted to go when

11     I got in the ambulance.  I couldn't -- when

12     they were asking me which hospital, because we

13     have two hospitals, which hospital we use, I

14     couldn't answer the questions.  I couldn't --

15     but I was awake and conscious and moving

16     around, but I couldn't answer questions.  I was

17     kind of like lost in space.

18  Q.  Were you on any medication at the time of this

19     incident?

20  A.  No.

21  Q.  Any other past medical problems of any kind

22     prior to this incident?

23  A.  No.  Besides me being asthmatic and those

                                                    66

1      medical problems that we went through before.

2  Q.  You broke your arm in this incident.  I want to

3      talk about your -- how your arm is doing now.

4          Do you have any problems with your arm?

5  A.  Yeah, I don't have full range of movement.

6  Q.  Are you done treating -- done receiving medical

7      treatment?

8  A.  No.  I have a steel rod that is inside the bone

9      that has to be removed at a later time.

10  Q.  Have you been given a time frame for when it

11     would be removed?

120110jk[1]

12   A.   If there is any discomfort, I'm supposed to go

13        see him immediately -- anywhere from a year to

14        a year and a half they usually let them sit in

15        unless you have any kind of pains or problems.

16   Q.   And after a year, year and a half, are they

17        going to take it out --

18   A.   Yes.

19   Q.   -- indefinitely?  Or is there a chance they can

20        leave it in?

21   A.   What I was told is some people have left them

22        in, but most people don't leave them in.  Some

23        people's bodies seems to reject it, or the

                                                        67

1         removal of the bone marrow for the space for

2         the rod might trick the bone into thinking that

3         it's dying from not having bone marrow and

4         become -- get weak and brittle.

5    Q.   What has your doctor told you?  Does he think

6         you are going to need to have it come out?

7    A.   That we would discuss later on, he said.

8    Q.   Do you have a scheduled medical point as you

9         sit here today?

10   A.   No.  I'm supposed to contact him within a year,

11        year and a half.

12   Q.   When was your last medical treatment for your

13        arm condition?

14   A.   About a year -- maybe a year ago.

15   Q.   Other than your arm, are you claiming any other

16        injuries to your body as a result of this March

17        incident?

                        120110jk[1]
18  A.  No.
19  Q.  With regard to your arm, did you have to miss
20      any work because of your injury?
21  A.  Yes.  I was considered unable to work for a
22      year, but I think I beat that back and was able
23      to go back to work in like nine months, but

                                                    68

1       they wanted me off for a year.
2   Q.  What was your job at the time of this March
3       incident?
4   A.  I was a truckdriver.
5   Q.  Who were you employed with?
6   A.  I was a farmhand.  I was working as a farmhand
7       and a driver for Don Edwards.
8   Q.  For who?
9   A.  Don Edwards.
10  Q.  And was that a full-time position or a seasonal
11      position?
12  A.  It was -- it could be either.  There was no
13      guarantees for anything, but I mainly worked
14      full time.
15  Q.  How long had you worked for him?
16  A.  I don't -- I don't remember.  I don't remember
17      how long it was.  Maybe six months before the
18      incident and nine -- six to nine months after
19      the incident.
20  Q.  So you first were hired with him,
21      approximately, six months prior to the
22      incident?
23  A.  Yeah.  Yeah.

                                                    69

120110jk[1]

```
 1  Q.  What did you do before you worked for Don
 2      Edwards?
 3  A.  I drove over the road -- truckdriver.
 4  Q.  Who was your employer previous to Don Edwards?
 5  A.  I worked for DCM.  I drove for a company called
 6      Risenberger (phonetic).
 7  Q.  Let's work, like you are, I think, backwards.
 8          How long did you work for DCM?
 9  A.  A little over a year.
10  Q.  Why did you leave there?
11  A.  We just had a problem.  I got sick over the
12      road and went and seen Flacco.  I had a sinus
13      infection, and he put me on medications where I
14      wasn't supposed to drive, and they asked me to
15      take a load even though I was under doctor
16      restrictions, and I took it, and I got out
17      there, and I just I felt I couldn't drive, and
18      I just left the load and went back and just
19      told them I'm done.
20  Q.  And where is DCM -- where were you hired out
21      of?
22  A.  Galesburg.
23  Q.  And then what's the Ring --
```

70

```
 1  A.  Risenberger?  They drive like the railroad
 2      around.
 3  Q.  That's in Galesburg?
 4  A.  Yes.
 5  Q.  How long were you employed with them?
```

Page 55

120110jk[1]

6   A.   Six to nine months.

7   Q.   Why did you leave there?

8   A.   For this job.

9   Q.   For the DCM job?

10   A.   Yes.  Well, I left there.  Went to school.  Got

11        the C.D.L., and I was in school for a month.

12   Q.   Let me make sure I'm correct on the chronology.

13        I want to work backwards.  You worked for Don

14        Edwards before the incident, correct?

15   A.   Yes.

16   Q.   Previous -- immediately previous to that was

17        DCM?

18   A.   Yes.

19   Q.   And immediately previous to that was this

20        company?

21   A.   Yes.

22   Q.   What is it again?

23   A.   It's like a taxicab service.

                                                    71

1   Q.   What's the name of it?

2   A.   Risenberger.

3   Q.   You worked for Risenberger for six to

4        nine months?

5   A.   Yes.

6   Q.   Why did you leave there?

7   A.   I went to get my C.D.L.  Because that's not a

8        C.D.L. driving job.  It's just a driving job

9        without a C.D.L.

10   Q.   What was your employer immediately before that

11        company?

12   A.   I worked at Tyson Foods.

Page 56

120110jk[1]

```
13  Q.  How long did you work for them?
14  A.  Six months, maybe.
15  Q.  Why did you leave there?
16  A.  I had -- it was a 40-minute drive, and I had a
17      scare incident where I had hit a deer and
18      almost lost control of the car and had a car
19      accident, and it just scared me during the
20      drive.  They would work me odd hours, and I
21      would have an eight-hour turnaround.  So with
22      my 40-minute drive, I wasn't getting enough
23      sleep.  Just the drive with not enough sleep
```

                                                          72

```
 1      scared me.  So I decided to find a different
 2      employer.  Wasn't working for me.  I went to
 3      Risenberger.
 4  Q.  Where was --
 5  A.  In Joslin, Illinois.
 6  Q.  Joslin.
 7          Did you have any gap between Tyson and
 8      Risenberger?
 9  A.  Maybe a couple of weeks.
10  Q.  How about Risenberger and DCM?
11  A.  Yes.  There was a period where I went to
12      college.
13  Q.  How long of a gap was it?
14  A.  One or two months.
15  Q.  Where did you go to college?
16  A.  Southeastern in Iowa.  It's in Davenport, I
17      believe.
18  Q.  Why did you only go for one to two months?
```

120110jk[1]

19  A.  I did the C.D.L. program.

20  Q.  All right.  Prior to Tyson Food, who did you

21      work for?

22  A.  I was incarcerated.

23  Q.  All right.  Going back to Don Edwards now, he

                                                    73

1       had hired you and you were working for him for

2       six months; and when he hired you, he indicated

3       there is no guarantees it would --

4   A.  I did kind of odd work with him.  First, when I

5       first met him, I went out there and worked

6       under my construction thing, and I laid

7       concrete.  I didn't start as like a farmhand.

8       He was building some new pole barns, and I had

9       done construction for years before and kind of

10      had my own construction company.  So when Don

11      Edwards first contacted me, I went out there

12      and did some individual contracting --

13      construction work for him, laying concrete.  I

14      built a pole barn.

15  Q.  Was that during that six-month period?

16  A.  That was before the arm being broke.

17  Q.  But during that six-month period -- your

18      relationship started with Don Edwards six

19      months before this incident?

20  A.  Yeah.

21  Q.  And it started out in a construction capacity

22      to do some concrete work and some building of a

23      pole barn?

