E-FILED
Monday, 04 April, 2011  09:51:16 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT 2

**1**

```
                                                    1

              UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
                    PEORIA DIVISION


     NORMAN DETH, JR.,           )
                                 )
              Plaintiff,         )
                                 )
         vs.                     )   09-1407
                                 )
     KNOX COUNTY, KNOX COUNTY    )
     SHERIFF, DAVE CLAGUE, in his)
     Official Capacity, KNOX     )
     County Sheriff's Deputies,  )
     BRAD ABERNATHY, JASON       )
     MORTON, CITY OF GALESBURG,  )
     Galesburg Police Officer,   )
     MICHAEL INGLES,             )
                                 )
              Defendants.        )


          DEPOSITION OF JASON R. MORTON, taken

     before Connie L. Boyle, CSR, Illinois License No.

     084-602383, a Notary Public, on the 2nd day of

     December A.D., 2010, at 10:10 a.m., at 152 South

     Kellogg Street, in the City of Galesburg, County of

     Knox, and State of Illinois.
```

**2**

```
     PRESENT:

        LOUIS J. MEYER, ESQ.,
        ATTORNEY AT LAW
        20 North Clark Street
        Suite #1700
        Chicago, Illinois  60602
            On behalf of the Plaintiff;

        BRIAN M. FUNK, ESQ.,
        ATTORNEY AT LAW
        Edens Corporate Center, Fourth Floor
        650 Dundee Road
        Northbrook, Illinois  60062
            On behalf of the Defendants Knox County,
            Dave Clague, Brad Abernathy, Jason Morton;

        JAMES M. KELLY, ESQ.,
        ATTORNEY AT LAW
        4801 North Prospect Road
        Peoria Heights, Illinois  61616
            On behalf of the City of Galesburg and
            Michael Ingles.

     Also Present:  Brad Abernathy
```

                         INDEX
                                              Page
     JASON R. MORTON

     Direct Examination by Mr. Meyer          4
     Cross Examination by Mr. Kelly         103
     Cross Examination by Mr. Funk          105
     Redirect Examination by Mr. Meyer      108
     Recross Examination by Mr. Kelly       112

     Exhibit No. 1                           82
     Exhibit No. 2                           86
     Exhibit No. 3                           94

     Errata Sheet                           114

     Certificate of Reporter                116

**3**

1    IT IS HEREBY STIPULATED by and between the

2 parties hereto and their respective attorneys that

3 this is a deposition on oral interrogatories taken

4 pursuant to notice to the attorneys of record and

5 pursuant to the Federal Rules of Civil Procedure and

6 the Rules of the Supreme Court of Illinois.

7    That the deposition may be taken before

8 Connie L. Boyle, CSR, a Notary Public of Tazewell

9 County, Illinois, on the 2nd day of December A.D.

10 2010, at Galesburg, Illinois.

11    IT IS FURTHER STIPULATED that the reading

12 and signing of the deposition by the witness is

13 hereby reserved and that the transcript or any part

14 thereof may be produced at trial for any appropriate

15 purpose without the necessity of calling the said

16 Connie L. Boyle to testify as to the authenticity or

17 correctness of said transcript, except the attorneys

18 of record shall have thirty days from receipt of

19 said transcript in which to call to the attention of

20 said reporter any errors or omissions.

21

22

23

**4**

1          JASON R. MORTON,

2    having been first duly sworn, was examined and

3    testified upon his oath as follows:

4

5 DIRECT EXAMINATION BY MR. MEYER:

6 Q.  Sergeant, could you please state and spell your

7    full name for the record?

8 A.  Jason R. Morton J-a-s-o-n R. M-o-r-t-o-n.

9    MR. MEYER:  Let the record reflect that this is

10    the deposition of Sergeant Jason Morton taken

11    pursuant to notice, in accordance with the

12    Federal Rules of Civil Procedure and all

13    applicable local rules.

14    Sergeant Morton, have you ever given a

15 deposition?

16    THE WITNESS:  No.

17    MR. MEYER:  Even though you sat through

18    Norman's yesterday, I am sure you kind of have

19    an idea of what a deposition is.

20    THE WITNESS:  Yes.

21    MR. MEYER:  I am sure you spoke with your

22    counsel, he kind of explained to you what a

23    deposition is going to be.

12/02/2010

**5**

1  THE WITNESS: Yes.

2  MR. MEYER: I am going to go over some of the

3  basic ground rules so we have them on the

4  record, okay, Sergeant?

5  THE WITNESS: Okay.

6  MR. MEYER: Connie is our court reporter today,

7  she is going to be taking down all of my

8  questions and all of your answers. To make her

9  job a little easier, even if you know where I

10  am going with the question, you know what I am

11  looking for, please just let me get it out

12  there before you answer. I'll extend you the

13  same courtesy, I'll allow you to answer fully

14  before I move on.

15  I don't want to be talking over one

16  another, so if there is any point that I cut

17  you off, you have more to say, just let me know

18  and I'll stop so you can get your full answer

19  out. Fair enough?

20  THE WITNESS: Yes.

21  MR. MEYER: If at anytime you don't understand

22  a question that I ask you, don't understand a

23  word I use in the question, I speak too quickly

**6**

1  or too quietly, just let me know, I'll rephrase

2  it, use another word, speak up or slow down,

3  whatever the case may be. Fair enough?

4  THE WITNESS: Okay.

5  MR. MEYER: The premise there is I don't want

6  you, and I am sure your counsel doesn't want

7  you answering questions when you don't know

8  what is be asked of you. Fair enough?

9  THE WITNESS: Yes, fair.

10  MR. MEYER: At the end, this deposition will be

11  typed up, and it will be understood that you

12  understood my questions as we were sitting here

13  today, okay?

14  THE WITNESS: Okay.

15  MR. MEYER: Also I'll ask, you've been doing a

16  good job of it, but keep answering orally or

17  verbally. "Uh-huh", "huh-uh", shrugs of the

18  shoulders, even though I understand you sitting

19  across the table from you, I won't understand

20  it when I try to read it on paper.

21  There might be a point where I ask you to

22  clarify an answer. Fair enough?

23  THE WITNESS: Fair.

**7**

1  MR. MEYER: As you sit here today, is there any

2  reason that you can think of why you can't

3  answer my questions truthfully or honestly?

4  THE WITNESS: No.

5  BY MR. MEYER:

6  Q.  In preparation for this deposition, did you

7  review any documents?

8  A.  **Yes.**

9  Q.  What did you review?

10  A.  **The original reports from the night in question**

11  **and the interrogatories that I answered.**

12  Q.  And the reports, was that your report along

13  with Abernathy's?

14  A.  **The two reports I had to do that I reviewed.**

15  Q.  And besides your two reports, did you review

16  any other reports?

17  A.  **No.**

18  Q.  Did you watch any of the video?

19  A.  **Not in the last 24 hours. I have watched it,**

20  **though.**

21  Q.  What videos have you watched?

22  A.  **Just the one from the jail booking area.**

23  Q.  It is my understanding in the jail here there

**8**

1  is approximately 32 cameras around the jail?

2  A.  **That is probably pretty close.**

3  Q.  Do you know if there is a video in the sally

4  port area?

5  A.  **There are three cameras in the sally port area.**

6  Q.  At any time from, I guess the date of the

7  incident up until today, have you ever watched

8  any of the video from the sally port area?

9  A.  **No.**

10  Q.  Were you ever requested to preserve any of that

11  video?

12  A.  **No.**

13  Q.  Besides your interrogatory answers and reports,

14  is that all that you recall reviewing within

15  the last 24 hours?

16  A.  **Yes.**

17  Q.  Besides speaking with your counsel, did you

18  speak with anyone else about your deposition

19  today?

20  A.  **No.**

21  Q.  Sergeant, I just want to get a little

22  background information. Where did you go to

23  high school?

12/02/2010

---

**9**

1  A.  Galesburg High School.

2  Q.  When did you graduate?

3  A.  1991.

4  Q.  And after graduating from Galesburg High

5      School, did you go onto college?

6  A.  Yes.

7  Q.  Where did you go to college?

8  A.  Carl Sandburg College.

9  Q.  Did you obtain a degree?

10 A.  No.

11 Q.  How far did you get in Carl Sandburg?

12 A.  I have 88 credit hours.

13 Q.  After Carl Sandburg, did you go into a

14     technical or trade school?

15 A.  Some work-related training classes.

16 Q.  Is that work-related through the Sheriff's

17     Department?

18 A.  Other places as well.

19 Q.  Okay.  And how long have you worked for the

20     Knox County Sheriff's Office?

21 A.  Started my 14th year.

22 Q.  And prior to starting with Knox County, did you

23     have any other law enforcement background?

---

**10**

1  A.  Yes.

2  Q.  Where did you work prior to Knox County?

3  A.  I was a Knox County auxiliary deputy.

4  Q.  What is an auxiliary deputy?

5  A.  A volunteer deputy.

6  Q.  How long were you a volunteer deputy?

7  A.  Approximately two years or so.

8  Q.  Is this back around '95, '96?

9  A.  '93 to '95, I believe.

10 Q.  And was it from '95 to present you have been

11     working?

12 A.  No.

13 Q.  I guess a gap of a year?

14 A.  Approximately a year and nine months.

15 Q.  And what did you do for that year and nine

16     months?

17 A.  I did security.

18 Q.  Where did you work security?

19 A.  I worked for Burns International Security or

20     Borg-Warner Protection, two different names.

21 Q.  Was that just a private security company that

22     contracted out with different businesses?

23 A.  Yes.

---

**11**

1  Q.  And prior to '92, '95 when you were auxiliary

2      deputy, did you do any law enforcement or

3      security?

4  A.  I did an internship program where I rode with

5      the police.

6  Q.  Was that here in Galesburg?

7  A.  Yes.

8  Q.  But no other actual jobs?

9  A.  No.

10 Q.  And so it was approximately 1996 when you

11     started your probationary period in Knox

12     County?

13 A.  1997.

14 Q.  '97.  And how long was your probationary

15     period?

16 A.  A year.

17 Q.  And prior to your probationary period, did you

18     have to go through any academy, police academy?

19 A.  Yes.

20 Q.  Where did you attend the academy?

21 A.  At the Peoria County Sheriff's Department.

22 Q.  How long was the academy?

23 A.  Five weeks.

---

**12**

1  Q.  After that you get a certificate as a

2      correctional officer?

3  A.  Yes.

4  Q.  Was that before you were hired here at Knox

5      County?

6  A.  I was hired September 15th, and I started

7      school, I believe, the last Monday or Tuesday

8      in September.

9  Q.  So it was you were hired, went through the

10     academy to get your certificate --

11 A.  I worked for a couple weeks, went to school for

12     the five weeks and came back.

13 Q.  And kind of just take me through your evolution

14     through the Knox County Sheriff's Department,

15     where you started and what your current rank

16     is.

17 A.  When I started in '97, I was a correctional

18     officer from 1997 until about January 31st of

19     2001.  I did that job, just a correctional

20     officer, then I was promoted to sergeant, and I

21     did that until, I want to say December 1st of

22     2002.

23        And then I stepped back to being just a

---

13

1  correctional officer until, I did correctional
2  officer duties until roughly September of 2007.
3  And I did at that point a little over three
4  months as a transportation officer, then went
5  back to being a correctional officer in January
6  of 2008, was appointed acting shift sergeant in
7  June of 2008, was officially promoted to shift
8  sergeant in August of 2008.
9  Q.  And is that your --
10  A.  And that is my current status.
11  Q.  Okay.  So I just want to kind of break this
12  down here.  So from when you started until
13  approximately January 31st of '01, you were
14  just a correctional officer, correct?
15  A.  Yes.
16  Q.  That is here at the Knox County Jail?
17  A.  Yes.
18  Q.  Then from '01 to approximately December 1st of
19  '02, you were a sergeant?
20  A.  Yes.
21  Q.  And then you went back to correctional officer?
22  A.  Yes.
23  Q.  Why was that?

14

1  A.  I wasn't happy with the position at the time.
2  I was fairly young at the time, there was no
3  way to get weekends off, you know.  I had a kid
4  I was raising and wanted to be able to do
5  things on the weekends with him.
6  Q.  Did you have a pay raise when you became a
7  sergeant?
8  A.  Yes.
9  Q.  Did you go back down when you went back to
10  corrections?
11  A.  Yes.
12  Q.  And then for approximately three months in
13  September of '07, you were a transportation
14  officer?
15  A.  Yes.
16  Q.  What is a transportation officer?
17  A.  You take people back and forth to court,
18  medical appointments, different jails.
19  Q.  Okay.  And then January of '08 you went back as
20  correction officer again, correct?
21  A.  Yes.
22  Q.  Up until June of '08 where you were the acting
23  shift sergeant?

