E-FILED
Monday, 04 April, 2011  09:51:16 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT 3

**1**

```
           UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
                    PEORIA DIVISION


NORMAN OETH, JR.,                    )
                                     )
            Plaintiff,               )
                                     )
    vs.                              )  09-C-1407
                                     )
KNOX COUNTY, KNOX COUNTY             )
SHERIFF, DAVE CLAGUS, in his         )
Official Capacity, Knox              )
County Sheriff's Deputies,           )
BRAD ABERNATHY, JASON                )
HORTON, CITY OF GALESBURG,           )
Galesburg Police Officer,            )
MICHAEL INGLES,                      )
                                     )
            Defendants.              )


         DEPOSITION OF OFFICER MICHAEL A. INGLES,
taken before Connie L. Boyle, CSR, Illinois License
No. 084-002383, a Notary Public, on the 18th day of
February A.D., 2011, at 1:10 p.m., at 4801 North
Prospect Road, in the City of Peoria Heights, County
of Peoria, and State of Illinois.
```

**2**

```
PRESENT:

LOUIS J. MEYER, ESQ.,
ATTORNEY AT LAW
20 North Clark Street
Suite #1700
Chicago, Illinois 60602
     On behalf of the Plaintiff;

JAMES H. KELLY, ESQ.,
ATTORNEY AT LAW
4801 North Prospect Road
Peoria Heights, Illinois 61616
     On behalf of the City of Galesburg and
     Michael Ingles.
```

```
                      INDEX
OFFICER MICHAEL A. INGLES                  Page

Direct Examination by Mr. Meyer             4

Exhibit No. 1                               78
Exhibit No. 2                               83
Exhibit No. 3                               85

Errata Sheet                                94
Certificate of Reporter                     96
```

**3**

1  IT IS HEREBY STIPULATED by and between the
2 parties hereto and their respective attorneys that
3 this is a deposition on oral interrogatories taken
4 pursuant to notice to the attorneys of record and
5 pursuant to the Federal Rules of Civil Procedure and
6 the Rules of the Supreme Court of Illinois.
7  That the deposition may be taken before
8 Connie L. Boyle, CSR, a Notary Public of Tazewell
9 County, Illinois, on the 18th day of February A.D.
10 2011, at Peoria Heights, Illinois.
11  IT IS FURTHER STIPULATED that the reading
12 and signing of the deposition by the witness is
13 hereby reserved and that the transcript or any part
14 thereof may be produced at trial for any appropriate
15 purpose without the necessity of calling the said
16 Connie L. Boyle to testify as to the authenticity or
17 correctness of said transcript, except the attorneys
18 of record shall have thirty days from receipt of
19 said transcript in which to call to the attention of
20 said reporter any errors or omissions.

**4**

1  OFFICER MICHAEL A. INGLES,
2 having been first duly sworn, was examined and
3 testified upon his oath as follows:
4
5 DIRECT EXAMINATION BY MR. MEYER:
6 Q. Officer, could you please state and spell your
7 full name for the record?
8 A. Officer Michael A. Ingles. And it is spelled
9 M-i-c-h-a-e-l, middle initial A., last name is
10 spelled I-n-g-l-e-s.
11 MR. MEYER: Please let the record reflect that
12 this is the deposition of Officer Michael
13 Ingles taken pursuant to notice and in
14 accordance with the Federal Rules of Civil
15 Procedure and all applicable local rules.
16 Officer Ingles, have you ever given a
17 deposition before?
18 THE WITNESS: No.
19 MR. MEYER: Have you ever testified in court
20 before pertaining to your work as a police
21 officer?
22 THE WITNESS: Yes.
23 MR. MEYER: Very similar, it is basically like

02/18/2011

**5**

1   we are in court, but it is a little more
2   informal, as you can tell, Officer.
3   THE WITNESS: Yes.
4   MR. MEYER: I am sure your counsel kind of went
5   over the basic ground rules of what a
6   deposition is, but I want to go over them so we
7   have them on the record. Okay, Officer?
8   THE WITNESS: Okay.
9   MR. MEYER: One thing, Connie is our court
10  reporter today, she is going to be taking down
11  all of my questions and all of your answers.
12  THE WITNESS: Okay.
13  MR. MEYER: To make her job a little easier,
14  I'll ask that even if you know where I am going
15  with a question, you know where I am going,
16  just let me get it out there before you answer.
17      I'll do the same thing for you, I'll allow
18  you to answer fully before I move onto my next
19  question. What I don't want is us talking over
20  one another, it makes for not a clean record,
21  it makes her job much more difficult. Fair
22  enough.
23  THE WITNESS: Fair.

**6**

1   MR. MEYER: I also ask that you keep answering
2   as you have been doing, orally or verbally.
3   "Uh-huh", "huh-uh", nods of the head, even
4   though I can understand you sitting across the
5   table, it won't be clear on the record. We all
6   kind of tend to do it if we start talking like
7   in normal conversation, so there might be a
8   point where I ask you, you know, can you
9   clarify an answer? Fair enough?
10  THE WITNESS: Okay.
11  MR. MEYER: Anytime you don't understand a
12  question that I ask, you don't understand a
13  word I use in it, speak too quickly or too
14  quietly, just let me know, I'll slow down,
15  speak up, rephrase the question or use another
16  word. Fair enough?
17  THE WITNESS: Yes.
18  MR. MEYER: The premise there is I don't want
19  you answering things that you don't know what
20  is being asked of you, okay?
21  THE WITNESS: Okay.
22  MR. MEYER: At the end of this, a transcript
23  will be typed up that can be used in further

**7**

1   court proceedings. When we have the transcript
2   typed up, all my questions, all your answers
3   will be on there and it will be understood that
4   you understood those questions as we are
5   sitting here today. Fair enough?
6   THE WITNESS: Fair.
7   BY MR. MEYER:
8   Q.  In preparation for this deposition today, did
9       you review any documents?
10  A.  Just my report.
11  Q.  And was that your arrest report of Norman Oeth
12      for the DUI?
13  A.  Correct.
14  Q.  Besides your report, did you view any other
15      type of documents?
16  A.  Video.
17  Q.  And which video did you review?
18  A.  The jail, and also my DUI.
19  Q.  That is from the booking with the Galesburg PD?
20  A.  Correct.
21  Q.  And the jail is at the Knox County Jail,
22      correct?
23  A.  Correct.

**8**

1   Q.  Did you review any type of testimony or
2       transcripts from anyone else who has been
3       deposed in this case?
4   A.  No.
5   Q.  And in preparing for this deposition, did you
6       prepare any type of notes to aid yourself?
7   A.  No.
8   Q.  I didn't ask you this before, but is there any
9       reason as you sit here today why you can't
10      answer my questions truthfully or honestly?
11  A.  No.
12  Q.  Looking for if you have a cold or taking any
13      medication that might affect your testimony
14      today.
15  A.  No.
16
17      (Off The Record Discussion)
18
19  Q.  All right. And my understanding is, how many
20      documents did you prepare pertaining to the
21      arrest of Norman in March of 2009?
22  A.  I had, of course, my General Offense Report for
23      the arrest, and then I had a memo that was

**9**

1         given to Lieutenant Riley and Sergeant Jim

2         Martinson.

3    Q.   When did you prepare the General Offense

4         Report?

5    A.   Shortly after the DUI arrest.

6    Q.   And then the memo you said was given to

7         Lieutenant Riley?

8    A.   And Sergeant Martinson, it was actually

9         headlined Lieutenant Riley/Sergeant Martinson.

10   Q.   When did you prepare that document?

11   A.   Close to about the same time.

12   Q.   Why is it that you prepared that memorandum?

13   A.   It is, anytime, you know, there is something

14         in, a situation where there was an injury or

15         anything like that or somebody goes to the

16         hospital, we have memos that we type up also.

17         It is just something that is, our department

18         asks for.

19   Q.   And is that, does your department have a Use of

20         Force Report or any other type of documents, if

21         you know what I am talking about?

22   A.   Not that I am aware of.

23   Q.   Okay.  And that is, does your department issue

**10**

1         Tasers or anything?

2    A.   Yes.

3    Q.   If you use a Taser, is there a special document

4         you have to fill out if you deploy a Taser?

5    A.   Yes, there is one for that.

6    Q.   Then if you have to use any type of force to

7         subdue someone, is there a special report you

8         have to fill out, or do you just document that

9         in your General Offense Report?

10   A.   Just document it in General Offense.

11   Q.   I just want to get a little background

12         information here.  Did you graduate from high

13         school?

14   A.   Yes.

15   Q.   Where did you go to high school?

16   A.   ROWVA.

17   Q.   How is that spelled?

18   A.   R-O-W-V-A.

19   Q.   Where is that located?

20   A.   It is located in Oneida, Illinois.

21   Q.   When did you graduate from ROWVA?

22   A.   1994.

23   Q.   And after graduating from high school, did you

**11**

1         attend college?

2    A.   Yes.

3    Q.   Where did you go to college?

4    A.   Carl Sandburg College.

5    Q.   That is in Galesburg, correct?

6    A.   Correct.

7    Q.   Did you attain a degree?

8    A.   No, I did not.

9    Q.   Did you go straight from high school into

10         college?

11   A.   Yes.

12   Q.   Okay.  What was your first job after college?

13   A.   After college?  I worked at Hy-Vee while I was

14         in college and then kind of went into, I was

15         working my way into management there, and then

16         stopped taking classes out there at Sandburg

17         from that.

18   Q.   I guess what I am looking for, what was your

19         first law enforcement job that you had?

20   A.   My first technical law enforcement job was

21         State Department of Corrections, IYC Kewanee.

22   Q.   You say technical, prior to that did you have

23         any like security jobs or --

**12**

1    A.   No, that is why I said technical.

2    Q.   And that was for the Illinois Department of

3         Corrections?

4    A.   Yes.

5    Q.   Did you have to take any type of courses prior

6         to working at the Illinois Department of

7         Corrections?

8    A.   I went through a six-week academy in

9         Springfield.

10   Q.   After that academy, did you receive your

11         certificate?

12   A.   Yes.

13   Q.   Was that in corrections?

14   A.   Correct.

15   Q.   And that is not a full sworn police officer,

16         correct?

17   A.   Correct.

18   Q.   And you worked at the facility in Kewanee?

19   A.   Not technically.

20   Q.   Okay.  After the six-week course, where did you

21         go?