                                                    74

Page 58

120110jk[1]

```
 1   A.   Then, he kind of used me as a farmhand and back
 2        and forth.  Like I did a concrete job, and then
 3        he needed a driver to deliver cattle and pigs
 4        to market.  I did it, and then he replaced the
 5        driver.  Used that driver for a while, and I
 6        went and did -- hauled corn, and he jumped me
 7        around all over.  Then, I went back to a
 8        construction job after that.
 9   Q.   What was the construction job?
10   A.   Like I said, there was a pole barn that we
11        built.
12   Q.   For him you mean?
13   A.   Yeah.  Yes, and a lot of concrete work I
14        started.  That was main -- him mainly
15        contacting me was for the concrete work.
16   Q.   What years did you have your construction
17        company?
18   A.   I don't remember the years.  I know I ran it
19        for about nine years.
20   Q.   Before you were incarcerated?
21   A.   Yeah.
22   Q.   What was the name of the company?
23   A.   Norman Oeth Roofing and Siding.
```

                                                            75

```
 1   Q.   What was your pay rate with Don Edwards during
 2        that six-month period prior to this incident?
 3   A.   The construction jobs were a bid job.
 4            Any time I worked on the farm, it was
 5        usually $10.
 6   Q.   $10 an hour?
```

120110jk[1]

 7  A.  Yeah.

 8  Q.  And how many bid jobs do you think you did for

 9      him?

10  A.  Two.

11  Q.  What was the amount of the two bids that you --

12  A.  I don't remember what they were.

13  Q.  Give me an approximation.

14  A.  I think he gave me $35 a square for the

15      concrete, and the pole barn he just paid me by

16      the day.

17  Q.  Do you remember what the total gross was for

18      both jobs?

19  A.  I don't remember the total gross.

20  Q.  Can you give me an estimate?

21  A.  I would have to go back and check with him.  I

22      don't remember at all.

23  Q.  Are we talking about $5,000, or are you talking

                                                    76


 1      about $20,000?

 2  A.  I don't remember what it was.  I know the

 3      concrete job was a couple month job.  So it

 4      could have been four to $5,000.

 5  Q.  What do you think the pole barn would be for an

 6      estimate?

 7  A.  I think it probably took a couple of weeks, and

 8      he was paying me by the day and that would

 9      determine.  Some days we would work 10 hours,

10      14 hours.  Some days we would only get to work

11      two hours because it rained sometimes, and that

12      determined how I got paid on that job.

13  Q.  For completing the pole barn, what would your

                        Page 60

120110jk[1]

14   estimate be?

15  A.  We really didn't have a deal like that.  We

16      kind of had a deal for a day was a $100 day for

17      a ten-hour day.

18  Q.  So you really didn't work six continuous months

19      for him.  There was --

20  A.  Yeah, I never left there; but as on his

21      payroll, I might have worked four months on the

22      payroll before, and the other time was doing

23      the construction and the other jobs.  He would

                                                        77

1       pay me different for everything.

2   Q.  And in terms of work going forward, you didn't

3       have any commitment from him as to what you

4       were going to be doing going forward, is that

5       fair?

6   A.  Yeah, he was a farmer.  I mean, there is no

7       commitment, but there is plenty of work there.

8   Q.  For instance, if the -- let's say the crops --

9   A.  He could wake up that day and tell me he didn't

10      want me to work.  That's what I'm saying.

11  Q.  And in terms of after the crops were in, for

12      instance, there was no guarantee you were going

13      to work the winter months, was there?

14  A.  I did work all winter with him.  After my arm

15      was broke, I worked all winter.

16  Q.  The year -- or the nine months, excuse me, that

17      you weren't able to work, what is the amount of

18      lost wages that you are claiming as a result of

19      that nine-month period?

120110jk[1]

20   A.   I think it's $9,500.  I'm not for sure.

21   Q.   After that nine-month period, how did you

22        become employed?

23   A.   After the -- I don't understand.

                                                        78

1    Q.   After you were -- you said it was a year that

2         you weren't able to work, but you were able to

3         crunch that down to nine months.

4              Where did you --

5    A.   I went back to the farm.

6    Q.   You went back to working for Don Edwards?

7    A.   Yeah.

8    Q.   What type of duties were you doing for him?

9    A.   Mainly, I started out working the animals,

10        hauling some grain, and then I went to

11        full time as a -- delivering animals to market

12        again.

13   Q.   Tell me what your work entailed when you were

14        working with the animals.

15   A.   Feeding, moving them around, vaccinating.

16        That's, basically, was your main --

17   Q.   So like the feeding part, for instance, you

18        would -- would you carry bags of feed?

19   A.   No, you would -- for pigs, he runs pigs, cattle

20        and sheep are his main animals, and the pigs

21        you would grind feed, drive the feed out, put

22        it in hoppers, and then it's ran through a

23        computer system that feeds as the things are

                                                        79

1         empty.

                    Page 62

120110jk[1]

```
 2   Q.   Would you have to use a shovel at all scooping
 3        the grain or using tools?  What kind of -- I
 4        want to know the nature of what your actual
 5        physical job duties were.
 6   A.   No.  Mainly -- well, yeah, you would have to --
 7        if you spilled feed on the ground, you would
 8        have to clean it up.
 9   Q.   Did you have to lift hay bales?
10   A.   No.
11   Q.   Did you have to carry buckets?
12   A.   Sometimes, yes.
13   Q.   Did you have to move hoses around?
14   A.   Yeah, sometimes.
15   Q.   Did you have to build fence?
16   A.   Sometimes.
17   Q.   Did you have to carry gates?
18   A.   Yeah.
19   Q.   Hay feeders, maybe?  Round pale feeders?  Did
20        you have to move those around?
21   A.   With a Bobcat or something, yes.
22   Q.   You were able to do all those duties?
23   A.   Yes.
```

80

```
 1   Q.   You were able to -- on the vaccination, would
 2        that entail actually holding an animal to have
 3        somebody give a shot?
 4   A.   No.  They run them through a chute.  So,
 5        basically, just herding animals to stick.
 6   Q.   What other manual labor did you have to do nine
 7        months after this incident?
```

Page 63

120110jk[1]

8  A.  That's pretty much it there.

9  Q.  And how did you quantify the $9,500 that you

10      are claiming in lost wages?

11  A.  I'm not for sure -- I'm not for sure how we got

12      that number.  I'm not positive.

13  Q.  Have you ever had any prior lawsuits?

14  A.  No.

15  Q.  Any prior work comp. claims?

16  A.  No.

17  Q.  Other than your medical bills and your lost

18      wages, do you have any other damages that you

19      are claiming as a result of this incident?

20  A.  During the time I wasn't able to work, they

21      still charged me child support, and I was

22      unable to pay the child support.

23  Q.  Are you claiming as an element of damage in

81

1       this lawsuit that you wanted your child support

2       to be paid by these officers in the cities  --

3       or the municipalities?

4  A.  Yes.

5  Q.  Are there any other damages that you are

6       claiming as a result of this lawsuit?

7  A.  And the broken arm which is the medical bills.

8  Q.  Medical bills?

9  A.  Right.

10  Q.  Any other out-of-pocket charges?  Any other

11      things you are claiming as damages?

12  A.  No.

13  Q.  Other than the two days in the hospital, did

14      you have any other hospitalization in that

120110jk[1]

15      nine-month period after this incident?

16  A.  No.  Not hospitalization, no.

17  Q.  Doctors' visits?

18  A.  Yes.  Yes.  I'm sorry.  I did.

19  Q.  What was that?

20  A.  After the surgery, I was in the hospital for a

21      little over a week, I believe.

22  Q.  For what reason?

23  A.  Just to put me on a Morphine pump and to

                                                    82

1       monitor me after the surgery.

2   Q.  You mean, related to the surgery from this

3       incident?

4   A.  Yes.

5   Q.  I wanted to know if you had any other

6       hospitalizations for any other reasons other

7       than your arm?

8   A.  No, no, no.

9   Q.  Had you ever had any prior problems with your

10      right arm?

11  A.  No.

12  Q.  Ever have any prior medical treatment with your

13      right arm?

14  A.  No.

15  Q.  Any prior limitations with your right arm?

16  A.  No.

17  Q.  Do you have any formal restrictions with your

18      right arm as you sit here today?