15

1  A.  Yes.
2  Q.  And that is, August of '08 you got that
3  appointment, correct?
4  A.  Officially.
5  Q.  And what are the duties of a shift sergeant?
6  A.  Supervising the staff of the shift that you are
7  assigned to, scheduling paperwork, doing basic
8  correctional officer duties as well.
9  Q.  And within the Knox County Sheriff's
10  Department, how are the shifts broken down?  Is
11  there mornings, days, nights; or one, two,
12  three?
13  A.  There are three shifts.
14  Q.  And it is like one, would that be morning; two,
15  afternoons; and three, midnights?  Just what
16  names --
17  A.  One is first shift, second shift, and then
18  third shift.
19  Q.  Let's go with the hours.  What are the hours of
20  first shift?
21  A.  6:45 to 10:45 -- no, I am sorry, that is wrong.
22  6:45 to 2:45 is day shift.  2:45 to 10:45 is
23  second shift.  10:45 to 6:45 a.m. is third

16

1  shift.
2  Q.  What shift are you the sergeant for?
3  A.  Third shift.
4  Q.  And have you always been third shift sergeant?
5  A.  Not always, no.
6  Q.  How long have you been assigned to third shift
7  sergeant?
8  A.  At this point, since June of '08, so two years
9  and just about six months.
10  Q.  Since you were officially appointed, that is
11  your shift?
12  A.  Yes.
13  Q.  Okay.  And how many correctional officers work
14  under your supervision during the third shift?
15  A.  Six.
16  Q.  Is it the same six usually assigned to third
17  shift?
18  A.  It depends, we switch around at the beginning
19  of each year.
20  Q.  So each year would be the same six working?
21  A.  Depends on how it goes.  Up to this year, they
22  had a bid situation where you could bid to a
23  different shift.

12/02/2010

**17**

1  Q. And do you know total, including first, second,
2  and third shift, how many correctional officers
3  there are?
4  A. At this time there are 22.
5  Q. And then at the time of the incident, which was
6  in March of '09, do you know how many there
7  were?
8  A. I believe 22.
9  Q. Now anytime during your employment with the
10  Knox County Sheriff's Department have you ever
11  been disciplined in any way?
12  A. Yes.
13  Q. And how many times have you been disciplined?
14  A. Twice.
15  Q. What were those for?
16  A. Security violations.
17  Q. What were the security violations?
18  A. The first time in 1998, I believe, it was for
19  not getting the control room door in the old
20  jail closed.
21  Q. And what was the result of that violation?
22  A. Got written reprimand.
23  Q. What was the second discipline?

**18**

1  A. Some doors were propped open.
2  Q. What type of discipline, if any, did you
3  receive for that?
4  A. I got a written reprimand and a five-day
5  suspension in my file.
6  Q. And at anytime during your employment with the
7  Knox County Sheriff's Department, excluding
8  this incident, have any detainees or inmates
9  ever made allegations of excessive force or
10  misconduct on your behalf?
11  A. Not that I am aware of.
12  Q. Have you ever been defended in a lawsuit
13  before?
14  A. Yes.
15  Q. When were you defended in a lawsuit?
16  A. I want to say 2000, 2001 was when we were
17  served with the papers and it was, I believe,
18  disposed of in 2004 or the spring of 2005.
19  Q. Do you know what the outcome of that case was?
20  A. Summary judgment in our favor.
21  Q. Do you know if that was a denial of medical
22  attention claim?
23  A. It was a death claim.

**19**

1  Q. Do you know if the plaintiff's estate was
2  alleging that proper medical care wasn't
3  provided to the detainee while they were an
4  inmate?
5  A. Yes, it was the plaintiff's estate.
6  Q. Okay. Have you ever sued anybody?
7  A. No.
8  Q. Have you ever been arrested before?
9  A. Yes.
10  Q. And what have you been arrested for?
11  A. I was arrested as a juvenile for criminal
12  damage to property and misdemeanor theft.
13  Q. And anything since you have been an adult?
14  A. No.
15  Q. Are you married?
16  A. No.
17  Q. Do you have any children?
18  A. Yes.
19  Q. How many children?
20  A. One.
21  Q. Is that Jennifer?
22  A. Well, that is his mother.
23  Q. So the mother is Jennifer?

**20**

1  A. My son's name is Christian.
2  Q. Jennifer, her last name, is it Thomas?
3  A. Yes.
4  Q. That is Norman Oeth's cousin?
5  A. Yes.
6  Q. And how old is Christian, your son?
7  A. 19.
8  Q. And I have to ask, but how old was Jennifer at
9  the time she became pregnant with Christian?
10  A. 17 or 18.
11  Q. Do you know whether or not there was any
12  dispute with the family as to getting married
13  or not bringing charges?
14  A. At the time --
15  MR. FUNK: I am going to object. Could you
16  clarify family?
17  BY MR. MEYER:
18  Q. Jennifer's mother, I can't remember her name.
19  They live up in Minnesota, correct?
20  A. Yes.
21  Q. What is the mother's name?
22  A. Linda.
23  Q. Linda. Was there anything about Linda telling

**21**

1  you you need to marry her because she was
2  underage at the time?
3  A.  No.
4  Q.  Was there any talk with anyone within
5  Jennifer's family about being forced to marry
6  her?
7  A.  No.
8  Q.  Did you ever marry her?
9  MR. FUNK:  Objection, speculation.  You can go
10  ahead and answer.
11  BY MR. MEYER:
12  Q.  Were you guys married?
13  A.  No.  Well, we did marry eventually.
14  Q.  And since the filing of this lawsuit, have you
15  ever spoken with Jennifer about this lawsuit?
16  A.  Yes.
17  Q.  What have you said to Jennifer?
18  A.  She asked me about it on the phone, and I said
19  yeah, it will be okay.
20  Q.  Did you ever speak with Jennifer's mother about
21  the lawsuit?
22  A.  No.
23  Q.  Did you ever bring up Norman's name at any

**22**

1  time?
2  A.  No.
3  Q.  Now prior to this March incident with Norman
4  Oeth, did you know who Norman Oeth was?
5  A.  Yes.
6  Q.  How did you know Norman Oeth?
7  A.  I have known him probably since the mid 1980s.
8  Q.  Is that through your relationship with
9  Jennifer?
10  A.  Yes.
11  Q.  And prior to March of '08, had you ever had any
12  problems with Norman?
13  A.  Yes.
14  Q.  What problems have you had with Norman?
15  A.  Norman threatened to tell my son that he wasn't
16  my biological son.
17  Q.  When was that?
18  A.  Approximately 10, 11 years ago.
19  Q.  Did you and Norman have any type of altercation
20  as a result of that?
21  A.  Verbal.
22  Q.  Besides that, can you think of any other
23  situations where you had any disagreements with

**23**

1  Norman?
2  A.  No.
3  Q.  When was the last time, I guess, you were
4  really social with Norman in relation with
5  Jennifer and the family?
6  A.  Would have been prior to me and his cousin
7  getting married, and that was in 1993.
8  Q.  You guys got married in '93?
9  A.  Yeah.
10  Q.  When did you separate?
11  A.  1993.
12  Q.  And since '93, you weren't really talking with
13  Norman regarding family issues at that time?
14  A.  No.
15  Q.  And prior to the March incident in '09, did you
16  know Galesburg Police Officer Mike Ingles?
17  A.  Yes.
18  Q.  How do you know Mike Ingles?
19  A.  I originally met Mike when he worked for the
20  Knox County Sheriff's Department as a
21  correctional officer.
22  Q.  Did he ever work under your supervision?
23  A.  I don't recall, he could have.

**24**

1  Q.  Do you know Mike Ingles outside of work?
2  A.  No.
3  Q.  Have you ever socialized with him outside of
4  work?
5  A.  No.
6  Q.  And do you know how long Mike Ingles was a Knox
7  County correctional officer?
8  A.  I would guess approximately two to three years.
9  Q.  And then he took a job with the Galesburg
10  Police Department, correct?
11  A.  Yes.
12  Q.  And obviously you know Officer Abernathy,
13  correct?
14  A.  Yes.
15  Q.  And how long have you known Officer Abernathy?
16  A.  Since he started here.
17  Q.  And are you social with him outside of work?
18  A.  I suppose you could say that.
19  Q.  I want to turn your attention to the March 5,
20  2009 incident that occurred here at the Knox
21  County Jail, okay, Sergeant?
22  A.  Okay.
23  Q.  You were working that day as a Knox County

12/02/2010

**25**

1  Sheriff's officer?
2  A.  Yes.
3  Q.  And you are the sergeant, the shift sergeant
4     for third shift, correct?
5  A.  Yes.
6  Q.  So your assignment, you would have started at
7     10:45?
8  A.  Yes.
9  Q.  What is the first thing you do when you come in
10    for your assignment on third shift?
11 A.  We get passover information given to us from
12    the previous shift.
13 Q.  Passover information referring to who possibly
14    is in custody that came in on second shift?
15 A.  Yes.
16 Q.  Whether there is any detainees that are any
17    problems in the cells?
18 A.  Yes.
19 Q.  Anything else, any other information you
20    received?
21 A.  That is basically it.
22 Q.  And after you receive the passover information,
23    what do you do at that time?

**26**

1  A.  Well, we start doing the cell checks, and those
2     you have to do every 15 minutes, 30 -- 15 if it
3     is suicidal.
4  Q.  And when you come in as the sergeant, do you
5     assign what correctional officers will have
6     what duties?
7  A.  At that time we didn't.
8  Q.  How did, you just determined who did what at
9     what time?
10 A.  At that point in time, when a call came in, we
11    all just said I want to go here, I want to go
12    there, and everybody was happy, so that is just
13    how we did it.
14 Q.  So there weren't like set positions?
15 A.  Not then.
16 Q.  Currently are there?
17 A.  Yes.
18 Q.  When did that change?
19 A.  I want to say that was approximately mid spring
20    of this year.
21 Q.  And do you have any understanding as to why
22    they decided to do that?
23 A.  To issue better training and proficiency by all

**27**

1     the officers.
2  Q.  And I guess, are there six positions then if
3     there are six correctional officers working?
4  A.  No, there is actually four to five.
5  Q.  And what are those four to five positions?
6  A.  One person in the control room, two people in
7     the security area, a minimum of one in booking,
8     and if there is a full complement of five
9     people there that night, that would be a second
10    person in the booking room.
11 Q.  Six would be the sergeant?
12 A.  No -- yeah, there is five people scheduled each
13    particular night.
14 Q.  I got you.  And the central, what area, is that
15    that door right when you come in there?
16 A.  Central?
17 Q.  Did you say one of them is in the central
18    control?
19 A.  Control room.
20 Q.  Control room.  Is that that first room you come
21    in where there is like black glass?
22 A.  Yes.
23 Q.  Okay.  The security area, where is the security

**28**

1     area?
2  A.  That is in the back probably two-thirds of the
3     jail, or third of the jail, I guess would be
4     more accurate.
5  Q.  The booking, that is when you can see in the
6     video it kind of has like a partition around
7     it?
8  A.  Uh-huh.
9  Q.  A desk?
10 A.  Yes, sir, yes, sir.
11 Q.  But back in March '09 there wasn't these kind
12    of assignments, though, correct?
13 A.  No.
14 Q.  Do you recall what -- strike that.
15    Do you recall what correctional officers
16    were working on March 5th of '09?
17 A.  Would have been myself, Brad Abernathy, Kim
18    Matthews, Cole Benoit, and Jeff Higgins.
19 Q.  Was it Colt?
20 A.  Cole, C-o-l-e.
21 Q.  Typically do you have at least one female
22    correctional officer in case there is a female
23    detainee that needs to be searched or

29

1    processed?

2  A.  **We try to.**

3  Q.  In a situation if there is no female

4      correctional officer working that day, what

5      happens if a female arrestee comes in?

6  A.  **We can process a female arrestee, and if they**

7      **are releasable, we release them without a**

8      **female correctional officer.  Is one is being**

9      **arrested for an offense that they have to be**

10     **held over for a judge, then all we can do is**

11     **put them in a holding cell and they wait until**

12     **a female comes in.**

13  Q.  For the search?

14  A.  **Right.**

15  Q.  Prior to Mr. Oeth arriving here at the Knox

16      County Jail, did you process any other

17      arrestees that day?

18  A.  I believe so.

19  Q.  Do you keep a record or keep track of who is

20      being processed?

21  A.  **It is all in the computer.**

22  Q.  Have you ever had to print out like a day's

23      shift to see how many people are processed in?