22   A.   I was offered a job through Knox County

23         Sheriff's Department in their jail, and I was

02/18/2011

### 13

1   actually offered that job in week five of the
2   academy.
3   Q.  So at anytime did you do ever work at any
4   Illinois Department of Corrections facility?
5   A.  Other than through the training, we went to a
6   couple of different locations, but not actually
7   physically working.
8   Q.  Okay.  After the six-week course, you get your
9   certificate, and then you go start working for
10  the Knox County Jail?
11  A.  Correct.
12  Q.  Wouldn't that be under the Knox County
13  Sheriff's Department?
14  A.  Yes.
15  Q.  And your position would be corrections officer?
16  A.  Yeah, we are sworn deputies, but yeah, I worked
17  in the jail as corrections.
18  Q.  And what is a sworn deputy?
19  A.  Basically the difference is we carry guns, and
20  you are allowed to carry, you know, a gun as
21  opposed to where some of the deputies, you
22  know, like DOC, you know, they don't carry like
23  on the normal basis.

### 14

1   Q.  And as a sworn deputy, do you have arrest
2   powers or police powers?
3   A.  Yeah, in some aspects you do.
4   Q.  Okay.  And when did you start at the Knox
5   County Jail?
6   A.  I want to say it was June of 2001.
7   Q.  What shift did you work in June of '01?
8   A.  I started on second shift.
9   Q.  And how long did you work at the Knox County
10  Jail until, I guess, your next job?
11  A.  I worked until September 2003, that is where I
12  was employed with the City of Galesburg.
13  Q.  Since September '03 to present, you have worked
14  as a Galesburg Police Officer?
15  A.  Yes.
16  Q.  And from that time from June of '01 to
17  September of '03, were you ever disciplined in
18  any way at the Knox County Sheriff's
19  Department?
20  A.  No.
21  Q.  And from September '03 to present, have you
22  ever been disciplined in any way through the
23  Galesburg Police Department?

### 15

1   A.  I have had some verbal stuff, but nothing like,
2   you know, no time off or anything like that,
3   so --
4   Q.  From June of '01 to September of '03 while at
5   the Knox County Jail, did any detainees or
6   prisoners ever file any grievances against you
7   that you are aware of?
8   A.  Not that I am aware of.
9   Q.  From September '03 to present, have any
10  citizens ever filed any complaints against you
11  as a Galesburg Police Officer that you are
12  aware of?
13  A.  One person did.
14  Q.  And when was that?
15  A.  I don't know, to be honest with you.  I know
16  the person who filed it was Keith Cunningham,
17  Sr.
18  Q.  And what were his basic allegations?
19  A.  It was, I received a call and we were busy, I
20  was going to make an arrest, but I was waiting
21  for other officers to become free.  And I just
22  didn't, my command just didn't feel like I
23  responded to that call in a timely manner

### 16

1   basically.
2   Q.  So he was just complaining of service?
3   A.  Yeah, basically.
4   Q.  Okay.
5   A.  Nothing other than that.
6   Q.  Besides this lawsuit, have you ever been a
7   defendant in a lawsuit?
8   A.  No.
9   Q.  Have you ever been arrested before?  I am not
10  talking about traffic tickets or anything.
11  A.  No.  That is what I was going to --
12  Q.  Back when you joined the Knox County Sheriff's
13  Department, did you receive any in-house
14  training?
15  A.  As far as what?
16  Q.  You took the six-week class to get the
17  certificate?
18  A.  Correct.
19  Q.  Once you get to Knox County, was there any
20  training that they offered besides six-week
21  course?
22  A.  Yeah, I went through the 40-hour mandatory
23  firearms training course.

02/18/2011

---

**17**

1   Q.   Anything else that Knox County offered you, any
2      other type of training?
3   A.   Not really.
4   Q.   While you were working at the Knox County Jail,
5      were you aware of video monitors within the
6      jail itself?
7   A.   Yeah, the old jail didn't have any video
8      monitors, but the new one I knew had some. I
9      didn't know the total extent as far as where
10     they were.
11   Q.   Did you ever work in the new jail?
12   A.   Yes.
13   Q.   Did you receive any type of training on how to
14     use them or monitor the video cameras?
15   A.   I received some training on how to monitor,
16     because the control room, how the control room
17     is set up to switch to different cameras.
18   Q.   So if you are assigned to the control room, you
19     would be able to know to monitor different
20     portions of the jail, correct?
21   A.   Correct.
22   Q.   Okay. Do you know whether or not those cameras
23     have audio recording capabilities?

**18**

1   A.   I am not aware.
2   Q.   Prior to leaving to go to the Galesburg Police
3      Department, had you ever worked with either
4      Officers Morton or Abernathy?
5   A.   I worked with Sergeant Morton.
6   Q.   And prior to this lawsuit, did you know who
7      Officer -- or is it Sergeant Abernathy as well?
8   A.   I knew him, I mean I had seen him in public,
9      but I didn't work with him or anything like
10     that. He was hired after I went to Galesburg.
11   Q.   Okay. But Morton was there when you were
12     working there?
13   A.   Yes, he was third shift.
14   Q.   Was he ever your immediate supervisor?
15   A.   Not my immediate, no.
16   Q.   Was he ever your supervisor?
17   A.   Sometimes if I held over he was.
18   Q.   That is because you typically work second
19     shift?
20   A.   Yeah, correct.
21   Q.   Since joining the Galesburg Police Department,
22     what positions have you held?
23   A.   I have been on second and third shift.

**19**

1   Q.   What are the hours of the second shift?
2   A.   Second shift are, the main hours are 3:00 p.m.
3      to 11:00 p.m.
4   Q.   And then third would probably be 11:00 to --
5   A.   7:00.
6   Q.   -- 7:00.
7   A.   Yes.
8   Q.   And are you patrol?
9   A.   Patrol, yes.
10   Q.   Typically when you are working on either second
11     or third shift, do you ride a solo car or would
12     you ride with a partner?
13   A.   Most of the time it is solo.
14   Q.   Is there a specific area of Galesburg that you
15     are assigned to?
16   A.   At this time I am, yes.
17   Q.   And how is Galesburg broken down, I guess?
18   A.   There is, basically it is broken down into
19     zones, there is four main zones.
20   Q.   And what zone are you currently assigned to?
21   A.   Downtown car 31 zone.
22   Q.   And what are the parameters of 31?
23   A.   Parameters are basically anything north of

**20**

1      South Street, anything west of the tracks on
2      East Main Street, and anything south of the
3      tracks, because it is kind of weird how the
4      tracks run through the town as far as that
5      goes, so they set them up that way. And as far
6      west as Academy Street.
7   Q.   Back in March of '09, were you assigned to a
8      specific zone?
9   A.   March '09, I do not recall.
10   Q.   That was the day of the arrest.
11   A.   Right.
12   Q.   You don't recall what you were working?
13   A.   No.
14   Q.   Okay. What are your duties currently as car 31
15     in the downtown zone?
16   A.   Patrol, monitor the bars, respond to calls in
17     your zone, cover cars, I mean just, it is just,
18     I mean basically everything you could think of.
19   Q.   Like routine patrol?
20   A.   Yeah.
21   Q.   There is, what I am looking for, there is not
22     specific assignments that you have if you are
23     31, focus on this house or this block?

02/18/2011

21

1   A.   No, no.
2   Q.   It is just --
3   A.   It is just broad.
4   Q.   Does the Galesburg Police Department have like
5        its own tactical teams or specific officers
6        that have specific duties?
7   A.   Yes.
8   Q.   Is there like a narcotics team or a gang team,
9        something along those lines?
10  A.   We have rifle team, entry team, bike team,
11       scuba team.
12  Q.   Do you ever get detailed out to any of those
13       teams?
14  A.   I am on the bike team, the rifle team and the
15       entry team.
16  Q.   What is the rifle team?
17  A.   Recently we purchased ten ARs for our
18       department, and basically it is we have gone
19       through the training and I am qualified with
20       those rifles, and that team, that is what we
21       consider the team.  People are assigned, you
22       submit a memo saying you want to be on the
23       team, and they basically make a decision, pick

22

1        you, and then you went through the proper
2        training to qualify for that.
3   Q.   And the entry team, I assume, is that for
4        search warrants?
5   A.   Yeah.
6   Q.   Is that just when you go to search, you are the
7        team, you are one of the members that goes into
8        the house or whatever the target is of the
9        warrant?
10  A.   Yes.
11  Q.   The bike team, is that usually in the summer,
12       bike patrol?
13  A.   Yes.
14  Q.   And I think you may have answered this, but
15       these teams are something you kind of like bid
16       into or write a memo to get onto that team?
17  A.   Yes.
18  Q.   Is it, tell me how you like split up like being
19       on the rifle team versus entry team, is it
20       different hours if you are working one of those
21       teams?
22  A.   There is no set hours.
23  Q.   Is it just on a need basis?

23

1   A.   Yes.
2   Q.   Okay.  I want to direct your attention here to
3        March 5th of 2009.  That is the date of the,
4        morning of the incident, okay, Officer?
5   A.   Yes.
6   Q.   And do you recall what shift you were working
7        on March 5, 2009?
8   A.   Third.
9   Q.   That is when you would have started at
10       11:00 p.m. and ended at 7:00 a.m.?
11  A.   Correct.
12  Q.   And prior to making the traffic stop on Norman
13       Oeth, do you recall if you had made any other
14       arrests or issued any other tickets that day?
15  A.   I don't recall.
16  Q.   Do you have to keep any kind of daily log or
17       officer log each day that you turn in at the
18       end of the shift?
19  A.   No.
20  Q.   If you had to go back in to see what activity
21       you had on that specific day and that shift,
22       how would you look that up?
23  A.   I can go in and look under my, do a search

24

1        under my ID number.
2   Q.   And that is your computer ID number?
3   A.   Yes.  My badge actually, I am sorry, my badge
4        ID number.
5   Q.   You do that within the computer and it will
6        show up, pull up all your arrest reports you
7        generated?
8   A.   It will pull up every call that I responded to,
9        as far as that goes.  Like traffic stop or if I
10       responded to a domestic situation, example, you
11       know, whatever.
12  Q.   Is that kept by date or just by --
13  A.   It is kept by dates, so everything on that
14       date, on March 5, 2009 the entire day from
15       midnight until, well, until 11:59, until it
16       turns the next day obviously.
17  Q.   Okay.
18  A.   So you get kind of doubles on some of those
19       days, because from midnight to 7:00, and then
20       from 11:00 to 11:59, or 10:00, depending what
21       time you come in.
22  Q.   Well, at some point in the early morning hours
23       of March 5, 2009, you observed a vehicle,

02/18/2011

**25**

1    correct?
2    A.   Correct.
3    Q.   What is the first thing you recall when you
4         first saw this vehicle?
5    A.   I recall the rear registration plate light was
6         out, I was at the intersection of East South
7         and Allens Avenue.
8    Q.   And that is the light that is on the license
9         plate, correct?
10   A.   That illuminates the plate, yes.
11   Q.   And have you received any training within
12        Galesburg on if it is early morning hours to
13        look for those type of violations to make
14        traffic stops?
15   A.   No training.
16   Q.   Have you ever made any traffic stops for like,
17        you know, those smelly things hanging in the
18        windshield?
19   A.   I have made traffic stops for obstructed view,
20        yes.
21   Q.   Approximately how many traffic stops do you
22        think you have made for rear registration
23        plates?