19  A.  Yeah.  I don't have full movement.  Like I

20      can't move it as far up my back as I can this

                        Page 65

120110jk[1]

```
21      arm.  It's mainly just that.  Other than that,

22      I have pretty much full range.

23  Q.  And when I said formal, I was thinking more
```

83

```
1       from a medical standpoint.  Your doctor hasn't

2       put you on any type of weight restriction?

3   A.  No.

4   Q.  Avoid any type of activity?

5   A.  No.

6   Q.  You are not restricting your everyday

7       activities in any way, are you?

8   A.  No.

9                       (Whereupon a short recess was

10                       taken and proceedings resumed as

11                       follows.)

12  BY MR. KELLY:

13  Q.  Sir, is it your testimony here today that you

14      didn't disobey any of the officers' orders --

15  A.  Yes.

16  Q.  -- on the night of this incident?

17  A.  Yes.

18  Q.  Your testimony is that you followed all of

19      their orders on the night of this incident?

20  A.  Yes.

21      MR. KELLY:  I don't have anything else

22      right now.

23
```

84

```
1       EXAMINATION BY MR. FUNK:

2   Q.  My name is Brian Funk.  I represent the county
```

Page 66

120110jk[1]

```
 3    and the officers.
 4         Just have a few questions -- some new,
 5    some follow-up.  Ask you just a couple of
 6    background questions about your residence.
 7         On your interrogatories, you state that
 8    you live at 678 South Chambers in Galesburg, is
 9    that correct?
10  A. That's my mother's house.
11  Q. Is that where you live currently?
12  A. Sometimes I do stay with my mother, yes.
13  Q. And if you don't stay with your mother, where
14     do you normally stay?
15  A. Sometimes I stay with my father.  Sometimes on
16     my own.  Sometimes with my sister.
17  Q. Does your father and sister live in Galesburg?
18  A. Yeah.
19  Q. And when you stay on your own, where do you
20     stay?
21  A. If I'm renting a place or --
22  Q. Have you rented a place in the last year?
23  A. No.
```

85

```
 1  Q. You mentioned child support.
 2         How many children do you have?
 3  A. One.
 4  Q. And how old is your child?
 5  A. Six.
 6  Q. And what is your child's name?
 7  A. Norman.
 8  Q. Is it Norman, Junior?
```

Page 67

120110jk[1]

9   A.   Yeah, Norman III.

10   Q.   And who does Norman III currently reside with?

11   A.   With his mother.

12   Q.   What is his mother's name?

13   A.   Michelle Mozina (phonetic).  I don't even know

14        how to spell her last name.

15   Q.   Do you know the address where Michelle lives?

16   A.   No.  I think it's 10th Street in Monmouth was

17        the last address on the child support papers.

18        I don't know if that's correct.

19   Q.   So she doesn't live in Galesburg.  She lives in

20        Monmouth?

21   A.   Correct.

22   Q.   Have you ever been married?

23   A.   No.

86

1   Q.   I want to go back to the day of the incident,

2        and I kind of want to start a little bit

3        earlier, and I want you to work me through your

4        day on March 5th, 2009.

5             What did you do when you woke up?

6   A.   I went and seen a friend about fixing a truck.

7   Q.   About what time was that?

8   A.   Probably, about 9:00, I got in contact with

9        him.

10   Q.   And what was your friend's name?

11   A.   Christian Price.

12   Q.   And was this the same truck that you were

13        driving at the time of the incident --

14   A.   Yes.

15   Q.   -- or the time you were arrested?

120110jk[1]

16  A.  Yes.

17  Q.  Was that your truck?

18  A.  Yes.

19  Q.  And so 9:00 AM, you contacted Christian to talk

20      about making repairs to the truck.

21          What repairs were you going to make?

22  A.  A couple of days before, I was going to the

23      farm and the hood had blown up because it

87

1       didn't get properly latched, and it hit the

2       windshield, and the hinges and the locking

3       mechanism wasn't working.  So we were going to

4       cut the hinges off, and use like lag bolts to

5       tie the hood down -- weld the studs and the lag

6       bolts.

7   Q.  At that time when you talked to Christian -- is

8       it Christian or Kristin?

9   A.  Christian.

10  Q.  What did Christian say?

11  A.  He told me it was okay.  He would help me.

12  Q.  And what did you do after you talked to

13      Christian?

14  A.  We kind of went and ate lunch and kind of had

15      blown off the beginning part of the day with

16      some of the things he needed to do, and we went

17      and purchased the stuff that we would need for

18      the repair.

19  Q.  So Christian came and picked you up at 9:00?

20  A.  I went there.

21  Q.  So you went and picked up Christian and then

120110jk[1]

22      you ran some errands for him, is that correct?

23  A.  We went there, and we parked the vehicle and

88

1       took his vehicle and ran errands, yes.

2   Q.  Where did Christian and you go?

3   A.  I can't remember all the -- I think we went to

4       Menards or something with him.  We went to

5       People's, a few other places.  I don't remember

6       every place we went that day.

7   Q.  All stores, commercial?

8   A.  Yeah.  Yeah.

9   Q.  You know what I'm going to ask you before I get

10      it out of my mouth; but for purposes of the

11      court reporter, let me ask the question, and I

12      will try to do the same.

13          So after you went to these commercial

14      places -- Menards and other places with

15      Christian, you guys -- you and Christian went

16      to lunch?

17  A.  Yeah.

18  Q.  And where did you guys go to lunch?

19  A.  I think we just went through a drive thru.  I

20      can't remember what we got.

21  Q.  And where did you take the lunch?

22  A.  Back to his house.

23  Q.  About what time did you get back to Christian's

89

1       house?

2   A.  I would say around noon.

3   Q.  Did you leave the house at any point in time

Page 70

120110jk[1]

```
 4      before you worked on the vehicle?  Let me
 5      rephrase that.
 6          At this point, you guys hadn't worked on
 7      your car yet, right?
 8   A.  No.
 9   Q.  And between the time you got back for lunch and
10      the time you worked on the vehicle, did you --
11      did you and Christian leave?
12   A.  I think we stayed there until the point we were
13      done.
14   Q.  Until you had worked on the truck?
15   A.  Until we were done.
16   Q.  Did Christian have the Miller Lite you were
17      drinking at the house?
18   A.  No.  I think we got it when we left and went
19      and got our lunch, and I think we stopped at
20      Hi Lo, I think -- I believe, and he ran in and
21      got it.
22   Q.  Where is the Hi Lo located?
23   A.  Just -- it's located on Seminary Street, I
```

                                                        90

```
 1      believe.
 2   Q.  In Galesburg?
 3   A.  Yeah.  I'm not for sure.
 4   Q.  Do you know what time you went to Hi Lo?
 5   A.  It would have been in between the times we were
 6      doing the running.  I don't remember which
 7      place we stopped first or what time we went
 8      into which places.
 9   Q.  Would 10:00 AM to 12:00 PM be fair?
```

                        Page 71

120110jk[1]

10   A.   Yeah.

11   Q.   And did you purchase anything else at Hi Lo

12        other than the 20-pack of Miller Lite?

13   A.   I think he bought bread and stuff for his

14        house.  Just some -- few other things he

15        needed.

16   Q.   And I'm not sure if I asked you this:  what

17        time do you think you got back to Christian's

18        house?

19   A.   I'm not sure.  I'm going to say it's afternoon.

20   Q.   When you say afternoon, after 12:00 PM?

21   A.   Yeah.

22   Q.   And about what time did you start working on

23        the vehicle?

                                                    91

1    A.   We waited until late.  We swam.  He has a

2         swimming pool.  We swam the majority of the day

3         until evening, and then we worked on the

4         vehicle.

5              We, from swimming, went inside, got on the

6         internet.  I think we did some other welding on

7         some motorcycle frames.  He builds motorcycles

8         and does roll cages and stuff for drag cars,

9         and he did some other welding before we took on

10        our project that we were doing together.

11   Q.   You and Christian went swimming on March 5th?

12   A.   Yeah.  We swam the majority from 12:00 until

13        about 5:00, I think we were in and out of the

14        pool, off and on the internet, things like

15        that.

16   Q.   Wasn't too cold to swim March 5th?

Page 72

120110jk[1]

17  A.  It was cold, but we did it anyway.

18  Q.  What kind of a pool does he have?  Is it below

19      ground?  Above ground?

20  A.  It's above ground.

21  Q.  And between 12:00 and 5:00 PM, you guys were

22      swimming, doing these things, did Christian

23      have anything to drink?

                                                    92

1  A.  When we drank, we started drinking together.

2  Q.  When I say drink, I'm talking about alcohol.

3  A.  Yeah.

4  Q.  And so what time did you and Christian start to

5      drink?

6  A.  I don't know the exact time.  I'm going to say

7      anywhere after 5:00, might have been the first

8      time a beer was opened.

9  Q.  Let's try to narrow that down, if we can.

10         You say after 5:00.  Do you think it was

11     before 8:00 PM?

12  A.  It could have -- I don't know -- I'm not for

13     sure the exact time.  I can't tell you the

14     exact time.

15  Q.  What time did you leave Christians's on --

16  A.  That's where I was leaving from when I left.

17  Q.  About what time did you leave Christian's

18     house?

19  A.  From the point where he pulled me over was

20     probably a five-minute drive.