30

1  A.  **Yes.**

2  Q.  Is there a name for that type of document?

3  A.  **I think it may be called the Daily Inmate**

4      **Report.**

5  Q.  Now back to the video from the day of the

6      incident, there appeared to be two civilians

7      also in the, I guess booking area, correct?

8  A.  **Yes.**

9  Q.  Did you recognize either of those two?

10  A.  **One of them I know.**

11  Q.  Who is that?

12  A.  **Christina Shouse.**

13  Q.  Do you know how to spell the last name?

14  A.  **I believe it is S-h-o-u-s-e.**

15  Q.  And was she the one that was walking around?

16  A.  **She would have been the one with the longer**

17      **grayish hair and the white, I believe,**

18      **sweatshirt.**

19  Q.  Okay.  Because there is one that appeared to be

20      sitting down the whole time on a bench.

21  A.  **Yes.**

22  Q.  So this is the one that, Shouse is the other

23      one?

31

1  A.  **Yes.**

2  Q.  Have you ever talked with Ms. Shouse about this

3      incident?

4  A.  **No.**

5  Q.  Have you ever been told that she has

6      information regarding what was said in that

7      holding cell?

8  A.  **No.**

9  Q.  And how do you know Ms. Shouse?

10  A.  **Through her arrests and being brought here.**

11  Q.  At some point in time did you receive

12      information that Galesburg was bringing an

13      arrestee to the jail?

14  A.  **Yes.**

15  Q.  What is the first information that you

16      received?

17  A.  **We saw them pull up in the parking lot.**

18  Q.  So my question is do they call and say hey,

19      Sergeant, we are on the way with --

20  A.  **No.**

21  Q.  Do they come honk at the sally port door?

22  A.  **There is an air hose thing that attaches to a**

23      **buzzer.**

32

1  Q.  Like at a gas station when you run over it?

2  A.  **Similar, yes.**

3  Q.  A dinging, knowing that someone is at the sally

4      port?

5  A.  **Yes.**

6  Q.  And when you first observed, I guess a

7      Galesburg Police car at the sally port door,

8      what happened next?

9  A.  **Brad was working in the control room that**

10     **night, and he opened the sally port door.**

11  Q.  And approximately what time was this?

12  A.  **Sometime, I would say probably around 2:00,**

13     **well, 1:30, 1:30, quarter to 2:00**

14     **approximately.**

15  Q.  A.M., correct?

16  A.  **Yes.**

17  Q.  And after the sally port door is open, the

18      vehicle goes into the sally port, what is the

19      next thing that you observe or hear regarding

20      this individual?

21  A.  **It appeared that it was taking longer than**

22     **normal to get the arrestee out of the back of**

23     **the car.**

12/02/2010

**33**

1  Q.  And could you see what was going on or just
2      time?
3  A.  We could see Ingles standing outside of the
4      car.
5  Q.  And did you see him on a monitor or could you
6      look out into the sally port?
7  A.  Monitor.
8  Q.  And could you observe Ingles do anything when
9      you saw him standing outside of the car?
10 A.  No.
11 Q.  Did it appear he was like pulling at the person
12     or just standing?
13 A.  It appeared to us that he was having problems
14     just getting him to get out of the car.
15 Q.  And you said you observed this on a monitor,
16     correct?
17 A.  Yes.
18 Q.  Is that in that control area?
19 A.  Yes.
20 Q.  Who was present when you are viewing the
21     monitor?
22 A.  Myself and Brad Abernathy.
23 Q.  And did you say anything to each other?

**34**

1  A.  We should go out and see if we can help.
2  Q.  Do you recall anything else that was said?
3  A.  No.
4  Q.  At this time did you know who the individual
5      was that was in the back of Ingles' car?
6  A.  No, I didn't.
7  Q.  And the two of you decide to go out there,
8      correct?
9  A.  Yes.
10 Q.  From the time, I guess, Ingles' car pulls into
11     the sally port until you and Officer Abernathy
12     go out there, how much time goes by?
13 A.  Maybe a couple minutes.
14 Q.  After approximately a couple minutes, how do
15     you get out into the sally port?
16 A.  We walk through the exit to the control room,
17     and then the door going into the booking room,
18     walk across the area where the first two
19     holding cells are and out that last door on the
20     right-hand side.
21 Q.  And that is the door that is the one just next
22     to holding cell one, correct?
23 A.  Yes.

**35**

1  Q.  And does that open up into like a stairs going
2      down to the sally port?
3  A.  No, it is a straight shot, no stairs.
4  Q.  And what is the first thing that you observe
5      once you open that door and look into the sally
6      port?
7  A.  Well, there is two doors, we go through the
8      first door, we go through the second door, and
9      as we get out there, we see Mike Ingles with
10     Norman Oeth heading toward holding cell one.
11 Q.  So I guess the first door, and then is there
12     like a little interlock?
13 A.  Yes.
14 Q.  So you let the first door lock, second door
15     opens?
16 A.  Exactly.
17 Q.  You open up, you come out into the sally port,
18     Ingles has Norman out of the vehicle, correct?
19 A.  Yes.
20 Q.  And when you observe Ingles with Norman out of
21     the vehicle, did you recognize Norman Oeth?
22 A.  Yes.
23 Q.  Did you say anything to Norman Oeth at this

**36**

1      point?
2  A.  Not at this point, no.
3  Q.  Did you hear Officer Abernathy say anything to
4      Ingles at this point?
5  A.  I don't recall anybody saying anything at that
6      point.
7  Q.  I was going to say the same question for
8      Ingles, did you hear him have any conversations
9      with Norman?
10 A.  I don't recall.
11 Q.  And did it appear that Ingles was having
12     trouble walking Norman at all?
13 A.  At that point, no.
14 Q.  From the sally port, can you put someone into
15     each holding cell?
16 A.  You can put somebody in holding cell one or
17     two.
18 Q.  Okay.  So your observation was Ingles was
19     walking Mr. Oeth toward holding cell one,
20     correct?
21 A.  Yes.
22 Q.  Okay.  And what was the next thing that you
23     observed?

12/02/2010

**37**

1 A. Brad went over, pressed the intercom button to
2    tell Kim Matthews, who was in the control room,
3    to go ahead and open the door, and Brad held
4    the door open, and Mike walked him into the
5    holding cell and we secured the door.
6 Q. So you walk Norman in, does Mike walk back out?
7 A. Yes.
8 Q. So he exits back out into the sally port, not
9    into the booking room?
10 A. Correct.
11 Q. Okay. And so it is just the three of you in
12    the sally port at that time?
13 A. Yes.
14 Q. After Norman is secured in holding cell one, do
15    you have any conversations with Mike Ingles at
16    this point?
17 A. As we are walking through the two doors going
18    back into booking.
19 Q. And it is just you, Ingles and Abernathy,
20    correct?
21 A. Yes.
22 Q. What is said during this conversation?
23 A. I don't remember exactly.

**38**

1 Q. Does Ingles tell you anything about what Norman
2    was saying or doing?
3 A. I think the gist of it was what he was arrested
4    for and he had a hard time with him.
5 Q. Did he ever tell you Norman is claiming he has
6    drugs in his socks or --
7 A. Not at this point, no.
8 Q. At any time did Ingles ever tell you that
9    Norman claimed he had drugs on him?
10 A. I don't recall Mike ever saying those things.
11 Q. Did he ever tell you that Norman said he had
12    drugs in his socks and he would split it with
13    you guys?
14 A. No.
15 Q. Do you recall specifically anything? And I am
16    talking about words that Ingles may have said
17    about what Norman said.
18 A. Not specifically, no.
19 Q. So just kind of a general he is arrested for
20    DUI and I was having problems with him?
21 A. Yes.
22 Q. Did he ever give you any warnings like he is
23    being totally out of control or we might need

**39**

1    to get additional people here?
2 A. At that point, no.
3 Q. So the three of you then walk back into the
4    booking area, correct?
5 A. Yes.
6 Q. And what happens when you walk back into the
7    booking area?
8 A. Mike Ingles, he goes around to the computer to
9    start doing his computer entry that he does on
10    arrestees. Myself and Brad Abernathy, we went
11    into the holding cell and began the process of
12    receiving the prisoner.
13 Q. And you said Mike goes to the computer to do
14    his entry, correct?
15 A. Uh-huh.
16 Q. Is that yes?
17 A. Yes, I am sorry.
18 Q. It happens to everybody. At the computer, is
19    it a special computer that all officers use?
20    That is a bad question.
21    Obviously Knox County is where all the
22    little cities in Knox County bring someone if
23    they need to be held, correct?

**40**

1 A. Yes.
2 Q. Is this computer -- I am not familiar with all
3    the towns in Knox County, but you know,
4    obviously Galesburg, do they have their own
5    computer with their own log-in?
6 A. No.
7 Q. Just one computer that everyone uses?
8 A. Just Galesburg and the Knox County Sheriff's
9    Department.
10 Q. And why is it that other, I guess,
11    municipalities don't use that computer?
12 A. They are not in the integrated system as of
13    yet.
14 Q. What is the integrated system?
15 A. Where Galesburg and Knox County and the
16    Galesburg Fire Department are all in the same
17    system.
18 Q. Is this like a program that does police reports
19    or supplemental reports?
20 A. All records.
21 Q. So if it is another municipality that is
22    bringing an arrestee in that needs to be bonded
23    over, they'll do their police reports at their

12/02/2010

41

1  own station?
2  A.  Yes.
3  Q.  And they have their own different format of how
4     they look?
5  A.  Yes.
6  Q.  And if they bring someone, do they have to give
7     you like a paper copy of what they already did
8     at their station?
9  A.  No, they give us a charge sheet, we call it
10    booking sheet.
11 Q.  At some point the arrest report and everything
12    needs to go into like the case file?
13 A.  Yes.
14 Q.  How do you get a case file from another
15    municipality if it is not within your own
16    system?
17 A.  They forward it to the State's Attorney's
18    office.
19 Q.  But for, I guess if Knox County makes an
20    arrest, or Galesburg, you can just print it
21    right out of your system?
22 A.  Yes.
23 Q.  Okay.  So Ingles goes to complete his, I guess

42

1     processing or his reports, and you and Brad go
2     to do, I guess, receiving of the inmate,
3     correct?
4  A.  Yes.
5  Q.  Are there procedures or protocols within Knox
6     County, and that is how you receive an inmate?
7  A.  Yes.
8  Q.  And take me through those.
9  A.  Basically you enter the cell; you begin an
10    initial search; remove handcuffs; relieve them
11    of certain property items, which would consist
12    of shoes, coats, belts, any small items.  And
13    then after that, you do a thorough pat-down.
14 Q.  Are there certain circumstances where you don't
15    immediately enter the cell?
16 A.  I don't recall any circumstances.
17 Q.  I guess is there, since you have been working
18    here for 14-some years, has an arrestee ever
19    been brought in that is highly combative or
20    completely out of control?
21 A.  Yes.
22 Q.  Are there times you put him in a holding cell
23    and have a cool-down period before you go in

43

1     and try to make any contact?
2  A.  Even then we would switch out the handcuffs and
3     give the arresting agency's officers their
4     cuffs back.
5  Q.  Are there times where you can see -- there is a
6     chuckhole in the door.  Is that what they call
7     it here?
8  A.  Yes.
9  Q.  Have you ever had people put their hands
10    through the chuckholes to switch out cuffs?
11 A.  I have had people put their hands through
12    there.
13 Q.  Are there times you can ask them to turn around
14    and put your hands out so I can cuff you out?
15 A.  Yes.
16 Q.  Or cuff them up, if you want to cuff them to
17    bring them out?
18 A.  Yes.
19 Q.  That is a practice that is used here in certain
20    situations?
21 A.  Yes.
22 Q.  Is that -- strike that.
23    And prior to you and Brad going into the

44

1     cell to start the processing of Norman, did
2     Mike Ingles give you any type of warnings
3     whatsoever about Norman?
4     MR. FUNK:  Objection, asked and answered.
5     THE WITNESS:  No.
6  BY MR. MEYER:
7  Q.  And the two of you go to the door, correct?
8  A.  Yes.
9  Q.  And you ask Norman to step back?
10 A.  Yes.
11 Q.  And he steps back?
12 A.  Yes.
13 Q.  Then the door is opened?
14 A.  Yes.
15 Q.  And then I think you asked Norm to turn and
16    face the wall?
17 A.  Yes.
18 Q.  And he turns toward the wall?
19 A.  Yes.
20 Q.  And after he turns toward the wall, that is
21    when you start to remove his cuffs, correct?
22 A.  Yes.
23 Q.  What cuff do you remove first?

12/02/2010

**45**

1 A. His right cuff.

2 Q. And up to this point, up to where you remove

3 his right cuff, besides giving the orders that

4 we just went through, did you have any other

5 conversations with Norman?