**26**

1    A.   I don't know.
2    Q.   And when you observed this vehicle, did you
3         know whose vehicle it was?
4    A.   Did I know?  No.
5    Q.   And after you observed that the rear
6         registration plate light was out, what did you
7         do next?
8    A.   I turned around to catch up with the vehicle so
9         I could initiate a traffic stop.
10   Q.   So when you first saw the vehicle, was it
11        coming towards you?
12   A.   When it turned, I looked out my driver's side
13        window and I saw that the plate was out, so
14        then I whipped a U-turn there at that
15        intersection.
16   Q.   And it was dark out at this time, correct?
17   A.   Correct.
18   Q.   Were there streetlights?
19   A.   Yeah, streetlights.
20   Q.   Was it a traffic light or was it like a stop
21        sign?
22   A.   Stop sign.
23   Q.   Were you able to observe the driver of that

**27**

1    vehicle at that point?
2    A.   Not at that time.
3    Q.   And after you make a U-turn, you proceed to
4         follow the vehicle?
5    A.   Well, I make the U-turn.  By this time it is at
6         Allens and Mulberry.
7    Q.   When you make the U-turn, what do you do next?
8    A.   Catch up with the vehicle and initiate the
9         traffic stop at Allens and Mulberry.
10   Q.   And after making the traffic stop, do you
11        immediately approach the car or do you run the
12        plates first?
13   A.   I will run the plates, as far as that goes.
14        Sometimes I have time to look to see who they
15        might check back to, sometimes I don't, it just
16        depends.
17   Q.   Do you recall on this specific incident if you
18        knew who the plates checked back to before you
19        approached the vehicle?
20   A.   I don't recall.
21   Q.   And after you made the traffic stop, what do
22        you recall doing next?
23   A.   I recall that the vehicle, I initiated at

**28**

1    Mulberry and Allens, the vehicle turns onto
2    Mulberry and then ends up turning into a
3    driveway in the 800 block of Mulberry Street.
4    Q.   Was that unusual in your experience as a police
5         officer?
6    A.   Not necessarily.  I mean we get instances where
7         people do that to try to duck us, think that we
8         will go on by or something like that.
9    Q.   Have you ever had people do that to get out, so
10        they are just not on the shoulder of the road
11        to keep traffic flowing?
12   A.   Only if they live at that residence.
13   Q.   And after the person pulled into the driveway,
14        what happened next?
15   A.   I approached the driver.
16   Q.   And what is the first thing that happened once
17        you approached the driver?
18   A.   I recognized the driver at that time.  I
19        didn't, I recognized his face and I knew that
20        he had a valid warrant, but I wasn't, at that
21        particular moment, I wasn't putting the name
22        with the face, the full name with the face.
23   Q.   How did you know he had a warrant at that time?

02/18/2011

### 29

1  A.  Like I said, dealing with, you know, working in
2      the jail for two years, you know, some of the
3      people that we dealt with or whatever, you
4      know, I just recognized his face and I knew
5      that he had a valid warrant.
6  Q.  Was there like a poster up in the Galesburg
7      Police Department?
8  A.  No.
9  Q.  And at that point you didn't know his name,
10     though, correct?
11 A.  I just knew it as Junior.
12 Q.  And how did you get information that he had a
13     valid warrant?
14 A.  We have a warrant list at the Public Safety
15     Building.
16 Q.  And when you, prior to this traffic stop, you
17     have come to learn his name is Norman Oeth,
18     correct?
19 A.  Correct.
20 Q.  Prior to this, have you had any encounters with
21     Norman?
22 A.  Yeah, I mean like I said, working in the jail
23     and stuff and even out on patrol, I have dealt

### 30

1      with him.
2  Q.  Have you ever had any difficulties with Norman
3      prior to this?
4  A.  No.
5  Q.  Is it true you actually went to school with
6      Norman?
7  A.  No.
8  Q.  Okay.  After you approached the vehicle, you
9      observe, you recognize the person, you know his
10     name is Junior, and you know he has a warrant.
11     What happens next?
12 A.  After I identified him and so on and so forth,
13     Officer McCone, my cover officer, he observes a
14     club within reach of Mr. Oeth, who was sitting
15     in the driver's seat with the door open
16     speaking with me at that particular time.
17         Officer McCone opens the door, grabs that
18     club out, at which time Mr. Oeth becomes upset
19     because Mr. Officer McCone took that club out.
20 Q.  And what did you mean by the term cover
21     officer?
22 A.  A lot of times when we initiate, like if we
23     have domestic situations or, you know, traffic

### 31

1      stop or whatever, we'll have a cover officer,
2      somebody else, I mean because we are in patrol,
3      and so I am there by myself, so we have a cover
4      officer who comes as our basically, you know,
5      if we need assistance or something like that.
6  Q.  And that was going to be my question, did you
7      get on the radio and call for assistance at any
8      point?
9  A.  No, it is just automatic anytime we have a
10     traffic stop, there is always the initial
11     officer on that and then a cover officer en
12     route.
13 Q.  So it is not, it is in every type of traffic
14     stop you have a cover officer?
15 A.  Yes, until the officer says otherwise.
16 Q.  So I guess when you make a traffic stop, do you
17     go over the air or do you go on your computer
18     to let dispatch know that you are down on a
19     call?
20 A.  No, we go over the air, actually initiate the
21     traffic stop over the air through headquarters.
22 Q.  That is whatever officer is nearby can hear and
23     say I am close by, I'll be cover officer?

### 32

1  A.  Correct.
2  Q.  And you are speaking with Norman and the
3      driver's door is open, correct?
4  A.  Correct.
5  Q.  Who opened the door?
6  A.  Norman did.
7  Q.  Did he ever try to get out of the vehicle or do
8      anything at that point?
9  A.  He was seated, like say this is normally how
10     the seat is (indicating).  He was seated like
11     this (indicating), facing me.  His feet were on
12     the sidestep, but he wasn't actually physically
13     out of the vehicle.
14 Q.  And from the time, I guess, you get up to the
15     vehicle until Officer McCone comes by, how much
16     time goes by?
17 A.  I couldn't tell you, not much time.
18 Q.  And then you say at some point Officer McCone
19     observes this club in there, correct?
20 A.  Correct.
21 Q.  Did you observe that club?
22 A.  I couldn't, due to the angle at which I was
23     standing talking to Mr. Oeth.

02/18/2011

**33**

1  Q.  And have you seen that club since this time?
2  A.  I just saw it the night of.
3  Q.  Did you ever photograph it or take it to
4      inventory?
5  A.  I don't recall photographing it or taking it to
6      inventory.
7  Q.  Have you come to learn it is a tire thumper?
8  A.  That is what Norman said it was.
9  Q.  Are you familiar with what a tire thumper is?
10  A.  No, I am not familiar.
11  Q.  You don't have a CDL or have never driven an 18
12      rig?
13  A.  No.
14  Q.  So you say McCone reaches into the vehicle?
15  A.  Yes, he reaches in and grabs the club.
16  Q.  Okay.  Up to that point, had Norman ever
17      reached for that club?
18  A.  I couldn't see if he could, to be honest with
19      you.
20  Q.  Well, when Norman is facing you, did you ever
21      see him reaching for anything or making any
22      movements with his hands?
23  A.  His hands were moving, but I didn't, you know,

**34**

1      I didn't see him actually go reach for it, but
2      it was well within reach.
3  Q.  When you say hands moving, like I am doing when
4      I am talking to you (indicating)?
5  A.  Correct.
6  Q.  But he wasn't like reaching under the seat or
7      in his pockets or his waist or anything like
8      that?
9  A.  Just kind of he would rub on his leg or
10      something like that.
11  Q.  Did you observe how Officer McCone reached into
12      Norman's vehicle?
13  A.  He opened the door.
14  Q.  And at that point, he grabbed that, the club,
15      correct?
16  A.  Correct.
17  Q.  And then you said Norman became upset?
18  A.  Correct.
19  Q.  What did Norman say?
20  A.  He was just upset that Officer McCone had
21      reached into his vehicle and grabbed out that
22      club.
23  Q.  Do you recall anything specifically Norman was

**35**

1      saying at that time?
2  A.  No.
3  Q.  And what happened next at that point?
4  A.  At that point in time, I informed him he was,
5      headquarters had confirmed he did have a valid
6      warrant and his license was suspended.
7  Q.  And you informed Norman of this?
8  A.  Yes.
9  Q.  What did Norman do?
10  A.  He was still upset about, he was just rambling
11      on about the fact that Officer McCone reached
12      in and grabbed that club out, so he was upset
13      about that.
14  Q.  And what happened next after you told Norman
15      about the valid warrant and that his license
16      was suspended?
17  A.  I informed him he was being placed under arrest
18      at that time for those two offenses.
19  Q.  And did Norman respond to you when you told him
20      he was being placed under arrest?
21  A.  Yes.
22  Q.  What did Norman say?
23  A.  He didn't say anything, he just acknowledged

**36**

1      the fact, most of it was, like I said, all of
2      his focus was he was being upset by the fact
3      that the club was taken out of his vehicle.
4  Q.  And were you able to place him under arrest?
5  A.  Yes.
6  Q.  Handcuff him?
7  A.  Yes.
8  Q.  And did you have any difficulties on the scene
9      handcuffing Norman?
10  A.  We didn't have extreme difficulties, myself and
11      Officer McCone.
12  Q.  During this encounter up to when, I guess you
13      first get to the car until you cuff him, what
14      was Norman's demeanor prior to McCone reaching
15      in?
16  A.  His demeanor was cooperative.
17  Q.  And then after McCone reached and grabbed that
18      club, he became upset, correct?
19  A.  That is correct.
20  Q.  Anything else unusual about Norman's behavior
21      at that point?
22  A.  Just speaking with him, I could, you know,
23      smell a strong odor of alcoholic beverage