21  Q.  I'm asking you what time of the day you left

22     Christian's house.

Page 73

120110jk[1]

23   A.   To --

93

1    Q.   To leave his house for good where you
2         eventually got pulled over.
3    A.   Five minutes before I got pulled over.  So
4         12:00 -- somewhere between 12:00 and 1:00.
5    Q.   And so between 5:00 and -- somewhere between
6         5:00 and 12:00, you and Christian started
7         drinking, is that correct?
8    A.   I don't think I drank until later.  I seen him
9         open one and drink one and kind of left it
10        laying around, and then I think I jumped on a
11        mower.  Did some mowing.  We were kind of all
12        over the place at the property there, but yeah,
13        I would say, the first beer was between 5:00
14        and 8:00.
15   Q.   And what were you mowing?
16   A.   He was mowing his yard.  I didn't mow.
17   Q.   So you didn't jump on the mower?  He jumped on
18        the mower?
19   A.   Yeah.
20   Q.   And he was mowing his grass March 5th, 2009?
21   A.   Yeah.
22   Q.   Now, earlier you told me that you and Christian
23        started drinking together.  Now you are telling

94

1         me that he started drinking first.
2    A.   Yeah, I think he opened a beer before I did --
3         a couple of hours before.
4    Q.   That was sometime between 5:00 and 8:00?

120110jk[1]

```
 5  A.  Yeah.

 6  Q.  And how many did -- how many beers did

 7      Christian have between 5:00 and 8:00?

 8          MR. MEYER:  Objection, speculation.

 9      BY MR. FUNK:

10  Q.  If you know.

11          MR. MEYER:  Asked and answered.

12          THE WITNESS:  I don't know.

13      BY MR. FUNK:

14  Q.  When did you have your first beer?

15  A.  I didn't open one and drink the first one until

16      we started doing the welding on my vehicle.

17  Q.  When was that?

18  A.  I don't know the time.  It was leaving -- way

19      later.  It was probably 9:00, 9:30, 10:00,

20      somewhere in there.  I know it was dark.  So --

21  Q.  And you testified that earlier I believe that

22      you had one full beer?

23  A.  I drank one full beer that I know from
```

                                                    95

```
 1      beginning to end.

 2  Q.  So after 9:00 PM, you had one beer, is that

 3      correct?

 4  A.  Yes.

 5  Q.  And then you drank part of another beer --

 6  A.  Yes.

 7  Q.  -- between 9:00 and the time you left?

 8  A.  Yeah.

 9  Q.  And so we are clear, nothing else to drink

10      besides that?
```

120110jk[1]

11  A.  That was it, yes.

12  Q.  Other than the beer, did you see Christian at

13      any time that day -- well, let's say, narrow it

14      down, between 5:00 and the time you left,

15      drinking anything else?

16  A.  I don't remember.  I don't think so.

17  Q.  Do you remember Christian doing any drugs?

18  A.  No.  Most definitely, no.

19  Q.  Was there anybody else there at Christian's

20      house at any point in time?

21  A.  No.

22  Q.  Does Christian own this house?

23  A.  Yes.

                                        96

1  Q.  What's the address?

2  A.  I don't know the address.  I know it's on

3      Chambers Street in Galesburg.

4  Q.  So I'm going to talk about when you guys

5      started welding the vehicle.

6          Did you have -- what type of vehicle is

7      it?  You said it was an SUV.  Do you know the

8      make, model?

9  A.  A Chevy Blazer.  Something along those lines.

10  Q.  Okay.  And you guys removed the -- you and

11      Christian removed the hood?

12  A.  Yes.  Completely.

13  Q.  And then you fixed it by welding bolts into the

14      frame, is that correct?

15  A.  Correct.

16  Q.  And at any point in time, were you and

17      Christian inside the vehicle or just working

                    Page 76

120110jk[1]

18    outside the vehicle?

19  A.  No, we were in and out.  We were also inside

20      the vehicle because we welded the door hinges.

21      It was an older truck; and from people flinging

22      the doors open, some of the welds started to

23      crack.  So we welded those, too.

                                                    97

1   Q.  Was it four doors?

2   A.  Two doors.

3   Q.  Did you weld both doors on --

4   A.  Yes, we welded both doors.

5   Q.  While you were working on the vehicle, at that

6       time just while you were outside working on the

7       vehicle, were you drinking?

8   A.  Yeah, we had beers open and were drinking.

9   Q.  Because you were pouring one out onto the weld?

10  A.  I know when I welded my side, I did the

11      driver's side of the door, and I seen him do

12      the same thing on the passenger side as we

13      handed the welder through the inside of the

14      vehicle -- take his beer and dump them on the

15      hot welds to cool them after.

16  Q.  So Christian welded the passenger side and you

17      welded the driver's side?

18  A.  Yes.

19  Q.  When you were pulled over, do you know what

20      type of bottle of liquor was in the car?

21  A.  I'm assuming it was the bottle -- same bottle

22      that we were drinking when we were there

23      welding.

120110jk[1]

98

```
 1  Q.  And so that's a no, you don't know?
 2  A.  I don't know.  I never seen the bottle myself.
 3  Q.  Earlier you testified that you -- THERE was
 4      approximately four beers missing from the
 5      20 pack, is that correct?
 6  A.  I think so.
 7  Q.  And where was the 20 pack at?
 8  A.  It was in the very back of the vehicle behind
 9      the driver -- or the back seat.  There is like
10      an area that's -- I don't know if you have seen
11      a Blazer.  Kind of like the open area back
12      there.  It was back there.
13  Q.  You mean, in the back trunk where you have a
14      swing gate and --
15  A.  Yeah.
16  Q.  When you left, did you take the beer with you?
17  A.  Yeah.
18  Q.  At the time of the incident, were you heavier
19      than you are now?
20  A.  Yes.
21  Q.  About, approximately, how much do you weigh
22      now?
23  A.  I weigh, probably, about 250.
```

99

```
 1  Q.  And how tall are you?
 2  A.  Maybe 6 foot.
 3  Q.  6 foot, 250.  What were you back in --
 4  A.  Maybe 310.
 5  Q.  Let me finish the question.
```

Page 78

120110jk[1]

6        On March 5th, 2009, same height and

7    310 pounds?

8  A.  Yeah.

9  Q.  After -- going to bounce around here a little

10    bit.

11        After the incident after you were treated

12    and you had surgery on your arm, you stated

13    that they wanted me to not work for a year.

14        I believe that was your testimony, and I

15    was just wondering who they were.

16  A.  The doctors that did the surgery.

17  Q.  So they said, no work for a year?

18  A.  They determined that before they did the

19    surgery.

20  Q.  Did they give you any specific limitations?

21        Did they say, you can work -- you can

22    type, but you can't carry dumbbells?

23  A.  Nothing.  Nothing at all.

                                    100

1  Q.  They just said, no work, whatsoever, for a

2    year?

3  A.  Right.

4  Q.  You kind of showed earlier -- you said you

5    had not the same range in the arm that was

6    broken currently as you did before it was

7    broken?

8  A.  Yeah.

9  Q.  And could you tell me -- or describe for me how

10    you don't -- what type of range you don't have

11    now.

120110jk[1]

12  A.  Because when they cut me for the incision, they
13      split the muscle in the shoulder is what he
14      told me; and when I go to go lift it up, the
15      small of my back, backwards, I can't lift it as
16      high as I can lift the other arm.
17  Q.  So when you have your, as you described
18      earlier, your hand -- your arm behind your back
19      and your forearm placed against your back, you
20      can't raise your forearm toward your neck as
21      far as you could, is that correct?
22  A.  Yes.  I don't have as much movement -- and as
23      far back.

                                                    101


1  Q.  During the -- during the nine months where you
2      were not working for Mr. Edwards, do·you know
3      if he had any projects or contracted out any
4      construction projects to anybody else during
5      that time?
6  A.  I wouldn't know that.  I'm sure there were
7      projects completely going at all times.  I'm
8      sure it never stopped.
9  Q.  Your answer to the question is:  You don't
10     know?
11 A.  I don't know.
12 Q.  Have you ever been arrested outside the State
13     of Illinois?
14 A.  No.  Maybe traffic violations.  Would that --
15 Q.  Did those traffic violations result -- do you
16     know what state?
17 A.  I think I have got them in Denver when I was
18     truck driving and in Indiana.

                    Page 80

120110jk[1]

19  Q.  Did any of those traffic incidents require you
20      to get out of the vehicle?  Did the officers
21      require you to get out of the vehicle?
22  A.  Sure.
23  Q.  Were you ever placed in cuffs for any of those?