6 A. Yes.

7 Q. What other conversations?

8 A. Norman indicated, indicated is a bad word, he

9 insinuated we wanted to feel his nuts, that he

10 had drugs stuffed in his crotch, and called me

11 a fag.

12 Q. Have any other arrestees ever used words like

13 this to you before?

14 A. Yes.

15 Q. You work in a jail?

16 A. Yes, sir.

17 Q. It is --

18 A. Yes.

19 Q. -- it is something you are used to?

20 A. Yeah.

21 Q. Okay. Have you ever had situations where you

22 processed Norman in the jail prior to that?

23 A. Yes.

**46**

1 Q. Have you ever had any problems with him before?

2 A. Nothing like this.

3 Q. Okay. Has he ever tried to fight you or

4 anything?

5 A. No.

6 Q. So you go in there and while you are giving the

7 orders, Norm says something that you want to

8 feel his nuts, I got drugs in my crotch, and

9 calls you a fag?

10 A. Yes.

11 Q. Do you recall anything else that he said?

12 A. No.

13 Q. Did you hear him direct anything toward Officer

14 Abernathy?

15 A. I don't recall.

16 Q. And what do you say in response to Norman when

17 he is saying this?

18 A. I believe I said something to the effect just

19 chill out, be cool and cooperate.

20 Q. Did he say anything in response?

21 A. Not at that point, no.

22 Q. And after he says that, you get the right cuff

23 off, correct?

**47**

1 A. Yes.

2 Q. After you remove the right cuff, what happens

3 next?

4 A. Then I take the left one off.

5 Q. What does Norman do with his right hand when

6 you remove the cuff from it?

7 A. He put it behind his head.

8 Q. Did you direct him to do that?

9 A. Yes.

10 Q. And he complied?

11 A. Yes.

12 Q. And then you take the left cuff off, correct?

13 A. Yes.

14 Q. And what happens when you take the left cuff

15 off?

16 A. He started to put it up against the wall and

17 then brought it up to his head.

18 Q. Does he put it behind his head?

19 A. Yes.

20 Q. And after -- so both his hands were behind his

21 head?

22 A. Yes.

23 Q. What happens at that point?

**48**

1 A. At that point I start the final part of the

2 search.

3 Q. What is the final part of the search?

4 A. Where I can really got underneath the person's

5 arms, because you can't do it when they are

6 cuffed, checking for weapons, a little bit more

7 thorough look for contraband issues.

8 Q. At this point do you have Norman spread his

9 legs?

10 A. Yes.

11 Q. At any point did you kick his legs apart?

12 A. No.

13 Q. And up to this point when he has both hands

14 behind his head and you are starting, I guess,

15 the final search, is there any other

16 conversations between you and Norman?

17 A. No.

18 Q. Any conversation between Norman and Officer

19 Abernathy?

20 A. At this point he does turn to face Brad.

21 Q. And did he turn in response to something Brad

22 said?

23 A. I don't remember hearing Brad saying anything.

**49**

1  Q.  You didn't hear Brad say anything up to the
2      point you see Norman turned toward Brad?
3  A.  Right.
4  Q.  What happens when Norman turns toward Brad?
5  A.  He came away from the wall, and I tried to put
6      him back to the wall.
7  Q.  Did his whole body come away or just the act of
8      turning?
9  A.  Yeah, he came probably eight to ten inches away
10     from the wall as he turned.
11 Q.  Was that like a full step back, or was it just
12     his body turned --
13 A.  More torso turned than anything.
14 Q.  So his feet are not moving at that point?
15 A.  Not at that point.
16 Q.  When he turns to look at Officer Abernathy,
17     what happens next?
18 A.  I went to put him back up against the wall.
19 Q.  Describe to me how you tried to put him back up
20     against the wall.
21 A.  I believe I put my forearm against his back and
22     pushed him against the wall.
23 Q.  Did you say anything to him at that point?

**50**

1  A.  Just to chill out.
2  Q.  Was he doing anything violent at that point?
3  A.  He was acting fidgety.
4  Q.  What do you mean by fidgety?
5  A.  Moving around more than he should have been,
6      swaying quite a bit.
7  Q.  At any point, or up to this point, you ever
8      smell alcohol on Norman?
9  A.  Yes.
10 Q.  Did you ever hear him slurring his words?
11 A.  I don't recall.
12 Q.  You heard him talking?
13 A.  Yeah.
14 Q.  Have you watched the video of him at Galesburg?
15 A.  No.
16 Q.  But do you recall whether or not he was
17     slurring his words, though?
18 A.  No.
19 Q.  Was he having trouble standing?
20 A.  Yeah.
21 Q.  Did he have trouble walking into the holding
22     cell?
23 A.  No.

**51**

1  Q.  Did you see him swaying or stumbling when
2      Ingles was bringing him in?
3  A.  I didn't look that closely at that point.
4  Q.  And so Norman turns approximately eight to
5      ten inches, I guess his head, body or torso
6      comes off the wall, he looks at Abernathy, and
7      you kind of put you forearm in his back to push
8      him back up against the wall, correct?
9  A.  Yes.
10 Q.  What happens at that point?
11 A.  At that point he pushes back.
12 Q.  Describe how he pushes back.
13 A.  He just comes off the wall.
14 Q.  Are his hands still behind his head?
15 A.  I think he brought one hand down.
16 Q.  Are you sure, or do you just think?
17 A.  I believe he did.
18 Q.  Which hand?
19 A.  I believe it was the left hand.
20 Q.  What happens when he brings his left hand down
21     off the wall?
22 A.  At that point I decided it was time to put him
23     back in cuffs.

**52**

1  Q.  Why did you decide to put him back in cuffs?
2  A.  Because he is fidgeting, he is uncooperative
3      physically, and the next step there is to
4      re-restrain him.
5  Q.  At this point, is there any reason why you
6      couldn't have exited the cell and just locked
7      him in the cell uncuffed?
8  A.  We hadn't searched him.
9  Q.  Do you know, typically when an arrestee is
10     brought in by an outside agency, do they search
11     him?
12 A.  No, we have to.
13 Q.  I am saying do you know if they are searched
14     before they are placed in the back of the squad
15     car?
16 A.  Yes, they do a --
17     MR. KELLY:  Object to foundation.
18     THE WITNESS:  They do a frisk search.
19 BY MR. MEYER:
20 Q.  Do you know whether a person gets searched when
21     they are processed at the municipality prior to
22     being brought to the jail?
23 A.  No.

12/02/2010

**53**

1   MR. KELLY:  Same objection.
2   BY MR. MEYER:
3   Q.   You don't know if they are or they aren't?
4   A.   No, I don't know.
5   Q.   As a correctional officer, police officer,
6        would you think it to be smart practice if you
7        are arresting someone, putting them in the back
8        of your car, to make sure they don't have
9        anything on them while you are transporting
10       them?
11   MR. KELLY:  Objection, speculation.
12   THE WITNESS:  I would assume, yes.
13   BY MR. MEYER:
14   Q.   Since you have worked with the Knox County,
15       have you ever heard of detainees stuffing stuff
16       in seats or hiding stuff in cars while they are
17       being transported so it is not detected?
18   A.   Yes.
19   Q.   Now you decide to re-cuff him because he is
20       being fidgety, correct?
21   A.   Yes.
22   Q.   Tell me how you start to re-cuff him.
23   A.   I told Brad let's get him back in cuffs.  I

**54**

1        grabbed his right arm, tried to get it around
2        behind his back, Brad grabbed his left arm, I
3        couldn't get his right arm, he resisted.
4            At that point I realized I wasn't going to
5        have the strength to get his right arm around
6        behind him.  I saw a fight coming.  So at that
7        point I decided it was better to put him down
8        on the ground or on the bench so that we didn't
9        have to fight.
10   Q.   Now up to this point, had Norman threatened any
11       violence toward you?
12   A.   No.
13   Q.   Had you heard him threaten any violence toward
14       Brad?
15   A.   No.
16   Q.   You just assumed that a fight was coming
17       because of how he was acting fidgety?
18   A.   Because he was resisting.
19   Q.   How was he resisting?
20   A.   When I tried to cuff him, he fought against it
21       by keeping his right arm in front of him with
22       his fist balled up (indicating).
23   Q.   At any time prior to taking him down, did Norm

**55**

1        ever say anything about his arm hurting?
2   A.   No.
3   Q.   Did he ever complain about his arm hurting?
4   A.   Not prior to that point.
5   Q.   And at that point you realized you cannot get
6        his right arm from him, correct?
7   A.   Yes.
8   Q.   And you decide it is better to take him down?
9   A.   Right.
10   Q.   And you and Brad take him down, correct?
11   A.   We attempted.
12   Q.   And what happens when you attempt to take him
13       down?
14   A.   Officer Ingles and Deputy Higgins come in to
15       help us.
16   Q.   So is Norman knocked down by the time both of
17       those officers come in?
18   A.   He is partway down.
19   Q.   And up to this point when Norman is partway
20       down and Ingles and Higgins are coming in, is
21       there any other conversation between you and
22       Norman?
23   A.   No.

**56**

1   Q.   Any conversation between Brad and Norman that
2        you hear?
3   A.   No.
4   Q.   And after Ingles and Officer Higgins come in,
5        what happens next?
6   A.   They come in and help us get his legs up on the
7        bench, Brad goes to holding the top part of his
8        body and his left arm, I hold his legs, Deputy
9        Higgins helps me.  And I request Officer Ingles
10       to grab shackles and jail cuffs.
11   Q.   And who has his right arm?
12   A.   His right arm at this point is free.
13   Q.   Now Officer, how tall are you?
14   A.   Six foot two and a half to six foot three.
15   Q.   How much do you weigh?
16   A.   Approximately 275 to 280 pounds.
17   Q.   And if you had to guess Norman's weight back in
18       March of '08 -- how tall was he?
19   A.   How tall was he?
20   Q.   Was he taller or shorter than you?
21   A.   Shorter.
22   Q.   And is he kind of fat, or was he fat then?
23   A.   I couldn't tell, he had a lot of clothes on.

---

**57**

1  Q.  When you have him -- and we just looked at the
2      cell in there, there is this kind of long
3      concrete bench, correct?
4  A.  Yes.
5  Q.  How long do you think it is, like how many
6      feet?
7  A.  I would guess six to eight feet.
8  Q.  Is it approximately two feet deep?
9  A.  Approximately.
10 Q.  Okay.  And where, I guess just to the left, if
11     I am in the cell looking straight at it, to my
12     left is where the toilet was, if I remember
13     correctly?
14 A.  To the back side of the cell, well, yeah, if
15     you were looking directly at the bench, to the
16     left toward the bench is a toilet, sink.
17 Q.  Then there is kind of a concrete wall, like
18     maybe a couple feet, and then an indentation
19     where the bench is?
20 A.  Yes.
21 Q.  And then that six feet, and then there is a
22     wall, another concrete wall, brick wall,
23     correct?

---

**58**

1  A.  There is a door after the toilet going this way
2      (indicating) and then the wall coming back up
3      this way (indicating).
4  Q.  I am going toilet, short wall, indentation,
5      bench?
6  A.  Okay, you are going the other direction, yes.
7  Q.  Another wall kind of comes out, and the door to
8      get out?
9  A.  Yes.
10 Q.  Where within that bench, are you closer to the
11     toilet or closer to the door or toward the
12     wall?
13 A.  I don't understand the question.
14 Q.  Sure.  When you get Norman, you kind of get him
15     on the bench.
16 A.  Okay.
17 Q.  And you and Higgins are working on his lower
18     body, Abernathy has his left arm.  Where, when
19     that is occurring, where is Norman on that
20     bench, closer to the wall with the toilet, or
21     closer to the wall with the door exiting out,
22     or in the middle?
23 A.  He is on the bench going this way (indicating).