02/18/2011

**37**

1     coming from him, glossy eyes, slurred speech.
2 Q. Before this deposition you watched the video of
3     Norman in the booking area, correct?
4 A. Correct.
5 Q. Where he is talking quite a bit?
6 A. Correct.
7 Q. Did you ever hear him slurring his words on the
8     video?
9 A. Yes.
10 Q. And had you ever had any conversations with
11     Norman prior to this, prior to this encounter?
12 A. To this encounter?
13 Q. Right.
14 A. Yes.
15 Q. Typically did his voice sound the same on those
16     occasions as it did on this occasion?
17 A. No.
18 Q. It sounded different?
19 A. Yes.
20 Q. Did Norman have, when you got him up, did he
21     have any difficulties walking or anything along
22     those lines?
23 A. I didn't have to actually physically carry him,

**38**

1     no.
2 Q. And after you handcuffed him, what happens
3     next?
4 A. Secure him in the squad car.
5 Q. And I guess from the time you first make the
6     traffic stop until you secure Norman in the
7     squad car, did he make any type of verbal
8     threats to you?
9 A. No verbal threats toward me.
10 Q. Did he make any verbal threats toward anyone?
11 A. Officer McCone.
12 Q. What did he say to Officer McCone?
13 A. Basically he was going to kick his ass.
14 Q. Did you ever see him try to take a punch at
15     Officer McCone?
16 A. He never tried to take any punches at him.
17 Q. Did he ever spit at him or do anything?
18 A. No, he just kind of lunged at him a couple
19     times.
20 Q. When did he lunge at him?
21 A. When I had him in handcuffs.
22 Q. Describe to me how he lunged at Officer McCone.
23 A. Like this (indicating), like with his upper

**39**

1     body making motions toward him.
2 Q. Kind of like a juke move? Are you familiar
3     with that term?
4 A. Yeah. You know, it was one of those things
5     where he was, like I said, he was pretty
6     agitated that Officer McCone took the club out,
7     so he was, a lot of his hostility was toward
8     Officer McCone at this particular moment.
9 Q. And at any point did you guys ever call for any
10     backup while on the scene?
11 A. While on the scene, we didn't actually call for
12     any. I don't know, I don't recollect if any
13     actually showed up or not.
14 Q. You get him secured, he is placed in the back
15     of your vehicle. What happens next?
16 A. Officer McCone is instructed to, you know, do a
17     tow sheet, and so on and so forth, which he was
18     going to do. And I transported him to Public
19     Safety Building.
20 Q. While you were on the scene, did you ever
21     search Norman's vehicle?
22 A. Yes, we searched it.
23 Q. Did you find anything during the search of his

**40**

1     vehicle?
2 A. An open bottle of alcohol on the right.
3 Q. Where was that bottle located?
4 A. Under the passenger seat.
5 Q. Did you ever ask Norman why there is an open
6     bottle of alcohol in his car?
7 A. I asked him.
8 Q. What did Norman tell you?
9 A. He said that he didn't know it was there even.
10 Q. Did Norman ever tell you he had been working on
11     that car that day?
12 A. Later on he did.
13 Q. Was this once you got back into the booking
14     area?
15 A. Correct.
16 Q. How long does it take you to get from the scene
17     to the police station?
18 A. Maybe five minutes tops, depending on trains.
19 Q. Did you have any conversations with Norman
20     during that period?
21 A. Yeah, he stated that he wasn't going to do
22     anything for, he wasn't going to take any tests
23     or do anything, he wasn't going to do shit, to

02/18/2011

---

**41**

1    be exact.

2  Q.  Was this just spontaneous, he just said that,

3     or was it in response to something?

4  A.  **I informed him that he was being -- he asked**

5     **why we weren't going to the jail, and I told**

6     **him that we were going to Public Safety**

7     **Building because he was being processed for**

8     **DUI.**

9  Q.  And while on the scene, did you ever ask him to

10    do any field sobriety tests?

11 A.  **No.**

12 Q.  The vehicle that you were in, was that equipped

13    with a camera?

14 A.  **Yeah.**

15 Q.  Did you ever activate the camera while on the

16    scene?

17 A.  **If the camera was working, you initiate the**

18    **overhead lights, they turn on.**

19 Q.  They automatically turn on when you hit your

20    MARS lights, correct?

21 A.  **Yes.**

22 Q.  Does it also have audio recording?

23 A.  **Yes, some of them did have audio recording too.**

---

**42**

1  Q.  Do you know whether or not you recorded the

2     traffic stop of Norman?

3  A.  **I am not sure if it recorded or not.  If it**

4     **was, there should be a tape or some type of**

5     **DVD.**

6  Q.  Would there be any reason why it wouldn't have

7     been recorded?

8  A.  **If the camera wasn't working.**

9  Q.  If the camera is not working, is there any type

10    of like sheets you have to fill out that say,

11    you know, car number A, the camera is not

12    working, and you have to send it in for

13    repairs?

14 A.  **Some of the officers, depending which shift,**

15    **notice that maybe the camera wasn't operating**

16    **correctly, would say it as they are clearing or**

17    **mention it to their commands, so there could be**

18    **a sheet that was filled out saying that, or it**

19    **could be, you know, informed to our dispatchers**

20    **that it wasn't working.**

21 Q.  In part of the processing of a DUI, do you

22    typically go and download the video so you can

23    send that with the court packet?

---

**43**

1  A.  **If there is video from the car, you know, the**

2     **report room, anything like that, we always**

3     **obviously take it and tag it into evidence.**

4  Q.  Do you recall on this specific incident if you

5     ever tagged into evidence the recording of the

6     traffic stop of Norman?

7  A.  **I don't recall doing it.**

8  Q.  Do you know if you ever notified anyone whether

9     or not the video camera was working in that

10    vehicle?

11 A.  **I don't recall ever saying it did or didn't, to**

12    **be honest with you.**

13 Q.  Typically on a DUI arrest, after you process a

14    person, how do you go and get the video out of

15    the vehicle?

16 A.  **We used to have tapes that were in the trunk,**

17    **and you would have a key, get the key from**

18    **command and take that and eject the tape, you**

19    **know, your VHS tape or whatever.  And that is**

20    **what you submitted into evidence, as far as**

21    **that goes.**

22      **Now our new ones have like little discs**

23    **and then we record them onto DVD or CD, you**

---

**44**

1     know, whatever you want to call them.

2  Q.  And you do that during the processing period of

3     the individual?

4  A.  **Like at the end of it when we are all said and**

5     **done, say well, I have a video of my DUI**

6     **traffic stop, I need that disc taken out and**

7     **certain, you know, you will tell them what**

8     **times and they'll take that and burn it onto a**

9     **DVD for you.**

10 Q.  That is kind of what I am looking for, and you

11    would do that for all your DUI arrests?

12 A.  **Yes.  Once again, you know, if the machine or**

13    **the camera is working properly.**

14 Q.  Okay.  So that the night of this arrest, you

15    would have typically under your, what you

16    normally do is you go and request that video,

17    correct?

18 A.  **Correct.**

19 Q.  So would you have probably known that night

20    whether or not the video was working or the

21    camera was working?

22 A.  **Correct.  If I, like I said before, if there**

23    **was video from the squad car, I would have**

45

1     taken out that tape and secured it into
2     evidence.
3 Q. And do you know if Officer McCone's vehicle had
4     a camera?
5 A. I don't recall.
6 Q. Okay. Do most of the squad cars?
7 A. They all had cameras, I just don't know if his
8     was working, if it was on or anything like
9     that.
10 Q. And then you get him back to the Galesburg
11     Police Department for the processing period,
12     correct?
13 A. Correct.
14 Q. And during that ride there, you say I am going
15     to charge you with DUI, and he says I am not
16     going to do any tests, I am not going to do
17     shit?
18 A. During the ride there, yes.
19 Q. Do you recall anything else said during that
20     ride?
21 A. No.
22 Q. When you get to the Galesburg Police
23     Department, is that kind of where the video

46

1     starts, the two of you walking in?
2 A. Yes.
3 Q. It shows you having Norman sit down in a chair
4     and you start working the paper, correct?
5 A. Yeah, I asked him to sit down.
6 Q. And we have all watched the video, he is having
7     a conversation and swearing and using all sorts
8     of profane language, making jokes at your
9     expense?
10 A. Correct.
11 Q. Is it fair to say you were kind of joking back
12     with Norman?
13 A. It is, basically in situations with DUIs, we
14     get certain people that are, you know, if they
15     are intoxicated, it doesn't matter, they are
16     happy, you know, even if they are just being
17     arrested for DUI or whatever. But then there
18     is other people where it is a roller coaster
19     and obviously you have seen the video, and that
20     is Norman's case.
21        At certain times he is more relaxed than
22     other times. Other times he is worked up and,
23     you know, agitated, you know, so on and so

47

1     forth. My job is to be obviously professional,
2     okay? I mean I have done, I don't know how
3     many DUIs, so I have seen them all. So that is
4     just kind of how that goes. I mean as far as
5     that goes, my job isn't there to agitate him
6     any further.
7 Q. Okay. It appears that he is still agitated and
8     complaining about the club being taken out of
9     his car throughout the video?
10 A. Correct.
11 Q. And at some point he is making jokes with you
12     about another officer stealing your girlfriend?
13 A. Correct, he makes several different jokes.
14 Q. I guess, did you ever know Norman pretty well,
15     or how did he know this stuff about you, if you
16     know?
17 A. I don't know.
18 Q. And approximately how long are you guys at the
19     Galesburg Police Department?
20 A. I would say, I mean I couldn't tell you exact
21     time limit, 45 minutes to an hour probably.
22 Q. And at no time on the video did you ever ask
23     him to do the standard field sobriety test,

48

1     though, correct?
2 A. He informed me that he refused those.
3 Q. And then he told you he couldn't do the
4     Breathalyzer because of a lung condition he
5     had?
6 A. No, he, I just recall I told him that he had
7     three minutes to provide us a breath sample, if
8     he didn't provide the breath sample, then it
9     would be counted as refusal. He never
10     mentioned anything, to my recollection, about
11     having any type of lung problems.
12 Q. Okay. And during that approximately 45 minutes
13     or so, did you ever feel physically threatened
14     by Norman?
15 A. There was several times where I was very
16     uneasy.
17 Q. At anytime did you ever re-handcuff him or
18     handcuff him back up?
19 A. No.
20 Q. Is there capability to cuff someone to a bench
21     or a pole?
22 A. No.
23 Q. Are you under your general orders or policies