102

1   A.  No.  No.
2   Q.  Did the officers ever search your vehicle?
3   A.  No.
4   Q.  I'm going to go back to your time in the county
5       jail when Officer Morton is attempting to place
6       the cuffs on you.
7           You testified earlier that he had one --
8       one of your arms behind your back.  Your right
9       arm, I believe?
10  A.  Yes.
11  Q.  And he was lifting up on it, and you were on
12      your tippy toes, is that correct?
13  A.  Yes.
14  Q.  And you had your left hand on the wall, is that
15      correct?
16  A.  I don't remember -- well, it kind of started
17      when that hand was on the wall, and then to the
18      point where it went to the back of my head.
19  Q.  Did he tell you to take your left hand off the
20      wall and then put it on the back of your head?
21  A.  Yes.
22  Q.  And you did that?
23  A.  Yes.

103

Page 81

120110jk[1]

```
 1   Q.  At any point in time, did any of the
 2       officers -- any of the officers in that room
 3       tell you to stop resisting?
 4   A.  No.
 5   Q.  Did any of them tell you to calm down?
 6   A.  I think he might have told me quit squirming
 7       around when he was twisting on my arm during
 8       the time that I was kind of dancing.  I don't
 9       remember what was all said word for word at
10       that point.
11   Q.  When you say he, you mean Officer Morton?
12   A.  Yes.
13   Q.  And how many times did he tell -- you don't
14       know exactly what he said, but to the extent
15       that he said something to the effect of stop
16       moving around, stop squirming around, how many
17       times did he say that to you?
18   A.  I think I directed something first like quit
19       twisting my arm, and then there was something
20       said back, and then we had a conversation --
21       sort of real quick.
22   Q.  And when you said stop twisting my arm, did you
23       raise your voice?
```

                                                   104

```
 1   A.  No.
 2   Q.  So you just said as in normal everyday
 3       conversation, stop twisting my arm?
 4   A.  Yes.
 5   Q.  Did you say anything else to the officers
 6       during the time that you were -- they were
```
                        Page 82

120110jk[1]

 7   attempting to place the cuffs on you?

 8  A.  No.

 9  Q.  So you were completely silent the entire time?

10  A.  I wouldn't say silent, but we talked.  We all

11      talked.  I don't remember what the

12      conversations were about.  Like I said, we

13      talked about him twisting my arm.

14          Once he slammed me down, we talked about I

15      couldn't breathe.  There was a point her

16      Abernathy come in and told me I was a waste of

17      air that I breathe, and he was kind of

18      verogatory (sic) toward me; and before he --

19      during the time I was pinned down and he was on

20      my back --

21  Q.  Let me -- not to interrupt you.  We will go

22      through all of it.  I just want to real quickly

23      here, at the time that you were standing and

                                              105

 1      Officer Morton is attempting to place the cuffs

 2      on you, the only thing you said at that time --

 3  A.  There was only a discussion about the twisting

 4      of my arm and stuff, and no sooner than -- I

 5      mean, it was like a 20 second deal -- two

 6      second deal.  I don't know, and I was flat on

 7      my face.

 8  Q.  Let's wait until -- I don't want to get to that

 9      point yet.

10          You are standing up, and the only thing

11      you said was in a normal voice, stop twisting

12      my arm?

120110jk[1]

13  A.  Correct.

14  Q.  And Officer Morton said to you, stop squirming

15      around, stop moving around?

16  A.  Yeah.

17  Q.  Did Officer Morton say anything else to you?

18  A.  No.

19  Q.  And you said nothing else to him?

20  A.  No.

21  Q.  Did Officer Abernathy say anything to you while

22      you were standing?

23  A.  While I was standing, he was asking me why I

106

1       was being arrested.

2   Q.  So you said something back to him?

3   A.  Yeah.

4   Q.  What did you say?

5   A.  I just told him what I was being arrested for.

6   Q.  What was that?

7   A.  DUI as far as I knew.

8   Q.  Was there any other conversation between you

9       and Officer Abernathy?

10  A.  No, no.

11  Q.  What about Officer Ingles?  Did you have any

12      conversation was him?

13  A.  At that point, I don't think I talked to

14      Officer Ingles at all.

15  Q.  Did you say anything else, or did anybody else

16      say anything to you other than what you just

17      testified to?

18  A.  No.  Other than when I was on the ground,

19      Abernathy come in and was saying verogatory

120110jk[1]

20    things.  I don't remember exactly what they

21    were.  I remember one thing being said where it

22    was a waste of air that I breathe, and this is

23    during the time they were on my back, and I was

107

1    face down.

2  Q.  Slow down.  I'm going to get to that.

3       So we are finished up with you standing?

4  A.  Right.

5  Q.  Nothing else was said.

6       Did you hear anybody say we are going

7    to -- that they were going to take you to the

8    ground or anything like that?

9  A.  No.

10  Q.  So you said what you said to Officer Morton?

11    He replied, quit squirming, quit moving around?

12    Something to that effect?  Then, the officers

13    took you down?  Is that your testimony here

14    today?

15  A.  Yes.

16  Q.  And they didn't say, stop resisting?  Calm

17    down?  Anything like that?

18  A.  No.

19  Q.  And so when they got you down, I believe you

20    testified you couldn't see who was where, is

21    that correct?

22  A.  Correct.

23  Q.  And at that point in time, you testified just a

108

120110jk[1]

```
 1       little bit ago that you said -- told them you
 2       couldn't breathe?
 3   A.  Right.
 4   Q.  And did you say anything else to them, and I'm
 5       talking -- you also testified earlier there was
 6       a point where you heard a pop?
 7   A.  Yes.
 8   Q.  Before that, did you say anything to the
 9       officers other than I can't breathe?
10   A.  I told them they were twisting my arm too far
11       and that I was in pain.  Let them know I was in
12       pain and asking them to stop, to get up.
13       Something along those lines.  I know there was
14       Abernathy come in saying things.  I know he
15       said that the air I breathe was a waste --
16       something along those lines; and if I could
17       talk, I could breathe.
18   Q.  And when you said -- told them, I can't
19       breathe, did you say it in a normal voice, I
20       can't breath?
21   A.  No.  More like a cry.  You know what I'm
22       saying, because I was in pain.
23   Q.  And is that the same way you said, you know,
```

109

```
 1       you had a problem with your arm?
 2   A.  Yes, and like -- you know, when you are in
 3       pain, you don't say it like I'm saying it now.
 4       It's not just --
 5   Q.  Other than the statements that you just
 6       testified to that Officer Abernathy, you
 7       testified, said to you, did anybody else say
```
Page 86

120110jk[1]

8    anything else to you?

9  A.   There were conversations going, but I don't

10       remember what they were.

11  Q.   Were they conversations with you?

12  A.   Not all the conversations were with me.  Some

13       of them were the officers talking amongst

14       themselves.

15  Q.   Did anybody tell you to quit resisting then?

16  A.   No.  They were telling me -- for me to give

17       them my other arm, but I couldn't give them my

18       other arm.

19  Q.   Did you say, I can't give you my arm?

20  A.   Yes.

21  Q.   So other than that, in addition to what you

22       testified to, they also said, give me your arm?

23       You told them, you can't?

110

1  A.   Yes.

2  Q.   And at that point, you heard the pop, is that

3       correct?

4  A.   Yes.  Maybe a couple of seconds or so later.

5  Q.   Before that, nothing else other than you just

6       testified to what they said according to you?

7  A.   Correct.

8  Q.   After you heard the pop, you testified earlier

9       that you asked for an aspirin.  They left --

10       the officers left the room, came back and said,

11       could not give you an aspirin, but an ambulance

12       was called.

13           Do you remember that?

Page 87

120110jk[1]

14  A.  Yes.

15  Q.  Is that correct?

16  A.  Yes.

17  Q.  Anything else said besides that between you and

18      the officers?

19  A.  No.  That my arm was broken and whether it was

20      dislocated or broken.  There was a conversation

21      about that.

22          MR. FUNK:  I want to look through my

23      notes.  You have anything else?

                                                    111

1       FURTHER EXAMINATION BY MR. KELLY:

2   Q.  The pool being open in March seems strange to

3       me.

4           Are you sure you are right about that?

5   A.  All we did was we vacuumed the leaves.  You

6       know how you get in and vacuum the leaves out

7       of the bottom.