---

**59**

1  Q.  So you have him flat out on the bench?
2  A.  Yeah, flat out on the bench.
3  Q.  So would his left arm then be against the wall?
4  A.  Yes.
5  Q.  And where are you standing?
6  A.  I am standing approximately the middle of
7      Norman.
8  Q.  Are you, do you have any contact on his body?
9  A.  Yeah, I have got, I believe my right knee is
10     across his butt.
11 Q.  And how about Officer Higgins, where is his
12     body?
13 A.  He is down at the bottom toward the toilet side
14     on his knees, trying to help me hold Norman's
15     legs.
16 Q.  Where is Officer Abernathy?
17 A.  He is up toward Norman's head, trying to hold
18     his head, his upper body, and keep control of
19     his left arm.
20 Q.  Okay.  And Norman's right arm would be closer
21     to the three of you, correct?
22 A.  It would be closer to me, if anybody.
23 Q.  Okay.  It would be, because his left arm would

---

**60**

1      be against the wall?
2  A.  Yes.
3  Q.  Okay.  And was his left arm not pinned against
4      the wall?
5  A.  No, his left arm was actually behind -- his,
6      the upper of his left arm would have been
7      against the wall with the lower part behind his
8      back.
9  Q.  And his right arm is completely free?
10 A.  Yes.
11 Q.  At any point did anyone say his right arm is
12     free and focus on his right arm?
13 A.  Officer Ingles.
14 Q.  When did Officer Ingles say that?
15 A.  He didn't say it, he just did it.
16 Q.  And when did Officer Ingles go for his right
17     arm?
18 A.  Within maybe 30 seconds of the physical part
19     starting.
20 Q.  Is this before or after he comes back with the
21     leg shackles?
22 A.  After he comes back.
23 Q.  And from the time, I guess, the first, when you

12/02/2010

---

**61**

1    first kind of pushed Norman back with your
2    forearm as you described until you get him flat
3    on that bench, how much time went by?
4  A.  **30 to 45 seconds approximately.**
5  Q.  So 30, 45 is kind of he is up in the air or
6    standing up and struggling?
7  A.  **That is the point where we are going from the**
8    **wall across to the bench.**
9  Q.  Okay.  And it took 30 to 45 seconds to get him
10    down?
11  A.  **I would say that would be max end of it.**
12  Q.  Could it have been less time?
13  A.  **Could have been.**
14  Q.  Could have been more?
15  A.  **No.**
16  Q.  And so you get him down, Higgins is toward the
17    toilet end controlling his legs, you are kind
18    of in the middle of his body controlling his, I
19    guess lower torso?
20  A.  **I have got my knee across his butt trying to**
21    **help Higgins hold his legs so he can't kick us.**
22  Q.  At any point did he ever kick you?
23  A.  **Yeah, he kept bringing his legs up and down,**

---

**62**

1    **never made contact, though.**
2  Q.  He is lying on his stomach?
3  A.  **Yes.**
4  Q.  Was he like kicking out or just moving his
5    legs?
6  A.  **Thrusting them back and forth, moving them,**
7    **like a knee bend.**
8  Q.  Did it appear he was like trying to kick or
9    just trying to move?
10  A.  **To me it appeared he was trying to kick.**
11  Q.  But you don't know?
12  A.  **I can't say what was in his head.**
13  Q.  And with his right arm that was free during
14    this time, did he ever try to punch you?
15  A.  **No, he tucked it under him.**
16  Q.  So it didn't appear he was trying to attack you
17    with that arm?
18  A.  **No.**
19  Q.  With the left arm, did you ever see him
20    swinging his left arm around?
21  A.  **No.**
22  Q.  Probably would have been impossible the way he
23    was positioned?

---

**63**

1  A.  **And it was being held.**
2  Q.  During this time when it is just the three, you
3    know, Knox County officers in there, Ingles
4    out, is there anything that is being said to
5    Norman?
6  A.  **I don't recall.**
7  Q.  Do you recall Norman saying anything?
8  A.  **No.**
9  Q.  And then you sent Ingles out to get the leg
10    irons, correct?
11  A.  **Yes.**
12  Q.  Did you tell him where to look for them?
13  A.  **I assumed he knew.**
14  Q.  Okay.  He has been here multiple times?
15  A.  **Yes.  And he actually worked in this building**
16    **before he left for the Galesburg Police**
17    **Department.**
18  Q.  At some point he comes back with the leg irons?
19  A.  **And handcuffs.**
20  Q.  And how long did that take for Ingles to exit
21    to go get the leg irons and cuffs?
22  A.  **Maybe 20, 30 seconds or so, I would guess.**
23  Q.  And when he comes back into the holding cell,

---

**64**

1    what happens next?
2  A.  **Then he gives me and Jeff the leg shackles, and**
3    **him and Brad start working on getting his upper**
4    **hands restrained behind his back.**
5  Q.  And Jeff?
6  A.  **Jeff Higgins, I am sorry.**
7  Q.  And are you and Officer Higgins or Deputy
8    Higgins able to get his legs in shackles?
9  A.  **Yes.**
10  Q.  How long did that take to get his legs in
11    shackles?
12  A.  **Approximately a minute.**
13  Q.  And what took so long to get his legs in cuffs?
14  A.  **We were being careful.**
15  Q.  What do you mean being careful?
16  A.  **Well, if you don't do it right, you can hurt**
17    **somebody.**
18  Q.  Okay.  And was he kicking his legs, were you
19    having difficulty with that, or is it just to
20    make sure --
21  A.  **Yeah, he was moving his legs, the shackles, I**
22    **don't know if you have ever seen, but one side**
23    **of them can be sharp, you don't want to lose**

**65**

1     control of them.  Once you get one on one leg,
2     you want to make sure you have control of the
3     other leg to get it on there.  And then
4     afterwards, you have to make sure you double
5     lock them so if somebody is kicking or moving
6     their legs erratically, if you don't double
7     lock them, they can cinch the cuff around so
8     that it would cut off the circulation.
9   **Q.**  At this point when you are getting the leg
10     irons on Norm, do you ever hear Norman complain
11     about having problems breathing?
12   **A.**  No.
13   **Q.**  You knew Norm since the mid '80s, correct?
14   **A.**  Yes.
15   **Q.**  Did you ever know he had a lung condition?
16   **A.**  No, I did not.
17   **Q.**  Anytime during this entire struggle, did Norman
18     ever complain he was having trouble breathing
19     or shortness of breath?
20   **A.**  No.
21   **Q.**  After approximately the one minute you and
22     Higgins get the leg irons on, what happens
23     next?

**66**

1   **A.**  At that point I started to look back to see if
2     there was anything else we could do.
3   **Q.**  Okay.  And what, when you looked back, you mean
4     looking up toward the top --
5   **A.**  Toward the top portion of his body.  I actually
6     looked over my shoulder about like I am
7     demonstrating right here (indicating).
8   **Q.**  So you just kind of just, I guess you would
9     have been looking over your right shoulder,
10     correct?
11   **A.**  Yes.
12   **Q.**  You kind of look over your right shoulder, what
13     do you first see when you look over your right
14     shoulder?
15   **A.**  I see Brad holding his head and upper shoulder
16     and his left arm, I see Mike wrestling with his
17     right arm.
18   **Q.**  Describe to me the manner in which Brad is
19     holding his head and left arm.
20   **A.**  He has got his head positioned so is he facing
21     the wall, he has got his arm across his body,
22     and he is holding his left arm around his wrist
23     behind his back.

**67**

1   **Q.**  And you say, where is Brad standing at this
2     point?
3   **A.**  I think Brad may have been on his knees
4     actually.
5   **Q.**  Did you ever see any officer with their knees
6     in the center of Norman's back?
7   **A.**  No.
8   **Q.**  In your opinion, would it be easier to control
9     someone if you put a knee in the mass of their
10     back?
11   **A.**  No.
12   **Q.**  Did you ever wrestle in high school?
13   **A.**  No.
14   **Q.**  Did you ever see anyone apply any pressure on
15     like the upper torso or back of Norman?
16   **A.**  Well, his upper shoulders.
17   **Q.**  Okay.  Who was --
18   **A.**  When Brad had his arm across his upper body, he
19     was trying to control his head and his left arm
20     and upper left-hand side of his body.
21   **Q.**  And you said that Brad had hold of Norman's
22     left wrist?
23   **A.**  Yes.

**68**

1   **Q.**  And then you said you saw Mike Ingles wrestling
2     with Norman's right arm?
3   **A.**  Yes.
4   **Q.**  At any time did you ever see Officer Abernathy
5     touching Norman's right arm?
6   **A.**  I don't recall him touching his right arm.
7   **Q.**  Did you ever touch his right arm?
8   **A.**  Not after he was facedown on the bench.
9   **Q.**  At some point did you touch his right arm?
10   **A.**  Well, yeah, I took the cuff off his right hand.
11   **Q.**  I am talking about during the struggle.
12   **A.**  No.  Well, I started on his right arm before we
13     turned him and he wound up on the bench.
14   **Q.**  Okay.  But after he is on the bench up until
15     the paramedics come, did you ever touch his
16     right arm?
17   **A.**  No.
18   **Q.**  Did you ever see Officer Higgins ever touch his
19     right arm?
20   **A.**  No.
21   **Q.**  Describe to me the manner in which Higgins is
22     wrestling with Norman's right arm.
23   **A.**  He is trying to get his hand out from

**69**

1    underneath him.

2   Q.   And how is he trying to do that?

3   A.   Pulling his hand out from underneath him.

4   Q.   Well, what part of his body is --

5   A.   He was grabbing for his lower arm.

6   Q.   Like forearm?

7   A.   Yes.

8   Q.   Between the elbow and the wrist?

9   A.   Yes.

10   Q.   And that is underneath Norman's body?

11   A.   Yes.

12   Q.   And did you see what hand Ingles was using to

13       reach for it?

14   A.   I can't recall that.

15   Q.   And was Ingles able to get hold of Norman's

16       lower arm?

17   A.   A couple times.

18   Q.   And let's go with the first time, what was the

19       first thing you observed?

20   A.   Well, he managed to get it out, looked like he

21       was going to be able to get it behind his back

22       and Norman pulled free and stuffed it back

23       underneath his chest.

**70**

1   Q.   After he stuffed it back under his chest, what

2       happened next?

3   A.   Mike went back to try to get it out again.

4   Q.   Was he able to get it out a second time?

5   A.   Yes.

6   Q.   What happened?

7   A.   He got it out the second time and began trying

8       to apply a gooseneck.

9   Q.   What is a gooseneck?

10   A.   I can demonstrate it, let me see to describe

11       it, basically you try to bend the wrist this

12       way (indicating) to bring it back behind you

13       back and you eventually are trying to work it

14       in this direction (indicating) so that your

15       forearm ends up horizontal across the back of

16       your spine.

17   Q.   So you kind of push the wrist down, correct?

18   A.   Yes.

19   Q.   And do you have it like, do you do a T-bar or

20       any type of lock on your own arm when you do

21       it?

22   A.   (Indicating).

23   Q.   Are you familiar with Jiujutsu at all?

**71**

1   A.   No.

2   Q.   Is a gooseneck something you used in the

3       academy?

4   A.   Yes.

5   Q.   Do they tell you what hands you are supposed to

6       use or how to do it?

7   A.   It depends on the hand you are doing it to,

8       whether you are left- or right-handed.

9   Q.   Okay.  Is that something you learned at the

10       academy, the five-week academy, or did you

11       learn it in-house here?

12   A.   I actually learned it at the five-week academy,

13       and it was something that former Sheriff

14       Thompson taught during refreshers.

15   Q.   Is it a technique that is still used today?

16   A.   Yes.

17   Q.   When you observed Ingles get Norman's arm out

18       the second time, he starts applying the

19       gooseneck, what do you observe happen next?

20   A.   I thought he was going to be able to get it

21       behind his back, looked like he was heading

22       that direction, and then we heard a pop.

23   Q.   Where did the pop come from?

**72**

1   A.   Norman.

2   Q.   What part of his body?

3   A.   His arm.

4   Q.   Could you tell where on his arm?

5   A.   No.

6   Q.   After you heard the pop, what happened next?

7   A.   Mike let go of his arm, he stepped back, went

8       out and called the paramedics.  I stood there

9       to make sure Norman didn't fall off the bench,

10       because he stopped fighting so there was no

11       more need for force on our part.  I kept my leg

12       up against the side of the bench just to

13       prevent him from rolling off.  Mike called

14       paramedics, we waited, and paramedics came.

15   Q.   And up to the point of the pop, do you recall

16       Norman saying anything else up to the pop?

17   A.   Yes.

18   Q.   What else was Norman saying?

19   A.   At one point he said you guys are hurting my

20       arm.

21   Q.   Did you ever hear him say stop, stop, I'll

22       stop?