02/18/2011

**49**

1 with the Galesburg Police Department, are you
2 allowed to keep someone handcuffed behind their
3 back during the entire time?
4 A. It doesn't say that you can't, but generally,
5 you know, we let them go, as far as that goes.
6 We take the cuffs off, whatever, you know.
7 There have been numerous instances not, you
8 know, for me but other officers who have
9 actually gotten into fights with different
10 people too, so it is just part of our DUI
11 process, as far as that goes.
12 Q. Is it kind of the officer's call whether or not
13 to keep them cuffed if they feel like the
14 person could attack them?
15 A. It is mainly the fact that, you know, the
16 paperwork and everything, it is a time-
17 consuming deal, you have to wait the 21-minute
18 observation period, and fill out paperwork and
19 citations that go with that and so on, so
20 forth. So you know, for somebody to have to
21 sit there with their hands behind their back
22 for 45 minutes to an hour, that is a short one,
23 is a long time to ask somebody to sit there

**50**

1 like that.
2 Q. Are there any type of holding cells in the
3 Galesburg Police Department?
4 A. We do have two holding cells that we use to put
5 inmates in or arrestees in before we take them
6 to the jail that used to be on the sixth level.
7 Q. Those are, are those still in use?
8 A. Only for questioning, we usually just put
9 people in there for, you know, they are under
10 arrest and we are going to question them, we
11 are going to question them different --
12 obviously we are not going to question two
13 people together.
14 Q. In the video, Norman asked to be placed in one
15 of these holding cells, correct?
16 A. He just wanted to be put in the holding cell to
17 get on with the process.
18 Q. He was never placed in the holding cell?
19 A. Not that particular one, no.
20 Q. And after that 45 minutes, you re-handcuff him,
21 correct?
22 A. Correct.
23 Q. And that shows on the video, is that you and

**51**

1 Officer McCone?
2 A. Yes.
3 Q. And at that point it looks like Norman was
4 walking around, correct?
5 A. At that point in time, yes, he is up and about,
6 out of his seat.
7 Q. It took the two of you to handcuff him?
8 A. Yeah, I go to handcuff him, and he tenses up
9 when I go to handcuff him, and at which time
10 Officer McCone comes over to assist me in
11 securing him in the handcuffs.
12 Q. And at that point did he ever swing at you or
13 try to fight you?
14 A. He wasn't, I mean he, the tense up, I mean he
15 tensed up to the point where, you know, he was
16 locking his arm in place at that point in time.
17 Q. Did you have to use any type of force or any
18 maneuvers to cuff him?
19 A. No maneuvers. Just like I said, at that
20 particular time I was able to get one on him
21 and say, you know, put your hands behind your
22 back. And after a couple minutes, he did
23 comply after Officer McCone came over to

**52**

1 assist.
2 Q. And after he is re-handcuffed, what happens
3 next?
4 A. He is transported over to the Knox County Jail.
5 Q. And that is where you kind of pull into the
6 sally port?
7 A. Right.
8 Q. And there is holding cells that you can bring
9 them right through the sally port and put them
10 into that holding cell?
11 A. Yes, there is a door on each end basically to
12 kind of keep you segregated or whatever.
13 Q. Do you recall what holding cell you placed Norm
14 in?
15 A. Holding cell number one.
16 Q. And was there any reason why you placed him in
17 holding cell one?
18 A. It was just the closest one.
19 Q. And back, before you leave Galesburg Police
20 Department and you go to Knox County, did you
21 have any difficulty getting Norman in your
22 vehicle?
23 A. No.

02/18/2011

### 53

1    Q.   And how, was he placed in the rear of the
2         vehicle?
3    A.   Yes.
4    Q.   And how much room is there in the back of the
5         vehicle?
6    A.   I couldn't give you an exact measurement.
7    Q.   And how much do you think Norm weighed back in
8         March of '09?
9    A.   I would say 250-plus.
10   Q.   He is kind of a fatter guy?
11   A.   He is 6,2, he is probably 250, 280 easy.
12   Q.   Was it a tight fit in the back of the squad car
13        with a man that size?
14   A.   I have had tighter.  We instruct them a lot of
15        times if they are larger individuals to sit
16        butt first and scoot back that way.  In this
17        situation, I don't recall which way Norman sat
18        in the vehicle, back of the squad, but I had
19        actually had people larger than Norman Oeth get
20        in and get out of that vehicle without any
21        problems.
22   Q.   If someone is intoxicated, does that make it,
23        have you ever had experience it is more

### 54

1         difficult for them to get out of the vehicle
2         with their, no balance with their hands cuffed
3         behind their backs?
4    A.   Actually the intoxicated people are actually
5         more limber, so probably why they don't get
6         hurt when they get in accidents, I don't know.
7         But they are more, it seems like they are more,
8         their muscles are more relaxed or something,
9         and they are more limber.  So actually I have
10        had less problems with people that are
11        intoxicated as opposed to people that are not.
12   Q.   My question is without their hands to balance,
13        have you ever had difficulty with them trying
14        to move if they don't have good balance with
15        putting their hands out?
16        MR. KELLY:  Just object, it is asked and
17        answered.  You can answer.
18        THE WITNESS:  Repeat the question, I am sorry.
19   BY MR. MEYER:
20   Q.   Sure.  With someone that may be intoxicated
21        that has their hands behind their back cuffed
22        and don't have their hands to put out for
23        balance, have you had, you know, difficulties

### 55

1         with them moving around?
2         MR. KELLY:  Same objection.  Go ahead.
3         THE WITNESS:  Only time I have had problems is
4         when they are actually exiting out toward me,
5         they might lose their balance.  But I am always
6         there to help, you know, keep their, you know,
7         basically help them or assist them out as far
8         as that goes.
9    BY MR. MEYER:
10   Q.   So that is what, they are coming back out?
11   A.   Coming back out, but actually moving in the
12        back of it, no.
13   Q.   And then you said sometimes with larger
14        individuals they kind of will scoot in butt
15        first so their legs are not right behind the
16        seat?
17   A.   Correct, they just actually, they are sitting
18        with their legs basically on the seat.
19   Q.   Okay.  Kind of like, is it just a bench seat in
20        the back?
21   A.   Yes.
22   Q.   So they can just kind of just lay out sideways
23        versus the normal way you would sit in the back

### 56

1         of the car?
2    A.   Yeah, you can sit, yeah, either way, whichever
3         they choose.
4    Q.   Once you get to the sally port, did you have
5         difficulty getting Norman out of the vehicle?
6    A.   Yes, he refused to get out of the vehicle,
7         informed me that I was going to have to drag
8         him out.
9    Q.   Did he say why you were going to have to drag
10        him out?
11   A.   He was just refusing.
12   Q.   Did he ever say he couldn't get out or he was
13        stuck?
14   A.   No, he did not.
15   Q.   And when he said you are going to have to drag
16        me out, what happened next?
17   A.   I requested several other times like come on,
18        Norman, let's just go, you know, you're almost
19        here you can bond out of here pretty soon, so
20        on, so forth.  And finally I just said look, if
21        you don't get out of the car, you are going to
22        be Tased.
23   Q.   What did Norman say in response?

57

1  A.  He said okay, okay, I'll get out, I'll get out,
2      and he got out.
3  Q.  And how did he get out?
4  A.  No problems, just right out (indicating).
5  Q.  And after he gets out, you take him to the
6      holding cell one, correct?
7  A.  Correct.
8  Q.  What do you do once you put him in holding cell
9      one?
10 A.  I just secured him in the holding cell one, and
11     then I go through the main doors that lead into
12     the jail.
13 Q.  And once again, we have that portion on video
14     as well, correct?
15 A.  Correct.
16 Q.  And then it looks like you go over to a
17     computer to start doing processing?
18 A.  Yeah.
19 Q.  And what is the next thing that you recall
20     happening that was unusual when you are working
21     on the processing?
22 A.  Basically you can see from the computer they
23     start, he starts fighting with Deputy Morton

58

1      and Deputy Abernathy, at which time Deputy
2      Higgins steps into the holding cell, and
3      shortly thereafter, I follow in to assist. And
4      they are fighting with him, so we are trying to
5      get him, you know, down someplace where you can
6      gain good control of him and get him properly
7      secured again. This is all after they took the
8      cuffs off, my cuffs off of Norman.
9  Q.  Did you hear anything first before you made any
10     observations?
11 A.  Yeah, yeah, I could see and hear the struggle.
12 Q.  What is the first thing you heard?
13 A.  I just heard them, you know, he is like, you
14     know, Sergeant Morton is like, you know,
15     Norman, quit it, knock it off. And then the
16     scuffling around in the holding cell, so I kind
17     of take a glance in there and see there is a --
18 Q.  Did you ever see like punches or blows being
19     thrown or kicks?
20 A.  I didn't see any punches or anything like that,
21     just a lot of arms, you know, flailing and
22     stuff like that, him trying to break their hand
23     grabs.

59

1  Q.  Did you ever see Norman with his head up
2      against the wall?
3  A.  What do you mean by that?
4  Q.  In the holding cell we have walls, correct?
5  A.  Yes.
6  Q.  Did you ever see him facing the wall with the
7      Knox County Deputies behind him?
8  A.  Initially, yes.
9  Q.  And watching the video, could you see Norman
10     put his hands up behind his head?
11 A.  He was informed, I believe, to place his hands
12     behind his head.
13 Q.  Did you observe him complying with that order
14     on the video?
15 A.  At that point in time.
16 Q.  And then at some point it looks like the two
17     officers grab him, correct?
18 A.  Right, it appears that he turns at Sergeant
19     Morton.
20 Q.  And is that based on watching the video, or is
21     that what you actually saw while you are in the
22     --
23 A.  That is just based on watching the video.

60

1  Q.  Do you know what made Norman turn at all?
2  A.  No.
3  Q.  Did you ever hear Norman say, you know, quit
4      twisting my wrist or let go?
5  A.  No.
6  Q.  Did you know whether or not Norman ever had any
7      problems with either of those two officers
8      prior to March 5th, 2009?
9  A.  No.
10 Q.  Have you come to learn he had problems with
11     those officers?
12 A.  I have come to learn, yes. Sergeant Morton got
13     his underage cousin pregnant. I don't know the
14     extent, I just know that he was married into
15     that family. That is all I know.
16 Q.  And prior to going to the Knox County Jail, did
17     Norman ever tell you that he had, he spit at
18     Sergeant Abernathy when he was in there for a
19     child custody issue?
20 A.  No.
21 Q.  And when you make, you hear the scuffling
22     around, you get up to go assist, correct?
23 A.  Correct.

61

1  Q.  Who is in the holding cell area when you get in

2      there?

3  A.  **All three deputies -- Abernathy, Sergeant**

4      **Morton and Deputy Higgins.**

5  Q.  And what is the first thing that happens when

6      you get into that area?