8   Q.  Was there actual water in the pool?

9   A.  Like half full.  You know how they lower it in

10      the wintertime.  It was the first nice day.  So

11      we took the tarp off, and there were leaves in

12      the pool, and we ran the vacuum through the

13      pump.  We kind of both took turns.  It was

14      really cold.  It wasn't like you swam to enjoy

15      it, but we got in the pool and did what we did

16      to start to open it.  Then, you put a hose in

17      the pool and start to fill it up.

18  Q.  Do you know any of the neighbors -- any of

19      Christian's neighbors?

20  A.  I don't know the neighbors.

120110jk[1]

21  Q.  Do you know the names of any --

22  A.  I know none of his neighbors.

23  Q.  That day, were you actually wearing shorts, or

112

1       were you in waders or jeans, or what were you

2       wearing when you were in the pool?

3   A.  I was wearing Carharts when I went there.  Like

4       the water was maybe just above your knees, you

5       know.

6   Q.  What were you wearing in the pool?  That's what

7       I'm asking.

8   A.  I borrowed a pair of his shorts when we got in

9       the pool.

10  Q.  You told me, when you looked at the video of

11      you at the Galesburg Community Center that you

12      were just joking around with Ingles, is that --

13      when you were talking to him.

14          Is that your testimony?

15  A.  Yeah.

16  Q.  When you tore up the paperwork and threw it

17      around, were you just joking with Officer

18      Ingles?

19  A.  At that point, Mike wrote me a misdemeanor DUI

20      and a felony DUI and told me he was writing me

21      two tickets because he thought in the past I

22      had already been arrested for a misdemeanor

23      DUI.  He would write me a misdemeanor and a

113

1       felony ticket because he wasn't sure -- or he

120110jk[1]

2    slightly had a recall where I had a DUI in my

3    past which wasn't true.

4  Q.  I just want to know if you were joking around

5    when you tore up the paperwork?

6  A.  Yeah, I told him I wasn't accepting the ticket.

7    So I tore it up.

8  Q.  And that was a joke?

9  A.  Yeah.

10  Q.  And when you were saying you wanted to kick the

11    other officer's ass if he came in, were you

12    joking about that?

13  A.  Yeah.

14  Q.  Do you like Abernathy?  Did you like Abernathy

15    before this incident?

16  A.  I don't have a problem with Abernathy.

17  Q.  Did you have a problem with Ingles prior to

18    this incident?

19  A.  No.  Me and Ingles had been kind of on a good

20    relationship the whole -- when I was in the

21    jail before I served my time, he was kind of

22    like my friend.

23  Q.  You don't know any reason why Ingles would want

114

1    to try to intentionally break your arm, do you?

2  A.  No.

3  Q.  And in terms of getting your hand out from

4    underneath your body, is it your testimony that

5    you could not pull your hand out from

6    underneath your body?

7  A.  Yes.

8  Q.  Did you ever play any sports when you were

120110jk[1]

9     growing up?

10  A.  No.

11  Q.  Did you ever wrestle with any of your buddies?

12  A.  Sure.

13  Q.  Essentially, what you are saying is that the

14     officer was, what, too heavy for you to pull

15     your arm out from underneath your body?

16  A.  In the room, it's a wall and a shelf, and I was

17     completely against the wall with it under me

18     and him on my back.  I wasn't able to move it

19     out and get it around even if -- if I could

20     move it, I couldn't move it anywhere.  I had a

21     wall right here -- pressed against the wall.

22  Q.  And you are saying you physically could not

23     lift your hand up and stick it up for the

                                  115

1     officer to grab it?

2  A.  No.

3  Q.  Did you say anything to any of the officers

4     that your arm was up against the wall?

5  A.  I told them I couldn't move my arm.

6  Q.  Did you say anything specifically to the

7     officers about you could not --

8  A.  I don't think I was specific.

9  Q.  Did you say anything specifically to the

10     officers that you could not lift your arm up

11     underneath your body because there was a wall

12     there?

13  A.  No.

14  Q.  Was the officer on your -- that was on your

120110jk[1]

15    back at the time your arm was broken, did he

16    have one leg on the ground?

17  A.  I don't know.  My head was turned in the

18    opposite direction.

19  Q.  Could be he had one leg on the ground and one

20    knee in your back, is that fair?

21        MR. MEYER:  Objection, speculation.

22        THE WITNESS:  I don't know.  I don't know.

23

                                                    116

1    BY MR. KELLY:

2  Q.  What was the last thing that was said by anyone

3    in the room prior to you being pushed down onto

4    the bench?

5        MR. MEYER:  Objection.  Asked and

6    answered.  I think both of you guys have

7    covered this ad nauseum but --

8        THE WITNESS:  I don't recall the last

9    thing being said.

10    BY MR. KELLY:

11  Q.  On the tape that you watched, it appears that

12    you are angry that you were being arrested.

13        Would you agree that you were angry you

14    were being arrested from the traffic stop?

15  A.  I wouldn't say angry but unhappy.

16  Q.  And if you used the words, I'm going to kick

17    your ass, to the officer, is it your testimony

18    that you were joking to the officer?

19  A.  Yes.  There is a conversation before that that

20    we were talking about.

21  Q.  It's on the video.  We can see what it says.

120110jk[1]

22   A.   Right.

23   Q.   I'm saying, when you say you are going to kick

117

1        the officer's ass, are you joking?

2    A.   Correct.

3    Q.   Did you threaten the officers in any way before

4         you were taken into that holding cell when you

5         were at the Knox County jail?

6    A.   From the car, you mean?

7    Q.   No.   Just outside of that holding cell when

8         they brought you in.

9              Did you watch that video?   There is a time

10        period you can see you before you are taken

11        into the holding cell.

12             Do you recall that?

13   A.   You mean, the video from the --

14   Q.   Knox County jail.

15   A.   I seen two videos.   I seen one that is at the

16        police station and one that's at the jail.

17   Q.   Not at the police station.   The one at the

18        jail.

19             Do you recall that video?

20   A.   Yes.

21   Q.   And you recall that you can be seen on the

22        video, correct?

23   A.   Yes.

118

1    Q.   Did you make any threatening statements to the

2         officers before you were put into the holding

120110jk[1]

3    cell?

4  A.  No.  I didn't see -- if you are referring to

5      the deputies, they're on one side of the room,

6      and I come from the garage sally port into

7      them.

8  Q.  Did you make any statements in that video when

9      you are walking in that video where you can be

10     seen?

11 A.  No.

12 Q.  Do you remember why you spit on Abernathy?

13 A.  Yeah, Abernathy sucker punched me once he got

14     me in cuffs in the eye -- during the struggle,

15     put me in cuffs.  He sucker punched me once I

16     was in cuffs.

17 Q.  Is pouring beer on welds, is that something

18     that is a welding thing?

19 A.  Probably not.  Cooling welds are.

20 Q.  What do you usually use to cool welds?

21 A.  Water.

22 Q.  Who came up with the idea to power beer on the

23     welds?

119

1  A.  Beer is water.  So it was in our hands.  The

2      garage doesn't have --

3  Q.  I don't know about you, I would rather pour my

4      water on the weld than the beer.

5          Who came up with -- especially the cost of

6      beer -- throwing the beer away as opposed to

7      water.

8  A.  I don't know.  It's something -- I have seen it

9      done several times there.  I don't know who did

Page 94

120110jk[1]

10       it first whether it was him or me or --

11   Q.   That video of you at the Galesburg Community

12       Center jail, is that how you normally act when

13       you are joking around with people?

14   A.   Yeah.

15   Q.   When you were in the holding cell, you didn't

16       tell the guys, you know, to grab your nuts and

17       you got drugs down there?  You didn't make any

18       comments like that to the guys in the holding

19       cell?

20   A.   No.  I don't -- I don't remember there ever

21       being -- I think there could have been a point

22       where he was grabbing my nuts, and I don't

23       remember there being anything said about drugs,

                                                120

1        but I remember a search where he, you know,

2        patted me down there.

3    Q.   Did you understand when he was asking you to

4        spread your legs that that's what he was doing

5        was searching you?

6    A.   I understand that.

7    Q.   You have been through that probably hundreds of

8        times?

9    A.   What I didn't understand is when he kicked my

10       legs wider and was --

11   Q.   Did you joke around with the guys in the

12       holding cell like you joked around in the video

13       at Galesburg?

14   A.   No.  No, we weren't joking then.  We were kind

15       of having a serious -- we were talking like we

                        Page 95

120110jk[1]

16     are talking now.  It was --

17  Q.  And you are talking in a conversational voice

18      with me now in this room, correct?