23   A.   No.

73

1   Q.   Did you ever document him saying I'll stop?
2        MR. FUNK:  I am sorry?
3   BY MR. MEYER:
4   Q.   Do you ever recall documenting at any point
5        Norman said okay, I'll stop?
6   A.   **Wait a second, maybe he did, maybe he did,**
7        **maybe he said I'll stop.  And I may have told**
8        **him if you are going to stop, give us your arm.**
9   Q.   Do you know whether or not Ingles kept applying
10       this gooseneck at that point?
11  A.   **At that point his arm was under -- at the point**
12       **he said it, his arm was physically underneath**
13       **his chest.**
14  Q.   And at one point prior to the pop, Norman was
15       saying that his arm was hurting, correct?
16  A.   **I don't recall.**
17  Q.   And after the pop, you said Ingles went out to
18       go call paramedics, correct?
19  A.   **Yes.**
20  Q.   What did Officer Higgins do?
21  A.   **He went back to booking where he had two**
22       **prisoners who were out in the booking area that**
23       **he needed to attend to.**

74

1   Q.   Those are those two females?
2   A.   **Yes.**
3   Q.   And what did Officer Abernathy do?
4   A.   **He stood at the doorway with me.**
5   Q.   And you stood near Norman to make sure he
6        didn't roll off?
7   A.   **Approximately midway Norman laying down.**
8   Q.   You have watched the video, correct?
9   A.   **Yes.**
10  Q.   Did you ever notice the part in the video where
11       five minutes are cut out of the video?
12  A.   **Yes.**
13  Q.   Do you know why there are five minutes missing?
14  A.   **Yeah.**
15  Q.   That is the five minutes when the struggle is
16       going on, correct?
17  A.   **I don't know.**
18  Q.   You watched the video.
19  A.   **I mean you see part of the struggle, I don't**
20       **know what point it cuts off, and then you see**
21       **in the video we walk out, or well, Mike walks**
22       **out, Brad is standing there, and Jeff is back**
23       **to normal booking duties.**

75

1   Q.   And you can see the video skip from 1:51 a.m.
2        to 1:56 a.m.?
3   A.   **Yes.**
4   Q.   And you don't know what happened to that five
5        minutes of the video?
6   A.   **No.**
7   Q.   Now after you are standing there, do you have
8        any conversation with Norman when he hears that
9        pop noise?
10  A.   **Yeah.**
11  Q.   What conversation did you have with Norman?
12  A.   **I think I told him just relax, paramedics are**
13       **coming, we will get you some help.**
14  Q.   Did he ever ask you for any pain medication or
15       Tylenol?
16  A.   **I don't recall him asking for anything.**
17  Q.   Was he saying anything to you when you are
18       telling him relax, we will get you paramedics?
19  A.   **He thought his arm was broke.**
20  Q.   Did you see any deformity in his right arm?
21  A.   **No.**
22  Q.   At any point did you ever see any deformity in
23       his arm?

76

1   A.   **No.**
2   Q.   Since this lawsuit, have you seen pictures of
3        the break in his arm?
4   A.   **No.**
5   Q.   Have you come to learn that he had a steel rod
6        in his arm?
7   A.   **That is what I am told.**
8   Q.   You but never actually saw the x-ray where the
9        bone was completely broken apart?
10  A.   **No.**
11  Q.   And as you are sitting there waiting, is Norm
12       doing anything else besides just laying there?
13  A.   **He just lays there and talks.**
14  Q.   What else is he saying?
15  A.   **Just about his arm.**
16  Q.   Do you hear him saying anything else besides
17       talking about his arm?
18  A.   **No, that was pretty much the entire context of**
19       **it, his arm hurt, he wanted help.**
20  Q.   When the pop was made, did you ever hear him
21       scream out in pain?
22  A.   **Yeah, yeah, I think he probably did, yeah.  I**
23       **think I do remember him going ahhh.**

**77**

1  Q.  After, at some period of time, the paramedics
2      arrive, correct?
3  A.  **Yes.**
4  Q.  How much time passed from the pop to the
5      paramedics arrive?
6  A.  **I would have to guess maybe five to**
7      **eight minutes.**
8  Q.  In that five to eight minutes, are you kind of
9      just standing there watching to make sure he
10     doesn't fall off the bench?
11 A.  **Yes.**
12 Q.  The paramedics come.  What happens?
13 A.  **They take over at that point caring for him,**
14     **and at that point we stepped back and did**
15     **basically security and safety stuff.**
16 Q.  They load him on a stretcher and wheel him out,
17     correct?
18 A.  **Yes.**
19 Q.  How long do you think the paramedics were
20     actually in the Knox County Jail?
21 A.  **Maybe 15 to 20 minutes.**
22 Q.  Do you have any conversations with any of the
23     paramedics?

**78**

1  A.  **I may have, but I don't recall.**
2  Q.  Do you know who they were?
3  A.  **No.**
4  Q.  Are you familiar with a lot of the paramedics
5      here in Knox County?
6  A.  **Some, yes.**
7  Q.  Is it the Galesburg, would it be the Galesburg
8      Fire Department?
9  A.  **Well, the first responders are the Galesburg**
10     **Fire Department paramedics, then the GHAS**
11     **Ambulance crew shows up.**
12 Q.  Okay.  Is that a private ambulance company?
13 A.  **Yes.**
14 Q.  But you can't recall any specific
15     conversations?
16 A.  **No.**
17 Q.  Can you recall any of the paramedics, the
18     responders that came?
19 A.  **I know some of them by face, I really don't**
20     **know any of them by name.  I am not really**
21     **friends with any of them.**
22 Q.  And 15, 20 minutes they take Norman?
23 A.  **Yes.**

**79**

1  Q.  What do you do after they take Norman?
2  A.  **At that point I call my lieutenant to let him**
3      **know that a prisoner was injured.**
4  Q.  Who was your lieutenant at that time?
5  A.  **Craig Carpenter.**
6  Q.  And do you call him with your cell phone?
7  A.  **Cell phone.**
8  Q.  Is it a private phone or is it a phone through,
9      that you were issued through the Knox County
10     Department?
11 A.  **At that point I didn't have an issued one as of**
12     **yet.**
13 Q.  Is there any reason why you didn't use just a
14     regular phone here to call?
15 A.  **I stepped outside to have a cigarette, figured**
16     **I would kill two birds with one stone.**
17 Q.  Okay.  So you go outside and have a smoke and
18     you call up your lieutenant, correct?
19 A.  **Yes.**
20 Q.  Okay.  What is said during that conversation?
21 A.  **I just called him, woke him up and told him,**
22     **said hey, just letting you know we had an**
23     **incident in the jail, Norman Oeth was here,**

**80**

1      there was an altercation, he got an injury to
2      his arm, he is on his way to the hospital, Mike
3      Ingles is following him.
4  Q.  And what did Lieutenant Carpenter say?
5  A.  **He said okay, thanks for letting me know.  You**
6      **know what to do, take care of it.**
7  Q.  When he said you know what to do, what did that
8      mean to you?
9  A.  **I assumed he was talking about make sure the**
10     **reports are all done, make sure everything was**
11     **documented.**
12 Q.  What type of reports did you need to do?
13 A.  **We have to do a Jail Incident Report for any**
14     **unusual occurrence.  And in this case that**
15     **report would have had to be done immediately**
16     **because there is a time limit on any prisoners'**
17     **injuries that they have to be submitted to the**
18     **Department of Corrections, and then an arrest**
19     **report.**
20 Q.  Okay.  The arrest report is because you were
21     charging Norman with resisting, correct?
22 A.  **Correct.**
23 Q.  Was that a felony or misdemeanor?

81

1   A.   I think it was a misdemeanor.

2   Q.   Did you sign a misdemeanor complaint against

3        Norman?

4   A.   I did a misdemeanor report and sent it to our

5        State's Attorney.

6   Q.   Did you ever go to court for that?

7   A.   No.

8   Q.   Do you know what happened to that charge?

9   A.   I was told later it was dismissed.

10  Q.   Do you have understanding why it was dismissed?

11  A.   No.

12  Q.   Do you know whether or not the State's Attorney

13       ever viewed the video --

14  A.   No.

15  Q.   -- and had a question why five minutes were

16       missing?

17  A.   No.

18  Q.   Do you know Carl Johnson?

19  A.   Yes.

20  Q.   And he is a criminal lawyer, public defender

21       here in town?

22  A.   Yes.

23  Q.   Have you ever talked to him about this

82

1        incident?

2   A.   No.

3   Q.   Did you ever ask the State's Attorney's office

4        why they dismissed this charge?

5   A.   No.

6   Q.   Did you ever ask to have it reinstated?

7   A.   No.

8   Q.   I'll just go through the reports here.  I am

9        going to mark this as 1.

10

11       (Morton Exhibit No. 1 so marked.)

12

13       (Brief Recess)

14

15           Sergeant Morton, I placed in front of you

16       what we have marked here as Morton Exhibit

17       Number 1.  Do you have Morton Exhibit Number 1

18       in front of you?

19  A.   Yes.

20  Q.   This is a three-page document?

21  A.   Yes.

22  Q.   And if you look in the lower right-hand corner,

23       it says Knox 4, 5, and 6 for bate stamps?

83

1   A.   Yes.

2   Q.   And on page 6, there is a signature there?

3   A.   Yes.

4   Q.   Is that your signature?

5   A.   Yes.

6   Q.   Okay.  And you recognize Morton Exhibit

7        Number 1 to be the Knox County Jail Unusual

8        Occurrence Report that you prepared regarding

9        the incident with Mr. Oeth, correct?

10  A.   Yes.

11  Q.   And is this one of the reports that you

12       testified to that you reviewed prior to the

13       deposition?

14  A.   Yes.

15  Q.   And you have had a chance, we just took a

16       bathroom break, and you had a chance to review

17       it?

18  A.   Most of it.

19  Q.   And I am just going to go through a couple

20       points here in your narrative and ask you a

21       couple questions, okay, Sergeant?

22  A.   Yes.

23  Q.   I am going to go to the, I guess it is the

84

1        second full paragraph right here in the middle,

2        it is the one that says, "Stepping out into the

3        sally port --"

4   A.   Okay.

5   Q.   And I want to move down here to, toward the

6        end, it looks like it is the third to the last

7        sentence, it says, "Again I reiterated the

8        instruction, telling him, 'Just face the wall,

9        Norman, and do what I tell you to do.'"  Do you

10       see that?

11  A.   Yes.

12  Q.   "Oeth moved toward the wall, staring at Deputy

13       Abernathy who was with me as backup for safety

14       reasons due to Oeth's known history of being

15       combative towards officers."  Correct?

16  A.   Yes.

17  Q.   What known history is there of Norm being

18       combative toward officers?

19  A.   He had been in a fight here in the jail about

20       four years before this happened.

21  Q.   And that was actually with Officer Abernathy,

22       correct?

23  A.   And another officer.

85

1  Q.  Besides that one fight, do you know of any
2      other history of Norm being combative toward
3      officers?
4  A.  No.
5  Q.  And were you present for that fight?
6  A.  No.
7  Q.  Did you have any information about that fight
8      firsthand?
9  A.  No.
10 Q.  How were you aware of that history if that
11     happened probably four years ago?
12 A.  The incident report.
13 Q.  And what is your understanding of as to what
14     caused that fight?
15 A.  He was upset about something and was being
16     taken to segregation and didn't like it.
17 Q.  And then I want to go down here to the third
18     paragraph, it says, "I began uncuffing Oeth."
19     Are you there, Sergeant?
20 A.  Yes.
21 Q.  "I instructed Oeth that once the cuff was off
22     to place his hand behind his head.  When I
23     removed the cuff from his right hand, I guided

86

1      his hand up behind his head.  I then began
2      working on his right hand, and as it came out
3      of the cuff, Oeth moved his hands to the wall,
4      pushing against me."  Correct?
5  A.  Yeah, that is what it says.
6  Q.  Do you know which hand you took -- was it the
7      right hand first or the left hand?
8  A.  It was the right hand first.
9  Q.  So is that just a typo where you put right
10     again?
11 A.  Yes, yes.
12 Q.  And you say when he pushed off the wall, that
13     is when he became physically uncooperative,
14     correct?
15 A.  Yes.
16 Q.  Did he ever pull his arms away from you or
17     swing them away from you?
18 A.  He pushed against me.
19 Q.  Did he ever swing his hands like a punching
20     motion toward you?
21 A.  No.
22 Q.  Did you ever see him try to punch at Abernathy?
23 A.  No.

87

1  Q.  Do you know if maybe with his hands behind his
2      head, he was having difficulty standing because
3      of his intoxication level?
4  A.  No, I don't know that.
5  Q.  You said at one point he was kind of swaying,
6      though, correct?
7  A.  Yes.
8  Q.  Do you know whether he was kind of just swaying
9      and pushed into you?
10 A.  He pushed back against me, and that is when I
11     tried to put him back up against the wall.
12 Q.  Do you know if that was from him losing
13     balance?
14 A.  I don't know that.
15 Q.  Now I want to go to page 2 here, which is Knox
16     5.  I am just kind of skipping around here
17     because you have already testified to most of
18     this.  I want to go to the third full paragraph
19     here, it is the largest where it says, "After
20     getting a pair of leg shackles --"
21 A.  Uh-huh.
22 Q.  You there?
23 A.  Yes.