7  A.  **I am right here, and they kind of move toward**

8      **me and I kind of get pushed back, and then I am**

9      **trying to get out of the way, because I am**

10     **trying to assist them if assistance is needed.**

11     **But at the same time, I am trying to, you know,**

12     **stand back too, you know, and let them handle,**

13     **you know, because a lot of times we just**

14     **consider it, you know, your house is, you know,**

15     **the Public Safety Building and their house is**

16     **the jail.  So you know, any rules under their**

17     **jail, you know, we kind of, that is how we do**

18     **it.**

19 Q.  Did you hear anything being said between any of

20     the parties when you went into that cell?

21 A.  **No.**

22 Q.  And what is the next thing that happens once

23     you are in there?

62

1  A.  **We struggle to get him secured, we just asked,**

2      **you know, continuously, they are telling him to**

3      **quit, put your hands behind your back, quit**

4      **resisting, quit doing this, you know, you are**

5      **just making this harder on yourself, stuff like**

6      **that.**

7  Q.  And at that point do you have any physical

8      contact with Norman?

9  A.  **Just briefly.**

10 Q.  Where did you touch Norman?

11 A.  **I think I just had him on the back, like one**

12     **hand on his back.**

13 Q.  Is he still standing upright at this point?

14 A.  **At this point, yes.**

15 Q.  And how long was he upright before he was put

16     down in the bed area or bench?

17 A.  **I couldn't tell you exactly.**

18 Q.  A couple minutes?

19 A.  **If I had to guess, probably a couple minutes.**

20 Q.  During those couple of minutes, did you ever

21     see Norman throw any punches at anyone?

22 A.  **No actual punches, he was swinging his arms**

23     **pretty good and trying to kick his legs.**

63

1  Q.  Did you ever see him come into contact with

2      anyone when he was swinging his arms and

3      kicking his legs?

4  A.  **Yes.**

5  Q.  Who did you observe him hit?

6  A.  **Well, I mean he was striking all three of them.**

7  Q.  Could you tell whether or not he had a cuff on

8      either one of his hands?

9  A.  **No cuffs.**

10 Q.  After the approximately couple minutes while he

11     is standing up, what happens next?

12 A.  **Eventually the three deputies were able to get**

13     **him placed down, so Sergeant Morton tells me to**

14     **go out and grab some shackles to restrain Mr.**

15     **Oeth in.**

16 Q.  And we can see on video you are kind of coming

17     and you are going through some drawers,

18     correct?

19 A.  **Yes.**

20 Q.  And then you go back toward the cell?

21 A.  **With the shackles, that is what, I actually had**

22     **the shackles, leg shackles and a pair of**

23     **handcuffs to restrain him.**

64

1  Q.  And then five minutes of the video is missing.

2  A.  **I don't know, I just know the next thing you**

3      **can see on the video, we are walking out.**

4  Q.  Did you ever look at the time stamp to see

5      that --

6  A.  **No, up until today, this is the first time I**

7      **have ever seen it.**

8  Q.  And so you don't have an understanding as to

9      why five minutes of the video is missing?

10 A.  **I don't even know if --**

11     MR. KELLY:  I just object to foundation.  I am

12     not sure he ever knew that.  I didn't talk to

13     him about that.

14 BY MR. MEYER:

15 Q.  When you watched it, did you notice that five

16     minutes were missing?

17 A.  **When I watched it, I knew that, you know, it**

18     **was like we are struggling with him and next**

19     **thing I know we are walking out.  So I know,**

20     **you mean, do I know for a fact that there is**

21     **anything, I don't see any time, but I just know**

22     **it was kind of quick, I was like, and we kind**

23     **of discussed it.**

02/18/2011

**65**

1   Q.   Right.  And that night I was just wondering did
2        anyone from Knox County ever tell you why there
3        is a portion of this video missing when you go
4        back into the cell?
5   A.   Like I said, up until today is the first time I
6        have seen it, so I didn't even know it.
7   Q.   Okay.  So since we don't have the video, what
8        happens once you get the shackles and start
9        going back toward that cell?
10  A.   I go back in, we end up putting leg shackles on
11       his legs.  And Deputy Higgins stays down by his
12       legs and Sergeant Morton is on Norman's, like
13       buttocks area, trying to keep him down, and
14       Deputy Abernathy is up toward his head area,
15       shoulder area, trying to kind of gain control
16       of the shoulders, and I am trying to grab the
17       hands, get his arms out from under him so we
18       can secure him in the handcuffs.
19  Q.   When you go back in, is anyone saying anything
20       to Norman at this point?
21  A.   We are just telling him the same as before, you
22       know, quit resisting, you know, just put your
23       hands behind your back and make this easier on

**66**

1        yourself.
2   Q.   Does Norman say anything in response?
3   A.   He is not saying anything.
4   Q.   At any point did you ever hear Norman say he
5        couldn't breathe?
6   A.   No.
7   Q.   His arms, were they underneath his body?
8   A.   Yeah, they were tucked, he had his arms tucked
9        up underneath his stomach and chest area.
10  Q.   Could you tell whether or not Morton, who is
11       kind of like in the butt area, and Abernathy,
12       who is by his head, are they putting pressure
13       on Norman to keep him down?
14  A.   Well, he is bucking up pretty good, so I am
15       sure they had some pressure on him to try to
16       keep him --
17  Q.   What do you mean bucking up?
18  A.   Well, I mean he is kicking his feet, trying to
19       bounce them off and going like this with his
20       shoulders and stuff (indicating) like that to
21       kind of, to keep them off of him, as far as
22       that goes, prevent them basically from putting
23       him in restraints.

**67**

1   Q.   When he is doing this bucking up, is he ever
2        saying get off me, I can't breathe or I am
3        having trouble breathing?
4   A.   No.
5   Q.   I guess Norman's left side would be at the
6        wall?
7   A.   Yes.
8   Q.   Is he pinned up against the wall?
9   A.   Yes, the wall meets like right there, and he is
10       facedown and the wall is like right here
11       (indicating).
12  Q.   And then you said you are trying to get his
13       arms, correct?
14  A.   Correct.
15  Q.   And what is the first body part of Norman that
16       you grab once you come back in?
17  A.   We are able to grab the left arm and get it
18       back behind his back and secure that in
19       handcuffs.
20  Q.   And you say we, who are you referring to?
21  A.   Deputy Morton and myself.
22  Q.   And were you able to get him so it didn't hit
23       the wall?  Was it pinned against the wall at

**68**

1        any point?
2   A.   We just kind of, we rolled him a little bit
3        away from the wall so we could get it out.
4   Q.   And then you got a cuff on that wrist?
5   A.   Correct.
6   Q.   Then what happened after you got a cuff on the
7        left wrist?
8   A.   I had Deputy Morton hold onto that handcuff.
9   Q.   And while Morton is holding onto the cuff that
10       is on the left wrist, what do you do next?
11  A.   That is when I start prying, pulling the right
12       arm out to get it out from underneath him.
13  Q.   And up to that point, did you see any other
14       officers have any physical contact with
15       Norman's right arm?
16  A.   No.
17  Q.   As you are pulling his right arm, what is going
18       on?
19  A.   I am able to basically get it free from out
20       under him, and at that time he, it comes out, I
21       lose my balance, fall down on my butt.  And he
22       swings it, almost hits me in the face, and he
23       swings it around the top.  He is going like

### 69

1  this with it (indicating) and almost strikes
2  Deputy Abernathy in the face as well.
3  Q.  Did he ever strike either you or Abernathy?
4  A.  I don't believe he actually made any good
5  contact with either one of us.  I mean he made
6  some contact with me and maybe some brief with
7  Deputy Abernathy, but nothing like clock
8  (indicating).
9  Q.  And after you regained your balance, what do
10  you do?
11  A.  I am able to regain my balance and grab onto
12  the wrist area of his right arm.
13  Q.  What happens when you grab the wrist area of
14  his right arm?
15  A.  At this point in time, I am trying to bring
16  that arm in to get it secured to the left hand.
17  Q.  What happens when you are bringing it to the
18  left hand?
19  A.  He just continues to fight, and he is fighting,
20  he is trying to push against me as hard as he
21  can and trying to move it up and down and
22  stuff.  Next thing I know, I heard a pop.
23  Q.  Prior to hearing the pop, did you ever hear

### 70

1  Norman say, "Okay, I'll stop, I'll stop"?
2  A.  No.
3  Q.  In preparing for your deposition, did you ever
4  read Sergeant Morton's report?
5  A.  No.
6  Q.  Did you ever hear Sergeant Morton say just give
7  us your arm, and Norman said, "Okay, I'll stop,
8  I'll stop," prior to the pop?
9  A.  No.
10  Q.  And you had his arm in a reverse gooseneck?
11  A.  I don't know if that is the proper terminology,
12  but it was basically like this (indicating).
13  And like I said, I had it like this
14  (indicating) to kind of, up against my body to
15  push it in like that (indicating).
16  Q.  And at any time when you are applying pressure,
17  did Norman ever say, "Let go, I'll stop, I'll
18  stop"?
19  A.  No.
20  Q.  Then you hear a pop, what happens?
21  A.  I let go.
22  Q.  And after you let go, what happens?
23  A.  At that point in time, he screams ah, you just

### 71

1  broke my arm.
2  Q.  After Norman says you broke my arm, what
3  happens?
4  A.  Then we are all just stunned, and I go out and
5  I call my lieutenant and call for paramedics.
6  Q.  At any time did you ever see Norman lose
7  consciousness?
8  A.  No.
9  Q.  Call your lieutenant, is that Lieutenant --
10  A.  Riley.
11  Q.  -- Riley.  And what do you tell Lieutenant
12  Riley when you call Lieutenant Riley?
13  A.  I just informed him that we needed an ambulance
14  and that Norman Oeth's arm was just broken.
15  Q.  At that time did you know whether or not his
16  arm was broken?
17  A.  No, I didn't.
18  Q.  Did you have any reason to doubt what Norman
19  was saying at that point?
20  A.  You know, if he says, I just was going on what
21  he said, as far as that goes.
22  Q.  After you called Lieutenant Riley and said that
23  you needed an ambulance, what did you do next?

### 72

1  A.  We waited for paramedics to arrive, and they
2  transported him in the ambulance and I
3  followed.
4  Q.  From the time you heard the pop until the
5  paramedics arrived, did you have any
6  conversations with Norman?
7  A.  Did I have any conversations with Norman?  No.
8  Q.  Okay.  Did you hear Norman talking with
9  anybody?
10  A.  I don't recall.
11  Q.  Did you have any conversations with Sergeant
12  Morton?
13  A.  Afterwards?
14  Q.  From the pop until the ambulance arrived.
15  A.  No, I just, like I said, I was just kind of
16  like I didn't know what was going on kind of
17  thing, you know.  I guess it was shock maybe, I
18  don't know.
19  Q.  Well, from the time of the pop until today,
20  have you had conversations with Sergeant Morton
21  about the incident?
22  A.  We have spoke briefly.
23  Q.  When was that?