19  A.  Right.  Well, I mean, to the point where he

20      kicks my legs open and starts wrenching, then,

21      the conversation kind of changes.

22  Q.  Did it change from you -- your voice?

23  A.  From both of us.

121

1  Q.  And can you think of any reason why if you were

2      using a conversational voice and following all

3      the orders why these guys and Officer Ingles

4      could not get you handcuffed?

5          MR. MEYER:  Objection, speculation.

6          THE WITNESS:  No.

7      BY MR. KELLY:

8  Q.  That doesn't make sense, does it?

9          MR. MEYER:  Is that a question?

10         MR. KELLY:  Yeah.

11         MR. MEYER:  It's a comment.

12     BY MR. KELLY:

13  Q.  That doesn't make sense to you, does it?

14         MR. MEYER:  You are asking him to

15     speculate as to what these officers were doing.

16         MR. KELLY:  He's there.  They are there.

17         MR. MEYER:  Your question, can you think

18     of any reason in this nature.  It's a

19     speculative question.  It's an improper

20     question.

21         MR. KELLY:  Can you read back my question.

22

Page 96

120110jk[1]

23

122

1                    (The requested portion of the
2                    record was read back by the
3                    Court Reporter.)
4          THE WITNESS:  I don't know.  I don't
5     understand the question.
6     BY MR. KELLY:
7  Q.  The question is:  If people in the room were
8     talking in a conversational voice with you and
9     they were giving you instructions and you were
10     following their instructions, can you -- does
11     it make sense to you that they were not able to
12     get you handcuffed?
13  A.  They weren't trying.  They were uncuffing me.
14  Q.  After they got you -- can you think of any
15     reason why they couldn't have gotten your other
16     handcuff off of your other hand?
17          MR. MEYER:  Objection, speculation.
18          THE WITNESS:  We weren't to that point
19     when he kicks my legs wider, and that makes a
20     scene to where he is cranking on my arm more
21     which makes me squirm around because he has me
22     in pain.
23

123

1     BY MR. KELLY:
2  Q.  When you say, it kind of makes a scene more,
3     you are talking about you moving around and you

Page 97

120110jk[1]
```
 4      not able to follow his orders because you are

 5      jumping up and down on your tippy toes?

 6  A.  No.  I followed his orders.  My hand was where

 7      it was supposed to be, and I did everything

 8      that he asked me to do.

 9  Q.  Can you think of any reason if he has your hand

10      behind your back why he could not have been

11      able to take that handcuff off his hand?

12          MR. MEYER:  Just objection, speculation.

13      Speculative questions.

14  BY MR. KELLY:

15  Q.  You can answer.

16  A.  I suppose he could have took it off any time he

17      wanted to.

18  Q.  And then do you know why from being in the room

19      based on your personal knowledge why then they

20      wanted to then handcuff you again?

21  A.  They didn't.

22          MR. MEYER:  Objection, speculation.

23          THE WITNESS:  That was never -- that was
```
                                                    124

```
 1      never mentioned until I heard it later on.

 2      Never was there anything said to me that they

 3      were trying to handcuff me again until I was

 4      pinned down.

 5  BY MR. KELLY:

 6  Q.  Based on --

 7  A.  That they asked for my other arm.  Wasn't said

 8      to put it back in the handcuff.  They just kept

 9      asking for my other arm when I was pinned down

10      on my back.
```
                        Page 98

120110jk[1]

11  Q.  Based on your personal knowledge of being in
12      the room, do you know why they were asking for
13      your other arm?
14          MR. MEYER:  Objection, speculation.
15          THE WITNESS:  Sure.  I know why they were
16      asking for my other arm.
17      BY MR. KELLY:
18  Q.  Why?
19  A.  To put it back in a cuff.
20  Q.  And do you know why they went from trying to
21      take the handcuffs off you to putting the
22      handcuffs back on you based on your personal
23      knowledge of being in the room with the

                                                    125


1       officers?
2           MR. MEYER:  Objection, you are asking him
3       to speculate what is in the officer's mind.
4           MR. KELLY:  I'm not.  Hold on.
5           MR. MEYER:  You are.  Listen to the
6       question.  You are saying why would they do
7       something.  He has to be in their position.
8           MR. KELLY:  I want to respond to this.
9       This is not a foundation question to get into
10      their minds.  I'm asking him based on his
11      personal knowledge of being in the room and
12      hearing and listening to what is going on if he
13      knows why they went from taking the handcuffs
14      off of him to putting them back on.
15          MR. MEYER:  Then, you are asking him to
16      give an expert opinion.

                        Page 99

120110jk[1]

17          MR. KELLY:  No, I'm not.

18          MR. MEYER:  He's not a trained police

19     officer -- what the procedures are.  Ask him

20     what the procedures are, why things are

21     happening.  Ask him to give a lay opinion as to

22     why an officer is doing something.

23          MR. KELLY:  No, I'm not.  He could come in

                                                126

1     and testify at trial, hey, I heard Abernathy

2     tell Ingles we are going to cuff this son of a

3     bitch because he just stepped on my foot.

4          MR. MEYER:  Ask him that.

5          MR. KELLY:  I'm going to ask -- I'm going

6     to ask my question.

7          MR. MEYER:  I will make my objection.

8          MR. KELLY:  Good, and if you want to

9     instruct him not to answer, do that.

10     Otherwise, I want an answer to the question.

11          MR. MEYER:  If you keep asking him

12     improper questions --

13          MR. KELLY:  We are going to be here a long

14     time if you keep doing --

15          MR. MEYER:  -- we will stop the

16     deposition.

17          MR. KELLY:  The objection is objection,

18     speculation; objection, foundation.  This is

19     Law 101.

20          MR. MEYER:  Gets to a point where it's

21     harassing.

22          MR. KELLY: Do you want to cancel the

23     deposition right now?  Because I will surely

120110jk[1]

127

```
 1    come back, and we will finish it up.  Cancel it
 2    right now.  Cancel it.  Cancel --
 3         MR. MEYER:  I didn't instruct him not to
 4    answer.
 5         MR. KELLY:  Well, then, I want an answer
 6    to the question.
 7         THE WITNESS:  I don't know.
 8    BY MR. KELLY:
 9  Q.  Do you know based on your personal knowledge of
10    being in the room as to why the officers would
11    have been in a conversational tone talking to
12    you, go from that, to somebody tackling you and
13    throwing you down onto the bench?
14         MR. MEYER:  Objection, speculation.
15         THE WITNESS:  I don't understand exactly
16    what kind of answer you are looking for or what
17    you are trying -- I don't understand the
18    question.
19    BY MR. KELLY:
20  Q.  Your attorney has given you good coaching on
21    that.
22         MR. MEYER:  I'm not telling him what to
23    say.
```

128

```
 1    BY MR. KELLY:
 2  Q.  What I want to know is your personal knowledge.
 3         Did you hear them say, I'm done fighting
 4    with this fat son of a bitch so I'm going to
```

Page 101

120110jk[1]

```
 5   tackle him?  Did you hear anything --
 6 A.  Nothing like that was said.
 7 Q.  Did you have any problem with your right arm
 8     that would have prevented you from taking it
 9     out from under your body and giving it to the
10     officer to handcuff?
11 A.  Other than being pinned down and unable to, no.
12 Q.  Prior to this incident, how would you
13     characterize your opinion of law enforcement
14     officers, in general?
15 A.  My opinion?
16 Q.  Yeah.
17 A.  They are great.
18         MR. KELLY:  I don't have anything else.
19     FURTHER EXAMINATION BY MR. FUNK:
20 Q.  Just a couple of follow-up questions.
21         Mr. Kelly asked you about when you were --
22     the officers were attempting to handcuff you,
23     and Sergeant Morton had your arm and was
```

129

```
 1     attempting to handcuff you, and Mr. Kelly asked
 2     you if there was any reason why you wouldn't
 3     have been handcuffed since there was a
 4     conversational tone between you and the
 5     officers and you were complying with all their
 6     orders according to your testimony, and I think
 7     you answered that the other cuff -- Officer
 8     Ingles' cuff was not off you yet.  So you
 9     weren't to that point.
10         Did I get your testimony correct?
11 A.  Yes.
```

Page 102

120110jk[1]

12  Q.  Let's assume that that cuff was not on your

13      hand.

14          Would there be any reason that you know of

15      why those officers would not be able to cuff

16      you at that time since you were complying with

17      their orders and there was a conversational

18      tone between you and the officers?