88

1  Q.  I want to skip down to, three-fourths of the
2      way down, it is the sentence that says, "As it
3      appeared, Officer Ingles --"
4  A.  Uh-huh, yes, sir.
5  Q.  "As it appeared Officer Ingles was going to get
6      Oeth under control, Oeth pulled his right arm
7      loose and in front of him, trying to again keep
8      us from getting him under control.  Officer
9      Ingles and Deputy Abernathy grabbed for his
10     right arm as I began to move to get hold of his
11     left one again and Officer Ingles began to move
12     Oeth into a gooseneck as Oeth began to say,
13     'I'll stop, I'll stop.'"
14     Do you see that?
15 A.  Yes.
16 Q.  At this point when Ingles is doing this
17     gooseneck, Oeth is saying, "I'll stop,"
18     according to your report, correct?
19 A.  Yeah, that is what it says.
20 Q.  Nothing further with that.
21
22     (Morton Exhibit No. 2 so marked.)
23

12/02/2010

**89**

1      Sergeant Morton, I place in front of what
2      we have labeled Exhibit Morton Number 2. Do
3      you have Morton Number 2 in front of you?
4  A.  Yes.
5  Q.  Once again, this is a three-page document?
6  A.  Yes.
7  Q.  With the bate stamps again of Knox 21 through
8      23?
9  A.  Yes.
10  Q.  And then once again on page 23, is that your
11     signature?
12  A.  Yes.
13  Q.  Okay. And do you recognize Exhibit Morton
14     Number 2 to be the arrest report that you
15     prepared in regard to the incident with Norman
16     Oeth?
17  A.  Yes.
18  Q.  And is this the report that you would have
19     prepared right at the computer right there in
20     the control area?
21  A.  No, in the booking area.
22  Q.  In the booking area, that is right, and that is
23     the same computer that Ingles was working on

**90**

1      earlier, correct?
2  A.  I don't recall which one I did it on.
3  Q.  I guess it is the same software that Galesburg
4      uses and Knox County uses?
5  A.  Yes.
6  Q.  Those were the only two within Knox County that
7      use this format?
8  A.  Yes.
9  Q.  That is why this report looks similar to the
10     Galesburg Police report?
11  A.  Yes.
12  Q.  Okay. Just kind of take your time and review
13     this and let me know when you have had time to
14     review this, and a couple quick questions off
15     this.
16  A.  Okay.
17  Q.  And looking at this narrative, if you go back
18     to Exhibit Number 1, it appears to be
19     identical, correct?
20  A.  Yes.
21  Q.  It looks like you went in, though, and did a
22     correction where you had the right and you put
23     the left there?

**91**

1  A.  Yes.
2  Q.  And just on the first part of this narrative,
3      it says, "All persons named in this report are
4      innocent until proven guilty in a court of
5      law."
6  A.  Yes.
7  Q.  Is that something that automatically prompts up
8      or is that something you type?
9  A.  It is department policy.
10  Q.  To always type that?
11  A.  Yes, for every arrest report.
12  Q.  Okay. And I don't think there is anything
13     different, but I just had a couple more
14     questions about the gooseneck that you were
15     taught. Is that a pain compliance technique?
16  A.  Yes.
17  Q.  Are you familiar with that term?
18  A.  Yes.
19  Q.  It hurts when you put someone in the gooseneck?
20  A.  Yes.
21  Q.  It usually gets them to stop?
22  A.  Yes.
23  Q.  And when Norman said, "I'll stop, I'll stop,"

**92**

1      if we go back to page 22 of Exhibit 2 you are
2      telling him to put his hands behind his back,
3      but you say he is still kind of refusing,
4      pulling around, correct?
5  A.  Yeah.
6  Q.  Was that his left arm you were talking about at
7      that point?
8  A.  No, it was his right.
9  Q.  Did you feel him pulling his right arm at this
10     point in time? Could you feel Norman trying to
11     pull his right arm away?
12  A.  No, I was watching.
13  Q.  Did it look like he was trying to get his hand
14     out of this gooseneck hold?
15  A.  Looked like he was trying to get his hand free
16     of Officer Ingles.
17  Q.  Who had him in a gooseneck?
18  A.  He was trying to get him in one, yes.
19  Q.  Did you see Ingles let go to see if he would
20     get his hand and then put it behind his back?
21  A.  No.
22  Q.  Did you ever see Ingles let go when Norman
23     said, "I'll stop, I'll stop"?

93

1   A.   I saw Ingles lose his hand a couple times.
2   Q.   During this point it appears that he is doing
3        the gooseneck this entire period, correct?
4   A.   Trying to, yes.
5   Q.   And my question is when Norman said, "I'll
6        stop, I'll stop," did Ingles let go of the
7        goose hold, gooseneck hold to see if Norman
8        would then just put it behind his back?
9        MR. KELLY:   Just object, it has been asked and
10       answered.
11       THE WITNESS:   I don't recall him, I don't
12       recall actually being able to see whether or
13       not he let go of his hand or not.
14   BY MR. MEYER:
15   Q.   So you didn't know whether or not he did?
16   A.   No.  At that point, where I was at, Ingles'
17        back would have been partially obstructing me.
18   Q.   And this arrest report, Exhibit Number 2, this
19        was for the charges that you and Officer
20        Abernathy brought for the resisting, correct?
21   A.   Yes.
22   Q.   Do you know whether or not Officer Abernathy
23        also had to do the arrest report?

94

1   A.   No, I did it.
2   Q.   Now do you know whether or not within the Knox
3        County Sheriff's Department -- are you familiar
4        with the term a paper car?
5   A.   A what?
6   Q.   A paper car.
7   A.   (Indicating).
8   Q.   Are there any --
9        MR. FUNK:   Is that no?
10       THE WITNESS:   I am sorry, no.
11   BY MR. MEYER:
12   Q.   Okay.  Do you know whether or not if you are
13        the complaining witness, whether or not you
14        need to have an additional officer write up the
15        report?
16   A.   No, don't know any procedure for that.
17   Q.   And this arrest only required this one report
18        and you did this report, correct?
19   A.   Yes.
20
21        (Morton Exhibit No. 3 so marked.)
22
23   Q.   Sergeant Morton, I am going to place in front

95

1        of you what we marked as Morton Exhibit
2        Number 3.  Do you have Morton Exhibit Number 3
3        in front of you?
4   A.   Yes.
5   Q.   This is a one-page document?
6   A.   Yes.
7   Q.   And it is Knox 7?
8   A.   Yes.
9   Q.   Is this kind of like an add-on or supplement to
10       your arrest report?
11   A.   This would have been to the, just a memo to the
12        command with change in status.
13   Q.   And that was my question, I will just read it
14        here -- oh, before I get to that, once again,
15        is that your signature here on Exhibit Number
16        3?
17   A.   Yes, it is.
18   Q.   Okay.  Looks like this is a memo to Lieutenant
19        Carpenter, Captain Caslin and Sheriff Clague?
20   A.   Clague, yes.
21   Q.   From Sergeant Morton, correct?
22   A.   Yes.
23   Q.   And it is dated March 5th of '09?

96

1   A.   Yes.
2   Q.   That is the day of the incident, correct?
3   A.   Yes.
4   Q.   Do you know at what time you prepared this
5        memo?
6   A.   Not exactly, no, it would have been later into
7        the shift.
8   Q.   It is fair to say it was probably before 6:45?
9   A.   Yeah.
10   Q.   Because that is when you would have ended that
11        morning?
12   A.   Yes.
13   Q.   Okay.  And in here, this report states, "I was
14        advised of a change in the situation regarding
15        the condition of Norman Oeth.  Oeth was
16        admitted at St. Mary's Hospital, according to
17        Galesburg Officer Ingles.  Oeth is expected to
18        be there a couple of days due to the
19        unfortunate injury from him fighting with
20        officers as described in my incident and ICIS
21        reports."
22   A.   Yes.
23   Q.   What does the acronym ICIS stand for?

97

1  A.  I think it is Integrated Criminal Information
2      System.
3  Q.  And that is the, what you and Galesburg have to
4      do the arrest reports, correct?
5  A.  Yes.
6  Q.  Okay.  And what information did you receive
7      about Mr. Oeth's injury from Officer Ingles?
8  A.  I think Mike called us and said yeah, his arm
9      is broke and they are going to admit him and
10     he'll be there for a couple days.
11 Q.  Have you ever broken a bone in your body?
12 A.  Yes.
13 Q.  Have you ever broken an arm?
14 A.  Yes.
15 Q.  Did you have surgery?
16 A.  No.
17 Q.  Did you just get a cast?
18 A.  Yes.
19 Q.  Were you admitted into the hospital?
20 A.  No.
21 Q.  Was it painful?
22     MR. FUNK:  Just object to relevance.
23     MR. KELLY:  Relevance.

98

1  BY MR. MEYER:
2  Q.  How did you break your arm?
3      MR. KELLY:  Same objection to relevance.
4      Everybody's pain threshold is obviously
5      different.
6      MR. MEYER:  That is a speaking objection.  It
7      is improper.  Relevance is not a proper
8      objection in a deposition.
9      MR. KELLY:  Well, Federal Court.
10     MR. FUNK:  I'll join in the objection.
11     MR. KELLY:  It is speculation, foundation.
12     MR. FUNK:  This is not a discovery depo, this
13     is Federal Court, but go ahead.
14     MR. MEYER:  There is not a difference between
15     discovery and evidence dep in Federal Court.
16     MR. FUNK:  You can go ahead and answer the
17     question.
18     THE WITNESS:  I was in a BMX bike wreck.
19 BY MR. MEYER:
20 Q.  And after you got this information from Ingles
21     that Norman had a broken arm, he is going to be
22     admitted to the hospital, did you have any
23     other conversation with Ingles regarding the

99

1      injuries?
2  A.  I don't think I saw Ingles that day.
3  Q.  When is the next time you saw Ingles after this
4      March 5th incident?
5  A.  Next week.
6  Q.  And did you talk to him about this incident?
7  A.  I may have, I can't say one way or the other.
8  Q.  Since this incident of March '09 up until
9      today, do you recall any other conversations
10     you have had with Ingles regarding this?
11 A.  No.
12 Q.  Have you had any conversations with Officer
13     Abernathy outside the presence of your counsel
14     regarding this incident?
15 A.  Yes.
16 Q.  And when have you had those conversations?
17 A.  At different times where we wondered when
18     things were going to progress with court.
19 Q.  And did you ever go back and talk about the
20     incident itself?
21 A.  No.
22 Q.  Any point did you inform anybody that Ingles
23     should be the one that is responsible for the

100

1      break in Norman's arm?
2  A.  Responsible, no.
3  Q.  You said responsible with kind of a puzzled
4      look.  Have you ever told anyone Ingles was the
5      one who did it?
6      MR. KELLY:  Objection.
7  BY MR. MEYER:
8  Q.  Nothing that you may have said to your
9      attorneys.
10 A.  I think, if anything, I may have said I felt
11     bad for Mike, because he is the one who had the
12     arm in his hand.
13 Q.  Since this incident in March of '09, have you
14     seen Norman Oeth?
15 A.  Yes.
16 Q.  When have you seen Norman Oeth?
17 A.  At Wal-Mart.
18 Q.  Did you have any conversations with Norman?
19 A.  I believe what I said to him was "Norman," I
20     acknowledged he was there, and I turned around
21     and went about my business.
22 Q.  Nothing more than just hello, good-bye?
23 A.  Wasn't even that.  I actually was bending down

101

1 to pick up some potato salad, stood up, he was
2 standing right in front of me about two feet
3 distance. I looked at him and said "Norman,"
4 turned around and walked away and went about my
5 business.
6 Q. Did he say anything to you?
7 A. No.
8 Q. Okay. Besides that one time in Wal-Mart, any
9 other time you saw Norman?
10 A. He has been in and out of the jail a couple
11 time.
12 Q. Is that related to child custody issues?
13 A. I am not sure what he was here for.
14 Q. Any conversations with Norman when he has been
15 at the jail here?
16 A. I think I served him breakfast once, and it
17 would have consisted of "juice or coffee?"
18 Q. Any conversation?
19 A. No, other than I would have asked, "Do you want
20 juice or coffee?"
21 Q. Got it. I may have asked you this, but you
22 have never had any physical fights with Norman
23 besides the one verbal that you talked about

102

1 earlier regarding your son?
2 A. Yes.
3 Q. And at no time during this entire incident did
4 Norman even threaten physical violence to you.
5 Is that correct?
6 A. No, he didn't.
7 Q. Bad question. At any time prior to the
8 encounter with Norman -- strike that.
9 After the break, did Norman ever complain
10 to you about shortness of breath or having
11 trouble breathing?
12 A. No.
13 Q. Did he ever say he thought he may have had a
14 seizure or lost consciousness?
15 A. I don't recall him saying anything other than
16 my arm hurts, get me some help.
17 Q. Did you ever see either of those two arrestees
18 that were in the jail ever come near the door
19 during the altercation?
20 A. No.
21 Q. Sergeant, have all your answers in this
22 deposition been complete to the best of your
23 ability?