02/18/2011

### 73

1  A.  I don't recall the date.
2  Q.  What was said during that conversation?
3  A.  It was basically just about when do you have
4      all your stuff, that is all it is.  We just
5      spoke, when do you guys have your stuff?  When
6      do we, you know, and that is basically it.
7  Q.  I am not sure, what do you mean stuff?  What
8      are you referring to?
9  A.  They spoke that they had, they had already had
10     their deposition and stuff like that.  And I
11     said well, you know, I wasn't able to make it
12     on that date, so I have got another date, I am
13     sure they are going to set up another date with
14     me, so --
15 Q.  Okay.  And same question with Abernathy, have
16     you spoken with him since the incident until
17     today?
18 A.  Just same as with Sergeant Morton.
19 Q.  Okay.  And after the ambulance arrives, Norman
20     is taken to the hospital, correct?
21 A.  At the time, yes, after it was, had arrived and
22     they transport him on a gurney.
23 Q.  And you follow to the hospital?

### 74

1  A.  Yes.
2  Q.  What happens when you arrive at the hospital?
3  A.  Arrive at the hospital, I finish out, you know,
4      issuing my citations and the paperwork for
5      Norman, and then they are running all their
6      tests, as far as that goes.
7  Q.  Did you have any conversations with Norman at
8      the hospital?
9  A.  Just to inform him of the citations and give
10     him his paperwork and stuff.
11 Q.  Did Norman say anything to you at the hospital?
12 A.  No.
13 Q.  And after you finish and give him that, you
14     leave?
15 A.  I talked to the doctor.  They just confirmed
16     that his arm was broken.
17 Q.  Did the doctor say anything else?
18 A.  As far as --
19 Q.  What type of break or how severe the break was.
20 A.  They just said it was a spiral fracture.
21 Q.  Do you have them explain what a spiral fracture
22     is?
23 A.  No, I didn't.

### 75

1  Q.  After speaking, you give Norman citations, you
2      speak with the doctor and confirm his arm is
3      broken, what do you do next?
4  A.  Once I tell them, you know, once he is ready to
5      be released because they were going to keep
6      him, I said once he is ready to be released,
7      please contact our department.
8  Q.  At some point did they contact your department?
9  A.  Yes.
10 Q.  And were you contacted?
11 A.  No, actually I believe Officer Anderson was the
12     one working at the time and transported Mr.
13     Oeth.
14 Q.  Do you know where Mr. Oeth was transported to?
15 A.  Knox County Jail.
16 Q.  Do you know whether or not he was processed in
17     or just released?
18 A.  I believe he was processed through as far as
19     the normal booking procedures.
20 Q.  After leaving the hospital, what was your next
21     involvement with this incident of March, 2009?
22 A.  As far as --
23 Q.  Court, or did you have any meetings afterwards?

### 76

1  A.  No, just, well, first was when I got the
2      paperwork in reference to Norman suing me.
3  Q.  Did you ever have to go to court for the
4      underlying criminal charge?
5  A.  No, they issued a couple warrants, but I never
6      had to go to court for it.
7  Q.  And do you know what the status of the
8      underlying criminal case was?
9  A.  I do not at this time.
10 Q.  Did you ever charge Norman with any type of
11     battering or resisting arrest?
12 A.  Yes.
13 Q.  You brought a charge for resisting?
14 A.  Yes.
15 Q.  Did you fill out a criminal complaint for that?
16 A.  Yeah, we fill out, yeah, all the criminal
17     complaints, at that particular time we were
18     still filling out criminal complaints for
19     batteries, you know, obviously non-felony
20     offenses.
21 Q.  Have you come to learn that those charges were
22     dismissed against Norman?
23 A.  Last I knew, there was a warrant issued for

02/18/2011

77

1   him, but they quashed the warrant because he
2   was someplace else, I guess, at the time. But
3   I didn't know the charges were officially
4   dropped yet.
5   Q.  Do you have the capability to look up to see
6       the status of a case?
7   A.  Other than just talking with the State's
8       Attorney's office, as far as that goes, you
9       know. We, a lot of times, you know, we make
10      our arrest, and you know, it goes through the
11      State's Attorney's office and they just call us
12      for court, is kind of how it goes.
13  Q.  Were you ever called to court to come to
14      testify for any hearing regarding the battery
15      charges you brought against Norman?
16  A.  I haven't been to court on any of the charges I
17      arrested Mr. Oeth for.
18  Q.  Okay. And since this incident, have you had
19      any conversations with Mr. Oeth?
20  A.  I am trying to think if I have seen him or not.
21      I don't believe I have made contact with Mr.
22      Oeth. Oh yes, once.
23  Q.  When was that?

78

1   A.  I was at court one time and he was at court.
2   Q.  And what was said during that conversation?
3   A.  I am trying to recall. He came up to me and
4       made some type of remark, I don't recall
5       exactly what the remark was, to be honest with
6       you.
7   Q.  Did you say anything in response?
8   A.  No.
9   Q.  Did you ever do any followup to see what
10      treatment Norman got as a result of that broken
11      arm?
12  A.  No.
13  Q.  Did you ever come to learn he had surgery and
14      had to have a steel rod placed in his arm?
15  A.  No, I mean a lot of times you are not going to
16      get that information from medical staff anyway.
17
18      (Ingles Exhibit No. 1 so marked.)
19
20  Q.  Officer, I am going to place in front of you
21      what we marked as Ingles Deposition Exhibit
22      Number 1. For the record, it says Oeth9 on the
23      bottom, and it should go to Oeth12, the last

79

1   page. Just make sure you have all the pages.
2   A.  Correct.
3   Q.  And you recognize what Ingles Deposition
4       Exhibit Number 1 is?
5   A.  Appears that it is part of my General Offense
6       Report.
7   Q.  Is there additional parts to this?
8   A.  There is several different pages missing from
9       the front here. It is my, different businesses
10      and stuff like that involved.
11  Q.  Oh, yeah.
12  A.  But the main page is all the offenses that he
13      was charged with.
14  Q.  Right.
15      MR. KELLY:  This isn't underlined either. The
16      Exhibit 1 you gave him had underlining.
17
18      (Off The Record Discussion)
19
20  BY MR. MEYER:
21  Q.  But the portion I gave you here, Ingles 1, is
22      this the narrative portion?
23  A.  Yes, it appears to be.

80

1   Q.  Do you know, is there any further narrative
2       that you are aware of?
3   A.  No.
4   Q.  Just take a chance to review this and just make
5       sure it is the same one that you are familiar
6       with.
7   A.  First glance it appears that it is all there,
8       as far as, I mean, the narrative.
9   Q.  At anytime when Norman was in the cell area,
10      did you ever say if you don't, you know, stop
11      resisting, I'll Tase you?
12  A.  In the holding cell?
13  Q.  In the holding cell, correct.
14  A.  Yeah. At no time, we were not allowed to use
15      Tasers in the Knox County Jail.
16  Q.  Okay.
17  A.  That was their policy.
18  Q.  You were aware of that policy because you
19      previously had been a Knox County correctional
20      officer?
21  A.  No, it was just because we were informed once
22      we got the Tasers that we were not allowed to
23      use them in there.

02/18/2011

**81**

1  Q.  Okay.  The resisting arrest, if you go back to
2      yours there --
3  A.  There it is.
4  Q.  Does that say Knox 14 on the first page?
5  A.  What do you mean?
6  Q.  I just want to make sure we are going off the
7      same document.  I think I have the same thing
8      here.
9      MR. KELLY:  They probably bate stamped the
10     original.
11 BY MR. MEYER:
12 Q.  Officer Ingles, I show you here we have the
13     offenses you were referring to earlier,
14     correct?
15 A.  Correct.
16 Q.  We have DUI, DUI violation, no insurance,
17     illegal possession, transport of liquor,
18     driver, no rear registration plate light,
19     operate uninsured motor vehicle, driving on
20     suspended/revoked license, and resist peace
21     officer/correctional employee, and then we have
22     the FTA warrant, correct?
23 A.  Correct.

**82**

1  Q.  But do you see anywhere, would there be
2      anywhere else where he would be charged with a
3      battery and that would that be documented?
4  A.  In the, as far as other than the offenses and
5      stuff like that, it is in the narrative of the
6      arrest module, says and resisting a peace
7      officer.
8  Q.  I was asking for a battery.
9      MR. KELLY:  I don't think you ever said you
10     charged him with battery.
11 BY MR. MEYER:
12 Q.  Did you say you charged him with battery?
13     MR. KELLY:  He said resisting --
14     THE WITNESS:  I never charged him with battery,
15     I charged him with resisting.
16 BY MR. MEYER:
17 Q.  Okay.  Are you familiar with where the
18     information is in the criminal case?
19 A.  No.
20 Q.  The charging document that you bring against
21     the individual arrestee.
22 A.  Okay.
23 Q.  And I don't have an extra exhibit here, but

**83**

1      what it is, for the record what it is, it is
2      Oeth1 and 2.
3
4      (Brief Recess)
5
6      (Ingles Exhibit No. 2 so marked.)
7
8      We will get to that Exhibit 3, first I just
9      want to go in order so we have it here.
10     I'll give you, Officer Ingles, what we
11     marked as Ingles 2.  Do you have Ingles 2 in
12     front of you?
13 A.  Yes.
14 Q.  This is a two-page document.
15 A.  Yeah, basically.
16 Q.  This is the memorandum that you were referring
17     to earlier, correct?
18 A.  Correct.
19 Q.  This just basically has a narrative portion of
20     the incident inside the Knox County Jail,
21     correct?
22 A.  Yes.
23 Q.  Do you know whether you just cut and pasted

**84**

1      that narrative right straight from your arrest
2      report?
3  A.  I don't know if I did.  I mean right off the
4      top of my head, I don't know.
5  Q.  Do you have those capabilities?
6  A.  Yeah, we do have those capabilities, yes,
7      because it is, I mean all our stuff is on
8      computers.
9  Q.  And then back to Exhibit 1, we have the bottom
10     portion on page Oeth11.
11 A.  Oeth11.
12 Q.  Last paragraph there says, "Norman Oeth, Jr. is
13     on pending for DUI, no rear registration plate
14     light, driving while suspended, no insurance,
15     illegal transportation of alcohol, felony DUI,
16     and Knox County body attachment," correct?
17 A.  Correct.
18 Q.  And that is what I was looking for, why it
19     doesn't show there is resisting arrest in that
20     portion, if you know.
21 A.  I don't know.
22 Q.  Okay.
23 A.  Must have been omitted.