19          MR. MEYER:  Objection speculation.

20  BY MR. FUNK:

21  Q.  In your opinion.

22  A.  I don't have an opinion, but I can tell you

23      what happened in the room.  I can tell you that

                                                    130

1       he kicked my legs wider and was wrenching on

2       the arm to put me in pain that caused me to

3       dance around; and at that point, he slammed me

4       to the ground.

5   Q.  Was there -- was there any reason why the

6       officers should not have been able to place the

7       cuffs on you at that time other than Officer

8       Ingles' cuff being on your wrist?

9   A.  If he wanted to put the cuffs back on me, all

10      he had to tell me was, put the cuffs back on.

11      I would have put my hand behind my back if

12      that's what he said, and we would have put the

13      cuffs back on normal.

14  Q.  So there shouldn't have been any problems?

15  A.  Shouldn't have been any problem.

16  Q.  Earlier, Mr. Kelly asked you about Sergeant

17      Abernathy and Officer Ingles, if you had any

                    Page 103

120110jk[1]

18   personal issues with them before this incident.

19        Do you remember that?

20  A.  Yes.

21  Q.  He did not ask you about Sergeant Morton.

22        Do you have any personal issues with

23   Sergeant Morton prior to this incident?

                                              131


1   A.  He has a kid with my cousin, and he has had

2       problems with me when he comes in -- like a

3       chip on his shoulder.

4   Q.  How do you know he has a chip on his shoulder?

5   A.  Just by the way he acts.

6        You can tell, like when these two were

7       arguing in the room whether there is a problem

8       or not, you know.

9   Q.  Did you -- before this incident, have you had

10      arguments outside of -- outside of the jail?

11  A.  Nothing outside of the jail.

12  Q.  You never had any arguments with Sergeant

13      Morton outside the jail?

14  A.  No.

15  Q.  Can you give me any idea what you mean by chip

16      on his shoulder.

17        I mean, you haven't had any arguments.   So

18      what do you mean?

19  A.  Just because him and her relationship because

20      I'm family he kind of, you know, isn't your

21      friend, you know.  You know if someone is

22      your -- being nice to you or, you know, doing

23      what they can to be a dick to you or --

                                              132

120110jk[1]

```
 1   Q.   And do you have any examples of that type of
 2        behavior that Sergeant Morton --
 3   A.   Sure.  Wrenching on my arm when it's in a cuff.
 4   Q.   I'm talking before that.
 5   A.   Sure.  Yeah.  There was another incident where
 6        I was in the jail and me and him have had
 7        conversations about Jennifer, and he was
 8        calling her a worthless mother, and I had asked
 9        him about how the kid was doing that they have
10        in common.  This was in the old jail.
11   Q.   I'm talking about you -- you and he personally.
12   A.   Yes.
13   Q.   Not Jennifer.
14   A.   Me and him were talking about Jennifer.
15   Q.   Has he shown anything that he doesn't like
16        you -- that shows he has a problem with
17        Jennifer according to you?  What about you?
18   A.   He is not liking me because of his relationship
19        with Jennifer.
20   Q.   That's my question:  Has he said anything to
21        you directly -- have any other knowledge --
22   A.   You mean, does he say, I don't like you right
23        out of his mouth?  No.
```

                                                    133

```
 1   Q.   You just believe he doesn't?
 2   A.   Yes.
 3   Q.   Earlier you testified that you were -- you were
 4        asking for the child support that you missed
 5        while you were out of work to be paid, is that
```

Page 105

120110jk[1]

```
6        correct?
7   A.   Yes.
8   Q.   If you had been working for Mr. Edwards -- you
9        would have been working for Mr. Edwards, is
10       that correct, during that time?
11  A.   Yes.
12  Q.   And would you have paid the child support out
13       of the payments that Mr. Edwards would have
14       made to you?
15  A.   Yes.
16  Q.   Just one question.  I saw you had some tattoos
17       on your hand.
18            What does that say?
19  A.   It says hell bent.
20            MR. FUNK:  That's all the questions I
21       have.
22            MR. KELLY: Just one thing.
23            MR. MEYER:  Back and forth here.
```

                                                        134

```
1            MR. KELLY:  I was going to -- off the
2        record for a second.
3                        (Whereupon a discussion was held
4                         off the record.)
5            MR. KELLY:  I don't have anything else.
6            MR. MEYER:  Just have a couple of
7        questions.  I want to follow up.
8        EXAMINATION BY MR. MEYER:
9   Q.   When you were at the Galesburg Public Safety
10       Office when you were joking around with Ingles
11       talking about fighting people, did he ever cuff
12       you?
```

                        Page 106

120110jk[1]

13  A.  No.

14  Q.  Was he laughing around with you at this point?

15  A.  Yes.

16  Q.  Were you joking about a police officer that

17      stole one of his girlfriends?

18  A.  Yes.

19      MR. KELLY:  Object to foundation and

20      speculation as to -- and compound when you are

21      referring to both of them.

22      MR. MEYER:  I'm talking about the video.

23      MR. KELLY:  I know, but he can't speak for

                                                    135

1       Ingles.

2       BY MR. MEYER:

3   Q.  You watched part of the video when he was

4       laughing?

5   A.  Yeah.

6   Q.  The one part counsel asked you about was, if

7       the other officer comes in, I'll kick his ass.

8   A.  Yes.

9   Q.  He came in?

10  A.  Yes.

11  Q.  Did you get up and kick his ass?

12  A.  No.

13  Q.  Did you take swings at anybody while you were

14      in there joking around?

15  A.  No.

16  Q.  Was your behavior a little inappropriate, would

17      you say?

18  A.  Yes.

Page 107

120110jk[1]

19  Q.  You never tried to fight any of them, did you?

20  A.  No.

21  Q.  As for Jennifer, is there a reason why there is

22      a family tiff with Sergeant Morton and

23      Jennifer?

136

1  A.  Yes.

2  Q.  How old was Jennifer when she got pregnant?

3  A.  I don't know the exact age, but I don't think

4      she was of the legal age.

5        MR. FUNK:  Objection, relevance.

6  BY MR. MEYER:

7  Q.  Have you heard anything from Jennifer or her

8      family regarding allegations or threats that

9      Morton has made to the family about you?

10  A.  Yes.

11        MR. MEYER:  Nothing further, and we will

12      reserve.

13

14

15

16

17        FURTHER DEPONENT SAYETH NOT.

18

19

20

21

22

23

137

120110jk[1]

```
 1    STATE OF ILLINOIS

 2                      SS

 3    COUNTY OF PEORIA

 4             C E R T I F I C A T E

 5       I, Deanna S. Gabbert, CSR, License

 6    #084-002929, a Notary Public duly commissioned

 7    and qualified in and for the County of Peoria

 8    and State of Illinois, DO HEREBY CERTIFY that,

 9    pursuant to notice, there came before me on the

10    1st day of December, A.D., 2010, at 2101

11    Windish Drive, Galesburg, Illinois, the

12    following named person, to wit:

13

14                  NORMAN OETH,

15    called by the the defendants who was by me

16    first duly sworn to testify to the truth and

17    nothing but the truth of his knowledge touching

18    and concerning the matters in controversy in

19    this cause and that he was thereupon carefully

20    examined upon his oath, and his examination

21    immediately reduced to shorthand by means of

22    stenotype by me.

23       I ALSO CERTIFY that the deposition is a
```

138

```
 1    true record of the testimony given by the

 2    witness.  That the reading and signing of the

 3    deposition by the said witness were expressly

 4    reserved.

 5       I FURTHER CERTIFY that I am neither

 6    attorney or counsel for, nor related to or
```

Page 109

120110jk[1]

7  employed by, any of the parties to the action

8  in which this deposition is taken, and,

9  further, that I am not a relative or employee

10  of any attorney or counsel employed by the

11  parties hereto, or financially interested in

12  the action.

13     IN WITNESS WHEREOF, I have hereunto set my

14  hand at Peoria, Illinois, this 30th day of

15  December, A.D., 2010.

16

17

18     _____

19     Certified Shorthand Reporter

20

21

22

23

                                          139


1

2  STATE OF ILLINOIS

3

4  COUNTY OF

5

6     I, do hereby certify that I have read the

7  foregoing transcript, consisting of pages

8  numbered 1 through 139 inclusive taken 12/1/10,

9  and that the same is true and correct, except

10  as may be noted on the attached sheet(s).

11     Dated at _____, Illinois this

12  _____day of _____, 2010.

13

                  Page 110