103

1 A. Yes.
2 Q. Is there anything that you can think of right
3 now as you are sitting here that you want to
4 clarify with any of your answers?
5 A. I can't think of anything right now, no.
6 Q. Is there anything about this incident with
7 Norman Oeth on March 5th of '09 that I didn't
8 ask you about that you think is important or
9 that I should know?
10 A. I think you covered it all.
11 MR. MEYER: Okay, thank you. Nothing further.
12 MR. FUNK: Do you have any questions?
13 MR. KELLY: A couple, yes.
14 CROSS EXAMINATION BY MR. KELLY:
15 Q. Sergeant, you were asked early on in the
16 deposition about whether you were given any
17 warnings by Officer Ingles when Oeth was
18 brought to the jail. I believe you said no.
19 But isn't it true that Ingles told you when he
20 came in that, when you were walking in he said
21 he had been having problems with --
22 A. Yes, yes, that would be true.
23 Q. Have you ever had any problems with Ingles when

104

1 he worked first here at the Knox County Jail?
2 A. No, always gotten along professionally with
3 Mike.
4 Q. Were there any incidents that you know of of
5 him being overly aggressive or using excessive
6 force with people at the Knox County Jail?
7 A. Not to my knowledge.
8 Q. And did you have any criticisms of the way he
9 handled prisoners when he was here at the Knox
10 County Jail?
11 A. No.
12 Q. With regard to the incident involving Mr. Oeth,
13 the same questions, did you have any criticisms
14 of the way Officer Ingles handled Oeth on the
15 night in question?
16 A. No.
17 Q. Do you have an opinion, based on your personal
18 observation of Oeth and Officer Ingles that
19 night, as to whether Oeth complied with the
20 order to be handcuffed after he said, "Stop,
21 stop"?
22 MR. MEYER: Objection, competence. You can
23 answer.

12/02/2010

105

1        THE WITNESS:  I don't think he complied.

2    BY MR. KELLY:

3    Q.   Based on the reports that we have looked at

4         here, Oeth 1 and 2, it is your opinion that

5         even after he gave some indication that he was

6         going to cooperate, he did not cooperate,

7         correct?

8    A.   That is correct.

9         MR. KELLY:  That is all I have.

10        MR. FUNK:  Sergeant Morton I just have a couple

11        follow-up questions.

12   CROSS EXAMINATION BY MR. FUNK:

13   Q.   Did you ever see Norman lose consciousness?

14   A.   No.

15   Q.   Did you ever see him have anything that you

16        would, in your own opinion, characterize as a

17        seizure?

18   A.   No.

19   Q.   I want to clarify one thing.  When Norman went

20        from the standing position into the prone

21        position on the bench, his head was pointed

22        toward the end of the room with the doorway,

23        correct?

106

1    A.   Yes.

2    Q.   I mean the doorway that comes from the booking

3         room?

4    A.   Yes, sir.

5    Q.   And that would mean that Norman's left arm was

6         against the wall at that time.  Is that

7         correct?

8    A.   Yes.

9    Q.   But you had control of the left arm and that --

10        strike that.

11            When you took Norman to the prone position

12        on the bench, you had his left arm behind him.

13        Is that correct?

14   A.   Yes.

15   Q.   So his left arm was never pinned in between the

16        wall and his body such that he couldn't get it

17        out?

18   A.   That would be correct.

19   Q.   His right arm was never pinned in between his

20        body and any wall.  Is that correct?

21   A.   Correct.

22        MR. MEYER:  Objection, leading, to the last few

23        questions.

107

1    BY MR. FUNK:

2    Q.   You mentioned earlier about Norman kicking his

3         legs.  Do you remember testifying to that?

4    A.   Yes.

5    Q.   I just want to clarify kind of how he was doing

6         that.  Was he kicking back at you kind of in a

7         leg curl action --

8    A.   Yes.

9    Q.   -- trying to kick you with his heels, is that

10        right?

11   A.   Yes.

12   Q.   You also testified earlier that Norman was

13        pushing back against you when you were

14        initially trying to remove the cuffs, Officer

15        Ingles' cuffs, and then place your cuffs on

16        him.  Do you remember that?

17   A.   Yes.

18   Q.   And you also testified that he was swaying in

19        some form or fashion as well.  Do you remember

20        that?

21   A.   Yes.

22   Q.   In your opinion, at that time did you believe

23        he was, Norman was being combative and

108

1         attempting not to be cuffed?

2    A.   Yes.

3         MR. FUNK:  That is all I have.

4         MR. MEYER:  Just a couple quick follow-up

5         questions.

6    REDIRECT EXAMINATION BY MR. MEYER:

7    Q.   As for Ingles, when did he work here at the

8         Knox County?

9    A.   Let's see, I want to say it was right around

10        1999, 2000 he would have got hired here, and he

11        left probably somewhere in late 2003 or middle

12        2004.

13   Q.   During that period of time, were there video

14        cameras in the jail?

15   A.   Yes.

16   Q.   Do you know if they were the same cameras in

17        the booking area as now?

18   A.   The same cameras, yes.

19   Q.   As a correctional officer, are you familiar

20        where they are and what areas of the jail they

21        monitor?

22   A.   I believe, yes, I am.

23   Q.   And you would be familiar what they capture if

12/02/2010

109

1    you look at the screen?

2    A.   Yes.

3    Q.   The actual security area, you see, you monitor

4         all the different areas of the jail?

5    A.   I am sorry, I don't understand that question.

6    Q.   You know the control area?

7    A.   Yes.

8    Q.   Is there a big monitor that shows all the

9         different cameras, what is going on at any

10        given period of time?

11   A.   We can look at most of them at one time, yes.

12   Q.   So if you are ever assigned to that area, you

13        can see what camera two looks at, what camera

14        three looks at?

15   A.   Yes.

16   Q.   And based on your knowledge of Officer Ingles

17        working here, do you know whether or not he

18        would be familiar with the camera system at the

19        Knox County Jail?

20        MR. KELLY:  Just object to foundation.

21        MR. FUNK:  Objection, speculation.

22        THE WITNESS:  I would have to say based on the

23        changes in between him leaving, he would only

110

1         be marginally familiar.

2    BY MR. MEYER:

3    Q.   When counsel for Ingles was asking you about

4         whether Norman complied after saying "Stop,

5         stop," you said no, correct?

6    A.   Yes.

7    Q.   Earlier you said that his body was kind of

8         blocking his view as to what Ingles was

9         holding, correct?

10   A.   It was my understanding he asked me for my

11        opinion.

12   Q.   You couldn't see what Norman was doing, though?

13   A.   No, not clearly.

14   Q.   At some point after the pop, Norman's body went

15        completely limp, correct?

16   A.   No, his arm went completely limp.

17   Q.   His whole body didn't go limp, he stopped

18        resisting?

19   A.   The rest of him was laying down, I couldn't

20        tell you.

21   Q.   Did his leg stop moving?

22   A.   Yes, he stopped moving.

23   Q.   Do you know what happened during that period of

111

1    time?  Could you see his face?

2    A.   I was looking back and forth from his face down

3         to his feet.

4    Q.   Did you see the expression on his face when his

5         whole body went limp?

6    A.   I don't know if I paid any attention to the

7         expression on his face.

8    Q.   This kicking that you are describing, did he

9         ever strike you?

10   A.   No.

11   Q.   Did you ever charge him with battery?

12   A.   No.

13   Q.   Kicking at a correctional officer, could that

14        be aggravated assault?

15   A.   I suppose it could be.

16   Q.   You never charged him with aggravated assault?

17   A.   No.

18   Q.   Aggravated assault can be a felony, correct?

19   A.   I believe aggravated assault only goes to Class

20        A misdemeanor.

21   Q.   Even on a correctional employee?

22   A.   Yes.

23   Q.   And a battery, that can, whether they touch you

112

1    once or, if you are an officer, that could be a

2    felony, correct?

3    A.   Yeah, they have to actually violently batter

4         you for it to be a felony, I believe.

5    Q.   Just insulting, provoking nature, are you

6         familiar with that?

7    A.   Yes.

8    Q.   If it is an insulting, provoking nature and it

9         is a correctional officer, police Officer, that

10        can be a felony, correct?

11        MR. FUNK:  Objection, it calls for a legal

12        conclusion.

13        THE WITNESS:  Yeah, I haven't read the ag-bat

14        statute in so long, I can't tell you.

15        MR. MEYER:  I have nothing further.

16        MR. FUNK:  Anything else?

17        MR. KELLY:  Yeah, I just want to ask you about

18        this concept.

19   RECROSS EXAMINATION BY MR. KELLY:

20   Q.   You are there in the process and handling Oeth

21        at the time that he is saying, you know, I am

22        going to stop.  And you can observe yourself

23        his body and you are touching his body,

12/02/2010

117

1  the reading and signing of the deposition by said
2  witness were not expressly waived, and that the
3  necessity of calling the court reporter at time of
4  trial for the purpose of authenticating said
5  transcript was waived.
6      I FURTHER CERTIFY that I am neither attorney or
7  counsel for, nor related to or employed by, any of
8  the parties to the action in which this deposition
9  is taken, and further, that I am not a relative or
10 employee of any attorney or counsel employed by the
11 parties hereto, or financially interested in the
12 action.
13     IN WITNESS WHEREOF, I have hereunto set my hand
14 and affixed by notarial seal this 25th day of
15 February A.D., 2011.
16
17
18
19     _____

20         CONNIE L. BOYLE,
          Certified Shorthand Reporter
21
22
23

12/02/2010

---

**113**

1 correct?

2 **A. Yes.**

3 **Q.** So you can tell, despite at moments your view

4 was partially blocked, whether he was

5 complying, correct?

6 **A. Yes.**

7 **Q.** And it is your opinion that even though at

8 certain times he might have said, "I'll stop,

9 I'll stop," he continued to resist, correct?

10 **A. Yes.**

11 **Q.** And the order at least was, or the order, in

12 your opinion, was abundantly clear that you

13 were ordering him to stop resisting and be

14 handcuffed, correct?

15 **A. Yes.**

16 MR. KELLY:  I don't have anything further.

17 MR. FUNK:  We will reserve.

18

19      FURTHER DEPONENT SAYETH NOT.

20

21

22

23

---

**114**

1      **ERRATA SHEET**

2 Oeth v Knox County, et al

3    I hereby verify that the foregoing is a true

4 and accurate transcription of my deposition taken on

5 December 2, 2010, except for those changes noted:

6 Page____ Line____ Change_____

7 Reason_____

8 Page____ Line____ Change_____

9 Reason_____

10 Page____ Line____ Change_____

11 Reason_____

12 Page____ Line____ Change_____

13 Reason_____

14 Page____ Line____ Change_____

15 Reason_____

16 Page____ Line____ Change_____

17 Reason_____

18 Page____ Line____ Change_____

19 Reason_____

20 Page____ Line____ Change_____

21 Reason_____

22 Page____ Line____ Change_____

23 Reason_____

---

**115**

1 Page____ Line____ Change_____

2 Reason_____

3 Page____ Line____ Change_____

4 Reason_____

5 Page____ Line____ Change_____

6 Reason_____

7 Page____ Line____ Change_____

8 Reason_____

9 Page____ Line____ Change_____

10 Reason_____

11 Page____ Line____ Change_____

12 Reason_____

13 Page____ Line____ Change_____

14 Reason_____

15 Page____ Line____ Change_____

16 Reason_____

17 Page____ Line____ Change_____

18 Reason_____

19

20      _____

     JASON R. MORTON

21

  Dated this ____ day of _____, 2010

22

23   _____

  Notary Public

---

**116**

1 STATE OF ILLINOIS )

     ) SS.

2 COUNTY OF TAZEWELL)

3

4

5     **C E R T I F I C A T E**

6

7   I, Connie L. Boyle, CSR, a Notary Public duly

8 commissioned and qualified in and for the State of

9 Illinois, DO HEREBY CERTIFY that pursuant to notice,

10 there came before me on the 2nd day of December,

11 A.D., 2010, at 152 South Kellogg Street in the City

12 of Galesburg, County of Knox, and State of Illinois,

13 the following named person to wit:

14 JASON R. MORTON

15 who was by me first duly sworn to testify to the

16 truth and nothing but the truth of his knowledge

17 touching and concerning the matters in controversy

18 in this cause and that he was thereupon carefully

19 examined upon his oath and his examination

20 immediately reduced to shorthand by means of

21 stenotype by me.

22   I ALSO CERTIFY that the deposition is a true

23 record of the testimony given by the witness, that