02/18/2011

85

1      (Ingles Exhibit No. 3 so marked.)

2

3  Q.  We will go to Deposition Exhibit Number 3.  Do

4      you have Exhibit Number 3 in front of you?

5  A.  Yes.

6  Q.  That says Oeth1 and 2 for the record, correct?

7  A.  Yes, it does.

8  Q.  And it states here, "The Circuit Court of the

9      Ninth Judicial Circuit, Knox County, Illinois"?

10 A.  Where are you --

11 Q.  Up at the top.

12 A.  Yes.

13 Q.  Sorry.  "People of the State of Illinois vs.

14     Norman Oeth, Jr."

15 A.  Uh-huh.

16 Q.  Is that a yes?

17 A.  Yes.

18 Q.  Then we have, "Information, now comes Eric R.

19     Gibson, Knox County Assistant State's Attorney,

20     in the name and by the authority of the People

21     of the State of Illinois, and prosecutes on

22     behalf of said People and informs the Court

23     that Norman Oeth, Jr. on or about 3/5/09,

86

1      within the County of Knox committed the offense

2      of, I, driving a vehicle under the influence of

3      alcohol (Class 4)," correct?

4  A.  Correct.

5  Q.  Then we have, "Count II, resisting a peace

6      officer," which is a Class A misdemeanor,

7      correct?

8  A.  Correct.

9  Q.  And then we have, "The said defendant knowingly

10     resisted the performance of Deputy Brad

11     Abernathy and Sergeant Jason Morton," correct?

12 A.  Correct.

13 Q.  And then there is no Count III.  My question,

14     do you know whether or not you actually charged

15     him as well?

16 A.  I actually charged him.  I don't know why my

17     name is not on here or anything like that.

18 Q.  Okay.  That is all, I was just wondering

19     because I had this, which I didn't see it.

20     Okay.

21 A.  Right.

22 Q.  And at any time did the State's Attorney ever

23     come up to you and inform you or ask for your

87

1      consent to dismiss any of the charges against

2      Norm?

3  A.  They never do.

4  Q.  Okay.  So you are never made aware if a charge

5      is dismissed or what the State's Attorney

6      decides to do with a charge that you bring?

7  A.  No.

8  Q.  Okay.  Officer Ingles, do you recall working on

9      interrogatories in this case where you had to

10     answer a bunch of questions that were sent?

11 A.  Yeah.

12 Q.  Specifically I am just going to show you a

13     document labeled "Answer to Plaintiff's First

14     Set of Interrogatories to Defendant Michael

15     Ingles".  Go to page 4 here, and it is

16     interrogatory number 10.  Just have a -- please

17     review that interrogatory and your answer.

18     MR. KELLY:  Before you answer, Mike, let me see

19     it.

20     THE WITNESS:  I just took a quick glance at it.

21 BY MR. MEYER:

22 Q.  And granted, that interrogatory basically says

23     basically do you know if anyone was hurt during

88

1      that occurrence, correct?

2  A.  Correct.

3  Q.  Your answer was none at this time?

4  A.  Investigation continues.

5  Q.  Do you remember when you answered these?

6  A.  I don't recall when the exact date of it was I

7      answered, I don't know.

8  Q.  Obviously it was asked after the lawsuit was

9      filed, correct?

10 A.  Correct.

11 Q.  On the day of the incident you actually knew

12     Norman was hurt, correct?

13 A.  What do you mean?

14 Q.  Well, the day of the incident, the doctor told

15     you that he had a spiral fracture?

16 A.  I assumed it was in reference to myself or

17     deputies, I guess that is, since we were the

18     ones being sued.

19 Q.  Did you ever ask any of the deputies if any of

20     them were ever injured?

21 A.  Did I ever ask any of them?  No, because I

22     figure they got their own stuff.

23 Q.  Were you ever injured as a result?

02/18/2011

**89**

1  A.  No.
2     MR. KELLY:  We can amend that on the record to
3     include the Plaintiff.  I think I read that the
4     same way he did, if anybody other than the
5     Plaintiff was injured.
6     MR. MEYER:  It just says do you know of any
7     person including yourself who was injured?
8     MR. KELLY:  We can supplement our answer here
9     on the record to include the Plaintiff.
10 BY MR. MEYER:
11 Q.  Since the filing of this lawsuit, have you had
12     any meetings with any supervisors in the
13     Galesburg Police Department?
14 A.  No meetings.
15 Q.  Has anyone ever talked to you or sent you any
16     memos regarding the allegations of the lawsuit?
17 A.  Just between what Mr. Kelly --
18 Q.  Yeah, I don't, nothing that you have had with
19     your attorney.
20 A.  I am just saying Mr. Kelly will send, you know,
21     them information saying, you know, you know,
22     they'll send a packet or something like that or
23     whatever as far as that goes, but we have

**90**

1     never --
2     MR. KELLY:  He doesn't want to know stuff
3     between us.
4     MR. MEYER:  That is privileged.
5     THE WITNESS:  I am just saying, I mean
6     basically no, I haven't had any meetings with
7     command or anything like that, no memos,
8     separate memos or anything like that other than
9     e-mails back and forth on times.  That is it.
10 BY MR. MEYER:
11 Q.  Do you know whether or not anyone within the
12     Galesburg Police Department started any type of
13     internal investigation into Norman's
14     complaints?
15 A.  Not that I am aware of.
16 Q.  Back when you were booking Norman at the
17     Galesburg Police Department, did you ever get
18     upset with him?
19 A.  When I was booking him?
20 Q.  Yes.
21 A.  No.
22 Q.  Were you ever annoyed or frustrated with him at
23     all?

**91**

1  A.  (Indicating).
2  Q.  You've got to, is that a yes or no?
3  A.  No.  Sorry.
4  Q.  When you were booking Norman at the Galesburg
5     Police Department, did you know that that room
6     records audio and video?
7  A.  The booking room?
8  Q.  Yes.
9  A.  I did not know that it recorded or anything
10     like that.
11 Q.  The room that you were in there with Norman
12     prior to going into the Knox County Jail, did
13     you know that room had recording?
14 A.  Yeah, the booking room, yes -- or I mean where
15     our Public Safety Building room is, yes, I did
16     know that, yes.
17 Q.  You know both audio and video, correct?
18 A.  Correct.
19 Q.  And did you know that the Knox County Jail had
20     audio or video recordings?
21 A.  No, I didn't.
22 Q.  You know they had cameras?
23 A.  They had cameras, yeah.

**92**

1  Q.  You didn't know where the cameras were?
2  A.  No.
3  Q.  Did you know whether or not they were in the
4     individual holding cells?
5  A.  I didn't know if they were.  To be honest, I
6     didn't see any of that, you know, but they made
7     several different changes too since I was
8     there, so I was only there for, since, from
9     February to September, so they were still
10     working out the bugs then.
11 Q.  If I were to tell you that Sergeant Morton
12     testified under oath that when you had Norman
13     in the gooseneck, Norman was saying, "All
14     right, I'll stop, I'll stop," and then the pop
15     sound came, would you disagree with his version
16     of what happened?
17 A.  I can't testify as to what Sergeant Morton
18     testified to, to be honest with you.
19 Q.  But you don't recall Norman ever saying
20     anything like that?
21 A.  I don't recall hearing Norman say anything.
22     MR. MEYER:  Okay.  I have nothing further.
23     MR. KELLY:  I have no questions.

02/18/2011

**93**

1   MR. MEYER:  Signature?

2   MR. KELLY:  Reserve.

3

4                   FURTHER DEPONENT SAYETH NOT.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**95**

1   Page____ Line___ Change_____

2   Reason_____

3   Page____ Line___ Change_____

4   Reason_____

5   Page____ Line___ Change_____

6   Reason_____

7   Page____ Line___ Change_____

8   Reason_____

9   Page____ Line___ Change_____

10  Reason_____

11  Page____ Line___ Change_____

12  Reason_____

13  Page____ Line___ Change_____

14  Reason_____

15  Page____ Line___ Change_____

16  Reason_____

17

18

19          _____

            OFFICER MICHAEL A. INGLES

20
    Dated this ___ day of _____, 2011

21
    _____

22  Notary Public

23

**94**

1               **ERRATA SHEET**

2   Oeth v Knox County, et al

3      I hereby verify that the foregoing is a true

4   and accurate transcription of my deposition taken on

5   February 18, 2011, except for those changes noted:

6   Page____ Line___ Change_____

7   Reason_____

8   Page____ Line___ Change_____

9   Reason_____

10  Page____ Line___ Change_____

11  Reason_____

12  Page____ Line___ Change_____

13  Reason_____

14  Page____ Line___ Change_____

15  Reason_____

16  Page____ Line___ Change_____

17  Reason_____

18  Page____ Line___ Change_____

19  Reason_____

20  Page _____Line___ Change_____

21  Reason_____

22  Page____ Line___ Change_____

23  Reason_____

**96**

1   STATE OF ILLINOIS )
                      ) SS.

2   COUNTY OF TAZEWELL )

3

4

5               **C E R T I F I C A T E**

6

7      I, Connie L. Boyle, CSR, a Notary Public duly

8   commissioned and qualified in and for the State of

9   Illinois, DO HEREBY CERTIFY that pursuant to notice,

10  there came before me on the 18th day of February,

11  A.D., 2011, at 4801 North Prospect Road, in the City

12  of Peoria Heights, County of Peoria, and State of

13  Illinois, the following named person to wit:

14         OFFICER MICHAEL A. INGLES

15  who was by me first duly sworn to testify to the

16  truth and nothing but the truth of his knowledge

17  touching and concerning the matters in controversy

18  in this cause and that he was thereupon carefully

19  examined upon his oath and his examination

20  immediately reduced to shorthand by means of

21  stenotype by me.

22     I ALSO CERTIFY that the deposition is a true

23  record of the testimony given by the witness, that

02/18/2011

97

1  the reading and signing of the deposition by said
2  witness were not expressly waived, and that the
3  necessity of calling the court reporter at time of
4  trial for the purpose of authenticating said
5  transcript was waived.
6      I FURTHER CERTIFY that I am neither attorney or
7  counsel for, nor related to or employed by, any of
8  the parties to the action in which this deposition
9  is taken, and further, that I am not a relative or
10 employee of any attorney or counsel employed by the
11 parties hereto, or financially interested in the
12 action.
13     IN WITNESS WHEREOF, I have hereunto set my hand
14 and affixed by notarial seal this 25th day of
15 February A.D., 2011.
16
17
18
19     _____

20         CONNIE L. BOYLE,
         Certified Shorthand Reporter
21
22
23